**STRYKER CORPORATION and Osteonics Corporation, Plaintiffs,**

v.

**INTERMEDICS ORTHOPEDICS, INC. and Marli Medical Supplies, Inc., Defendants.**

No. CV 90–3006 (ADS).

United States District Court, E.D. New York.

July 11, 1995.

Morgan & Finnegan, New York City, for plaintiffs; John A. Diaz, Robert E. Paulson, Christopher A. Hughes, James W. Gould, Michael A. Nicodema, Andrea L. Wayda, of counsel.

Bell, Seltzer, Park & Gibson, Charlotte, NC (Larry C. Jones, Frank B. Wyatt, II, Guy R. Gosnell, of counsel), Fulbright & Jaworski, Houston, TX (James W. Repass, Patricia J. Kerrigan, of counsel), Fulbright & Jaworski, New York City (Ralph Dawson, of counsel), for defendants.

*OPINION*

*FINDINGS OF FACT AND CONCLUSIONS OF LAW*

Table of Contents

INTRODUCTION ...................................................... 761
I. BACKGROUND ..................................................... 762
 1. The 023 Patent and Claims ................................... 762
 2. The APR II and the Parties' Contentions...................... 764
II. AS TO PATENT INFRINGEMENT ................................... 766
 1. Literal Infringement ......................................... 766
 A. The Legal Standard ....................................... 766
 B. The Infringed Claims ..................................... 767
 (1) Limitation (iii):
 "Enabling Flexing" of the Shaft........................... 769
 (a) Claims Construction................................. 769
 (b) Infringement Determination.......................... 772
 (2) Limitation (ii): "Distal Tip Integral With The Distal End of the Stem" ................................................ 776
 (a) Claims Construction................................. 776
 (b) Infringement Determination.......................... 779
 (3) Limitation (v): A Fixation Resistant Surface–Finish.......... 783
 (a) Claims Construction................................. 783
 (b) Infringement Determination.......................... 785
 C. Other Evidence of Infringement: Development of the APR II Distal Sleeve After the February 1988 AAOS Meeting.................. 786

| | | D. | Conclusions and Findings as to Literal Infringement | 791 |
| | 2. | | Infringement Under the Doctrine of Equivalents | 792 |
| | | A. | The Legal Standard | 792 |
| | | B. | The Defendant's Equivalency Contentions | 793 |
| | | C. | Equivalence of the APR II and the 023 Patent | 794 |
| | | D. | Prosecution History Estoppel | 795 |
| | | E. | Conclusion and Findings as to Equivalents | 796 |
| III. | AS TO UNENFORCEABILITY: II. EQUITABLE CONDUCT AND INVALIDITY | | | 797 |
| | 1. | | Inequitable Conduct | 797 |
| | | A. | Applicable Legal Standard | 798 |
| | | B. | Determination of Inequitable Conduct | 800 |
| | | | (1) Materiality of the Whiteside Device | 800 |
| | | | (2) Intent to Deceive | 804 |
| | 2. | | Invalidity | 806 |
| | | A. | Invalidity Under 35 U.S.C. §§ 102 and 103 | 806 |
| | | | (1) Legal Standard | 806 |
| | | | (a) The Hoffman–Daimler Patent | 807 |
| | | | (b) The Lee and Ling Patents | 808 |
| | | B. | Invalidity Under 35 U.S.C. § 112 | 810 |
| | | | (1) The Legal Standard | 810 |
| | | | (2) Definiteness Analysis | 810 |
| | 3. | | Conclusion and Findings as to Unenforceability | 812 |
| IV. | WILLFUL INFRINGEMENT | | | 813 |
| V. | DAMAGES | | | 817 |
| | 1. | | Lost Profits | 818 |
| | | A. | The Legal Standard | 818 |
| | | B. | Evidence Regarding Osteonics's Lost Profits | 819 |
| | | | (1) Panduit Factor One: Demand for the Patented Product | 819 |
| | | | (2) Panduit Factor Two: The Absence of Acceptable Non–Infringing Substitutes | 823 |
| | | | (3) Panduit Factor Three: Osteonics's Manufacturing and Marketing Capacity | 825 |
| | | | (4) Panduit Factor Four: The Amount of Profit Osteonics Would Have Made | 825 |
| | | C. | Conclusions and Findings on Lost Profits | 830 |
| | 2. | | Reasonable Royalty | 832 |
| | 3. | | Prejudgment Interest | 832 |
| | 4. | | Enhancement of Damages and Attorneys' Fees | 833 |
| | | A. | Enhancement of Damage Award | 833 |
| | | B. | Attorneys' Fees | 834 |
| | 5. | | Injunctive Relief | 835 |
| VI. | CONCLUSION | | | 835 |

SPATT, District Judge:

## INTRODUCTION

In years past, a person with an arthritic hip was generally relegated to a wheelchair. The advent of modern medical prosthesis technology now permits such a person to walk and resume a normal life through the use of an artificial socket, ball and neck of the hip joint, known as a hip implant prosthesis or femoral prosthesis. Today, the manufacture and supply of prosthetic devices is a growing and profitable industry. The marketing of such devices is estimated to have generated $2.2 billion dollars in revenue to manufacturers in 1990, and has averaged approximately a 15 percent annual dollar growth since 1988. Approximately one quarter of the orthopedic market involves hip implants.

The present case concerns the alleged infringement of a femoral prosthesis patent. The patent in suit is United States Patent No. 4,888,023 ("the 023 patent"), which is entitled "Femoral Prosthesis with Uncoupled Distal Tip." The 023 patent was filed with the United States Patent Office ("Patent Office") on January 19, 1988 and assigned by its

inventor to the plaintiff Osteonics Corporation ("Osteonics" or "plaintiff"). The Patent Office issued the patent on December 19, 1989.

Among the key features of the 023 patent is a metal distal (lower end) tip adapted for engagement with the prosthesis's stem by means of complementary tapers. The term "distal" means furthest away from the point of attachment. The term "proximal" means nearest the point of attachment. As related to a hip implant or femoral prosthesis and as the terms are used in this opinion, distal means at the lower end of the prosthetic device, and proximal means at the upper end of the device. A diagram of the 023 patent is annexed as Appendix A.

Osteonics is a subsidiary of the Stryker Corporation and is in the business of "researching, developing, designing, manufacturing, marketing and selling hip and knee implants." (Tr. at 368).[1] Since 1988, Osteonics has manufactured and supplied a femoral prosthesis known as the Omniflex, which is the commercial embodiment of the 023 patent. A diagram of the Omniflex is annexed as Appendix B.

The defendant Intermedics Orthopedics, Inc. (the "defendant" or "Intermedics" or "IOI") has, since January 1990, manufactured and supplied to the medical and orthopedic industry a femoral prosthesis known as the APR II. A diagram of the APR II is annexed as Appendix C. Each APR II has a metal distal sleeve which engages with the distal portion of the stem by means of a complementary taper. The successor to the APR II is the APR II–T, which was designed in 1991 and introduced in 1992. The three changes embodied in the APR II–T are (1) a tapered neck to fit the ceramic ball, (2) wrapped porous coating all around the proximal portion of the device, and (3) a multi-sized hollowed stem. The APR II–T retained the tapered stem and the distal sleeve which "serves the same purpose as the sleeve made available with the [APR II]." (Tr. at 762).

Both Osteonics and Intermedics supply a full complement of Omniflex and APR II stem sizes and correspondingly sized distal tips or sleeves to the hospital operating room, so that the surgeon is able to assemble and use the stem and the tip or sleeve when medically appropriate. The complete APR II hip system sells for between $3800 and $4000.

This infringement suit was brought by Stryker and Osteonics against Intermedics and Marli Medical Supplies, Inc. ("Marli"), an Intermedics distributor. Osteonics charges Intermedics with literal and willful infringement of claims 8, 10, and 12 of the 023 patent by reason of its manufacture and sale of the APR II and its successor, the APR II–T. (Unless otherwise indicated, references to both the APR II and APR II–T will be to the "APR II"). Osteonics seeks damages, treble damages, injunctive relief and attorneys' fees pursuant to 35 U.S.C. §§ 284, 285 (1988). The defendants deny the allegations of literal and willful infringement. Intermedics also asserts that the 023 patent is invalid in light of prior art and because its claims are indefinite, and further asserts that the patent is unenforceable due to inequitable conduct by Osteonics.

This case was tried by the Court over a substantial period of time on all the issues, including liability and damages. This Opinion includes the Court's findings of fact and conclusions of law on all the issues of liability and damages. Because the parties raise a large number of separate issues, the Court's findings and conclusions will be integrated and set forth in the discussion of each particular issue.

Although there are two named plaintiffs and two named defendants, the Court will refer to the two plaintiffs as "the plaintiff" or "Osteonics," and to the two defendants as "the defendant" or "Intermedics" or "IOI."

## I. BACKGROUND

### 1. The 023 Patent and Claims

In order to recreate the hip joint, a porous stem-type femoral prosthesis consists of (1)

---

1. References to the trial transcript are cited as "Tr." References to the plaintiff's and defendant's trial exhibits are respectively cited as

"Plaintiff's Exh." and "Defendant's Exh.", and are followed by a number or letters.

an artificial acetabulum consisting of a socket or cup, (2) an artificial ball or head of the femur, and (3) a stem, which at the proximal end contains a neck to be attached to the head, and a wedge-shaped affixation surface containing a porous substance that press fits into the softer cancellous bone at the proximal portion of the resected femur.

The socket of the implant is screwed into the acetabulum of the pelvis. The ball is then fitted into the socket. The ball and socket are joined to the femur through the neck on the stem of the prosthesis. The stem itself is inserted longitudinally into the intermedullary canal of the resected femur. In order to prepare the femur, the surgeon must ream out the canal for a length equal to the stem. The distal portion of the canal is reamed until only the harder cortical bone is left. The proximal portion of the canal is reamed by a broach that allows for some of the softer cancellous bone to remain. When the stem is inserted into the canal, the wedge-shaped affixation surface allows the stem to be affixed to the proximal portion of the femur by a tight press fit, with the prosthesis seated on the femoral calcar. The porous surface on the affixation surface is conducive to ingrowth of the softer cancellous bone onto the proximal end of the prosthesis. The stem may also be cemented into the intermedullary canal.

When a person moves, various forces act on the femur. In a normal hip joint, the load (force) on the femur is transmitted through the ball and socket to the proximal portion of the femur, which carries the brunt of the load. In the case of a stem-type femoral implant, the load on the femur from the joint is transmitted down the metal stem of the implant and is borne by the femur along the entire length of the stem, and not just at the proximal portion of the femur.

Significantly, forces acting on the ball of the prosthesis will tend to cause the prosthesis to swing at the proximal end of the stem, thus causing a bending stress on the stem and creating forces tending to move the distal end of the stem axially (up and down) and transversely (side to side), relative to the femur. This side to side movement of the stem is called "toggling" in the hip implant industry. In addition, and particularly in cases where the stem is cemented to the canal, the stresses acting on the stem tend to concentrate at the distal end of the stem, thus reducing the load stress at the proximal end of the stem. This is called "stress shielding" in the hip implant industry. Stress shielding is undesirable because reducing stress in the proximal end of the stem, where the stress is best accommodated relative to the bone, causes the proximal portion of the femur to atrophy, thereby loosening the affixation of the proximal end of the stem to the femur and requiring replacement of the entire prosthesis. Both toggling and the loosening of the prosthesis resulting from stress shielding cause severe thigh pain to the implant patient.

On January 19, 1988, Robert G. Averill and Robert C. Cohen filed the 023 patent application. The patent specifies that it is an improvement of the stem-type femoral prosthesis, because it contains a distal tip which interlocks with the distal end of the stem by means of complementary tapers. The distal tip is made from a fixation resistant metal alloy, which prevents the tip from affixing to the intermedullary canal. According to Osteonics the 023 patent is a "break-through invention in the field of artificial hips," because it solves the problems of toggling and stress shielding. Toggling is prevented by placing the distal tip within the harder cortical bone of the femur, such that it fits tightly within the reamed canal. In this way, transverse movements of the distal end of the stem, which is locked onto the tip, are precluded. Proximal stress shielding is prevented by maintaining the tip unaffixed to the wall of the canal, thus allowing axial and rotational movement of the stem relative to the femur. Allowing this movement prevents the concentration of stress at the distal end of the stem.

The patent description summarizes the invention as follows:

The present invention provides an improvement in a stem-type femoral prosthesis, which improvement deals with the problem of stress shielding in a simple, yet effective manner and accomplishes several objects and advantages, some of which

may be summarized as follows: Provides control over the distribution of loads applied to the prosthesis so as to enable the transmission of axial and transverse forces to the femur at the most appropriate locations for better load distribution; precludes stress shielding and maintains at proximal portions of the femur those stresses which ordinarily are borne by the proximal portions of the femur; ... permits the use of a more flexible stem, and a stem which transmits axial loads to the proximal femur while transferring bending movements to more distal portions of the femur; enables greater versatility in allowing the selection of a prosthesis of appropriate size from an offered range of sizes for increased ease and accuracy of fitting; . . . .

The above objects and advantages ... are attained by the present invention [through] the improvement comprising: a distal tip at the distal end of the stem, the distal tip being spaced axially downwardly from the affixation surface a distance sufficient to enable seating of the distal tip within harder portions of the bone in the wall of the femur when the affixation surface is properly seated in the prepared femur and having an external peripheral surface for engaging the harder portions of bone to confine the distal tip against transverse movements within the passage upon completion of the implantation, a fixation-resistant surface finish on the external peripheral surface for maintaining the distal tip unaffixed to the femur and moveable axially relative to the wall of the femur to permit axial displacement of the distal tip and the distal end in response to forces applied to the prosthesis during use of the prosthesis.

Plaintiff's Exh. 2, at Col. 1, line 65 to Col. 2, line 50.[2]

The 023 patent lists 14 claims of exclusivity. The relevant claims which are at issue in this suit will be described and discussed below.

Finally, the patent specifies that having complementary tapers between the stem and the distal tip allows for removal and replacement of the distal tip with one of another sized diameter. According to the patent specification, the interchangeability of distal tips allows a wide variety of distal tip diameter sizes to be fitted onto one stem. This interchangeability is called "modularity" in the industry. One of the several benefits of modularity is that the number of stems necessary to accommodate the different sized tips is reduced.

The Omniflex is the preferred embodiment of the 023 patent. It was introduced in 1988, and apparently was a financial success. During the period from 1988 through April 30, 1993, Osteonics sold almost 29,000 of the Omniflex hip implant devices amounting to a sales volume in excess of one hundred million dollars.

The parties agree to the following uncontested facts concerning the Omniflex:

1. The Omniflex hip prosthesis is manufactured and sold by the plaintiff Osteonics and is a preferred commercial embodiment of the prosthetic hip implant device described in the 023 patent and embraced by at least representative claims 8, 10 and 12 of the 023 patent.

2. As of May 31, 1992, Osteonics had sold 24,640 Omniflex Hip System hip prostheses embodying the 023 patent claims.

## 2. The APR II and the Parties' Contentions

During the time period that the Omniflex was being introduced, the defendant Intermedics was having problems with its own hip implant, called the APR I. In 1988, the defendant marketed the APR I without a distal tip component. This device apparently caused a 24 percent incident of hip pain and, with its sales fading fast, Intermedics would soon find itself out of the hip implant business. Intermedics therefore embarked on the development of the APR II. As ulti-

---

**2.** References to the 023 patent are to the column and line(s) within the column. From this point on, reference to the patent shall omit the words "col." and "line", and shall be cited as "Patent at" followed by the column number, a colon, and the line numbers. Thus, the citation which this footnote accompanies is "Patent at 1:65–2:50."

mately developed, the APR II included a distal sleeve component.

The parties agree to the following uncontested facts concerning the APR II:

1. Each of the APR II and APR II–T hip prostheses includes a femoral stem-type component for implantation in the resected proximal end of a femur. Each of the APR II and APR II–T hip prostheses includes a stem component to be received within the prepared femur (collectively referred to hereinafter as the "APR II and APR II–T stem[s]").

2. Each APR II and APR II–T stem has a proximal end.

3. Each APR II and APR II–T stem has an affixation surface adjacent to the proximal end for enabling the stem to be affixed in place when seated properly within the prepared femur.

4. Each APR II and APR II–T stem has a distal end spaced axially downwardly from the proximal end for reception within a passage created in the wall of the prepared femur.

5. At all relevant times, Intermedics has manufactured +2mm and +4mm modular distal sleeve components (collectively referred to as "APR II modular distal sleeve[s]", or "distal sleeve[s]") for optional use during surgery with each size APR II and APR II–T titanium stem.

6. Each APR II modular distal sleeve component is made from a titanium metal alloy.

7. Each APR II modular distal sleeve is formed with a Morse-type taper on the internal bore thereof which is complementary in design to a Morse-type taper formed on the correspondingly sized APR II or APR II–T titanium stem. The complementary Morse-type tapers formed on the APR II and APR II–T stem/modular distal sleeve components are specially adapted to lockingly engage the modular distal sleeve onto the stem.

8. Each APR II modular distal sleeve component is adapted to be secured to the APR II or APR II–T stem such that, if the sleeve is used, all movements of the stem during use in the body result in corresponding movements of the modular distal sleeve.

9. Each APR II modular distal sleeve has an external peripheral surface so that, if the sleeve is used, it engages the harder cortical bone portions of the femoral canal and confines the distal sleeve against transverse movements within the canal upon completion of the implantation.

10. Each APR II modular distal sleeve is cylindrical.

The plaintiff contends that the APR II infringes the 023 patent. According to the plaintiff, in early February 1988 Intermedics officials attended a conference of the American Association of Orthopedic Surgeons ("AAOS") in Atlanta, Georgia. At this conference, they obtained a brochure describing the Omniflex. Two weeks later, the plaintiff contends the defendant began designing an APR II distal sleeve modeled on the Omniflex distal tip. Prior to the conference, the plaintiff claims the APR II did not include a distal sleeve component and Intermedics did not have any plan for developing such a sleeve. The February 1988 AAOS meeting is discussed in more detail later in this Opinion.

Osteonics proceeds with its claim of patent infringement on two theories. First, it contends that there was a literal infringement in that the APR II infringes claims 8, 10 and 12 of the 023 patent. Second, the plaintiff also contends that the APR II infringes claims 8, 10 and 12 of the 023 patent under the doctrine of equivalents.

On the other hand, the defendant contends that it devised and created the design of APR II by the ideas of its own personnel and without any reference to the Omniflex. Further, according to the defendant, the APR II functions in a manner "contrary to the design philosophy embodied in the Omniflex implant." According to the defendant, the Omniflex was designed to promote flexibility of the stem, while the APR II was designed to eliminate movement in the femur and promote "solid, stable proximal (upper) fit." Moreover, the defendant contends that its distal sleeve has been used in less than half of the cases in which the APR II was implanted, and that the percentage of cases in

which the distal sleeve was actually implanted is as low as 5 to 20 percent with most surgeons.

In addition, as a defense, the defendant asserts that prior to the plaintiff's patent, a Dr. Leo Whiteside designed a hip implant with a plastic distal sleeve, which was intended to prevent the prosthesis from moving within the femoral canal. The defendant asserts that because of the non-disclosure of the "prior art" Whiteside distal sleeve to the Patent Office, the plaintiff engaged in inequitable conduct and its patent is unenforceable. With regard to this defense of inequitable conduct, the plaintiff contends that the Whiteside device is not "prior art" to the 023 patent in suit.

The defendant further asserts as defenses that the 023 patent is invalid, because (1) certain of its claims are vague and indefinite, and (2) various prior art render the patent obvious. The plaintiff denies that the patent is invalid on these grounds.

## II. AS TO PATENT INFRINGEMENT

### 1. Literal Infringement

#### A. *The Legal Standard*

Section 271(a) of the Patent Statute, 35 U.S.C. § 271(a) (1988 & Supp. IV 1992), provides in relevant part that "whoever without authority makes, uses or sells any patented invention, within the United States during the term of the patent therefor, infringes the patent." In addition, section 271(b) provides that "[w]hoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b). *See also Joy Technologies, Inc. v. Flakt, Inc.,* 6 F.3d 770, 774 (Fed.Cir.1993); *Moleculon Research Corp. v. CBS, Inc.,* 793 F.2d 1261, 1272 (Fed.Cir. 1986), *cert. denied,* 479 U.S. 1030, 107 S.Ct. 875, 93 L.Ed.2d 829 (1987).

In a patent infringement case the burden of proof is on the plaintiff to prove the defendant's infringement by a preponderance of the evidence. *Conroy v. Reebok Int'l, Ltd.,* 14 F.3d 1570, 1573 (Fed.Cir.1994); *Rite–Hite Corp. v. Kelley Co., Inc.,* 819 F.2d 1120, 1123 (Fed.Cir.1987).

The determination of infringement is a two-step process. The first step involves determining the meaning and scope of the patent claims asserted to be infringed. The second step entails comparing the properly construed claims to the product accused of infringement. *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 976 (Fed.Cir. 1995) (in banc) (citing *Read Corp. v. Portec, Inc.,* 970 F.2d 816, 821 (Fed.Cir.1992)). The first step, referred to as claim construction or interpretation, is a question of law. *Markman,* 52 F.3d at 976; *Electro Medical Systems, S.A., v. Cooper Life Sciences, Inc.,* 34 F.3d 1048, 1053 (Fed.Cir.1994). The second step, application of the construed claim to the accused product, is a question of fact. *Id. Read,* 970 F.2d at 822.

The United States Court of Appeals for the Federal Circuit has analogized the interpretation of patent claims to statutory interpretation. *Markman,* 52 F.3d at 987. To determine the meaning of the patent claims, the Court looks to three sources: the claims, the patent specification, and the patent's prosecution history. *Id.* at 979 (citing cases); *Electro Medical,* 34 F.3d at 1054. Moreover, expert testimony, including evidence of how those skilled in the art would interpret the claims, may also be used to assist the court in coming to a correct conclusion as to the true meaning of the language claims. *Markman,* 52 F.3d at 979–80 (internal quotations and numerous citations omitted).

According to the Federal Circuit, the numerically paragraphed claims of the patent "provide the concise formal definition of the invention," and "particularly point out and distinctly claim" the subject matter which the applicant regards as his or her invention. It is to "these wordings that one must look to determine whether there has been infringement." *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.,* 868 F.2d 1251, 1258 (Fed. Cir.1989) (quoting *Autogiro Co. of America v. United States,* 384 F.2d 391, 395–96, 181 Ct.Cl. 55 (1967)).

Further, the wordings of a claim "describe and point out the invention by a series of limiting words or phrases," which are called limitations. *Corning Glass,* 868 F.2d

at 1258. In construing the claim, "all the limitations of a claim must be considered meaningful." *Unique Concepts, Inc. v. Brown*, 939 F.2d 1558, 1562 (Fed.Cir.1991); *accord Texas Instruments Inc. v. United States Int'l Trade Comm'n*, 988 F.2d 1165, 1171 (Fed.Cir.1993) (claim cannot be construed so as to render the disputed claim language mere surplusage).

■ Claims must also be read in view of the specification of which they are a part. "The specification contains a written description of the invention that must enable one of ordinary skill in the art to make and use the invention." *Markman*, 52 F.3d at 979. However, claims are not to be interpreted by adding limitations appearing only in the specification. Thus, "although the specification may well indicate that certain embodiments are preferred, particular embodiments appearing in the specification will not be read into the claims when the claim language is broader than such embodiments." *Electro Medical*, 34 F.3d at 1054.

■ If in evidence, the prosecution history of the patent should also be considered because it is the "undisputed public record" of the patent proceedings, and confirms the construction of the patent by the patentee. *Markman*, 52 F.3d at 980. The prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution. *Southwall Technologies, Inc. v. Cardinal IG Co.*, 34 U.S.P.Q.2d 1673, 1995 WL 274383 at *4 (Fed.Cir. May 10, 1995) (citing cases).

■ In addition, extrinsic evidence may be used to help the court understand the claims language. Such evidence consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises. This evidence is helpful to explain scientific principles, the meaning of technical terms, and terms of art that appear in the patent and prosecution history. The extrinsic evidence may be used only for the court's understanding of the patent, and not for the purpose of varying or contradicting the terms of the claim. *Markman*, 52 F.3d at 981 (citing *U.S. Indus. Chems. Inc. v. Car-*

*bide & Carbon Chems. Corp.*, 315 U.S. 668, 678, 62 S.Ct. 839, 844, 86 L.Ed. 1105 (1942)). It should be noted that, by using such extrinsic evidence to assist in its construction of the patent claims, the court is not crediting certain evidence over other evidence or making factual evidentiary findings. *Markman*, 52 F.3d at 981.

■ Once the claims have been properly construed, they must be applied to the accused product to determine infringement. *Conroy*, 14 F.3d at 1573. As stated in the seminal patent case of *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*:

> In determining whether an accused device or composition infringes a valid patent, resort must be had in the first instance to the words of the claim. If accused matter falls clearly within the claim, infringement is made out and that is the end of it.

*Graver Tank*, 339 U.S. 605, 607, 70 S.Ct. 854, 855, 94 L.Ed. 1097 (1950).

■ In conducting this second step of the infringement inquiry, the physical similarities between the accused device and the patentee's commercial embodiment of a patented invention are not to be compared. Rather, the proper comparison is between the patent *claims* and the accused device. *International Visual Corp. v. Crown Metal Mfg. Co.*, 991 F.2d 768, 771–72 (Fed.Cir.1993); *Datascope Corp. v. SMEC, Inc.*, 879 F.2d 820, 824 (Fed. Cir.1989) ("the district court lost sight of this court's repeated caution that it is *claims*, not commercial embodiments, that are infringed.") *cert. denied*, 493 U.S. 1024, 110 S.Ct. 729, 107 L.Ed.2d 747 (1990). As explained by the Federal Circuit, in determining infringement, "the words of the claim must first be interpreted, and, as properly interpreted, they must be 'read on' the accused structure to determine whether each of the limitations recited in the claim is present in the accused structure." *Corning Glass*, 868 F.2d at 1258 (citations omitted).

### B. *The Infringed Claims*

The plaintiff contends that the APR II literally infringes on claims 8, 10 and 12 of the 023 patent. Claim 8 incorporates claims 1, 4 and 5, and is delineated as follows:

*Claim 8:*

1.(i) In a stem-type femoral prosthesis for implantation in a resected proximal end of a femur, the prosthesis including a stem to be received within the prepared femur, the stem having a proximal end, an affixation surface adjacent the proximal end for enabling the stem to be affixed in place when seated properly within the prepared femur, and a distal end spaced axially downwardly from the proximal end for reception within a passage created in the wall of the prepared femur, the improvement comprising:

(ii) a distal tip integral with the distal end of the stem, the distal tip being spaced axially downwardly from the affixation surface a distance sufficient to enable seating of the distal tip within harder portions of the bone in the wall of the femur when the affixation surface is properly seated in the prepared femur,

(iii) the stem including a shaft portion located between the affixation surface and the distal tip, the shaft portion having a diameter smaller than the corresponding diameter of the distal tip for enabling flexing in the shaft portion,

(iv) and the distal tip having an external peripheral surface for engaging said harder portions of bone to confine the distal tip against transverse movements within the passage upon completion of the implantation,

(v) and a fixation-resistant surface-finish on the external peripheral surface for maintaining the distal tip unaffixed to the femur and moveable axially relative to the wall of the femur to permit axial displacement of the distal tip and the distal end in response to forces applied to the prosthesis during use of the prosthesis.

4. The improvement of claim 1 including securing means for securing the distal tip to the stem for selective removal and replacement of the distal tip.

5. The improvement of claim 4 wherein the securing means includes a securing mechanism responsive to relative axial movement between the stem and the distal tip for securing and releasing the distal tip and the stem.

8. The improvement of claim 5 wherein the securing mechanism includes an internal bore in the distal tip and complementary tapered surfaces on the stem and on the internal bore of the distal tip.

Claim 10 includes all of the elements of claims 8 and 9, and is delineated as follows:

*Claim 10:*

Same elements as claim 8.

9. The improvement of claim 8 wherein the external peripheral surface of the distal tip includes means in the form of an axial length long enough to provide an area of contact between the distal tip and the wall of the femur, when the stem is seated properly in the passage for maintaining a relatively low level of stress on the wall of the femur at the location of the distal tip in response to forces applied to the prosthesis which result in transverse forces at the distal tip.

10. The improvement of claim 9 wherein the external peripheral surface is cylindrical such that the distal tip is rotatable about the central axis thereof relative to the wall of the femur.

Claim 12 includes the elements of claims 1 and 11, and is delineated as follows:

*Claim 12:*

All the elements of claim 1.

11. The improvement of claim 1 wherein the fixation-resistant finish is a smooth finish on the external peripheral surface of the distal tip.

12. The improvement of claim 11 wherein the distal tip is constructed of a metal alloy and the fixation-resistant finish comprises a polished surface.

The defendant contends that the APR II does not infringe claims 8, 10 and 12. According to the defendant, these claims contain the following limitations of claim 1: (1) limitation (iii): "the stem including a shaft portion ... having a diameter smaller than the corresponding diameter of the distal tip for enabling flexing in the shaft portion."; (2) limitation (ii): "a distal tip integral with the distal end of the stem"; and (3) limitation (v): "a fixation-resistant surface-finish on the external peripheral surface [of the distal tip]." Because each of these limitations is contained

in independent claim 1, on which claims 8, 10 and 12 are dependant, Intermedics contends that the APR II does not infringe these claims.

The Court will construe the claim limitations, and review each of the contentions with respect to the claim alleged to be infringed.

### (1) Limitation (iii): "Enabling Flexing" of the Shaft

#### (a) Claims Construction

##### (i) Patent Language and Specification

■■■ Limitation (iii) of claim 1 states that the 023 patent improvement consists of the stem shaft portion located between the affixation surface and the distal tip "having a diameter smaller than the corresponding diameter of the distal tip for enabling flexing in the shaft portion." Patent at 7:3–7.

Although the term "enabling flexing" is not defined in the patent specification, understanding the problems the patent sought to address and a reading of the patent specification enables the Court to interpret the meaning of the term.

In describing the problems which led to the invention, the patent states in its "Background of the Invention" that certain components of the forces exerted upon the prosthesis during use are transferred to distal portions of the stem, rather than being accommodated by the proximal portion of the prosthesis. This results in concentration of stresses at non-proximal portions of the femur and a corresponding reduction in stresses at the proximal portion of the femur, a condition described above as stress shielding. Moreover, forces on the ball of the prosthesis will tend to swing the prosthesis about the proximal end of the stem, "thereby exerting bending stresses on the stem and establishing forces tending to move the distal end of the stem" in a transverse direction relative to the femur, a condition described above as toggling, and axially relative to the femur. Patent at 1:31–36.

The patent specification explains that the invention's distal tip is essentially locked onto the distal end of the stem by a system of complementary tapers, so that movement by the distal end of the stem will result in a corresponding movement by the distal tip. By using a distal tip that is the same diameter as the reamed passage inside the femur, the distal tip engages or presses against the harder portion of cortical wall inside the femur. By so pressing against the wall, the tip prevents transverse movements of the stem within the reamed passage, i.e., prevents toggling, while at the same time allowing the transverse force at the distal end to be transmitted to the femur. Significantly, by creating a cylindrically shaped distal tip with a fixation-resistant surface that prevents the tip from affixing to the femur, the distal tip prevents stress shielding by (1) allowing the bending movements of the stem to displace the distal tip, and thus the distal end of the stem, axially upwards, (2) allowing the bending forces to displace the distal tip axially downward in certain cases, and (3) allowing the tip to rotate about its central axis in response to torsional forces. Patent at 4:4–44.

Moreover, in order to reduce the stress in the area of contact of the distal tip's surface and the cortical bone of the femur, the external surface of the distal tip must be of sufficient length to maintain a relatively low stress in that area. However, the length of the surface of the distal tip must also be short enough "to preserve flexibility in the shaft of the stem." As described in the specification:

> Flexibility in the shaft enables the stem to respond in the manner indicated [bending, and moving axially upward] so that the combination of the prosthesis and the femur can manage the forces to be applied to the prosthesis. It is desirable that the shaft have sufficient flexibility to preclude excessive stiffening of the femur by the prosthesis along the implant site. In the preferred configuration, the diameter of the shaft of the stem above the distal tip is made smaller than the diameter of the external peripheral surface of the distal tip itself so as to render the shaft flexible, while still providing a contact area between the distal tip and the wall of the femur great enough to maintain relatively low contact stresses.

Patent at 5:44–57 (emphasis supplied).

Thus, in the Court's view the specification explains that shaft flexing is the ability of the

shaft to bend in response to forces transmitted to the stem from loads applied to the femur, resulting in a corresponding axial movement of the distal end of the stem relative to the femur. Significantly, the specification also explains that the patent "enables flexing" by requiring the diameter of the stem shaft above the distal tip to be smaller than the diameter of the distal tip itself. By enabling such flexing, the proximal portion of the femur is kept rejuvenated and alive.

### (ii) The Patent's Prosecution History

The patent's prosecution history (Plaintiff's Exh. 568; Defendant's Exh. AKR) corroborates this interpretation of the term "enabling flexing" found in the third limitation of claim 1. The language of the third limitation was found in claim 14 of initial disclosure of the patent filed with the Patent Office on January 19, 1988. The initial patent disclosure described the bending of the shaft and corresponding axial movement of the distal tip. (Plaintiff's Exh. 568 at 8–10, 24).

After reviewing the disclosure, the Patent Examiner rejected claims 1 and 14, along with other claims, in a letter dated July 14, 1988. The grounds for the rejection of the relevant claims were that claim 1 was anticipated by the Lord patent, and claims 1 and 14 were unpatentable over the Witzel and Freeman patents. (Plaintiff's Exh. 568 at 33, 35).

The Patent Examiner did not discuss the Lord patent. In discussing the Witzel patent, the Patent Examiner concluded that the Witzel device performed the same function as the 023 patent, because the stem of the Witzel patent moved axially within a distal tip:

> Wherein Witzel's tip (25 resin) moves axially within the tip in response to axial and bending loads applicant's device, as claimed, has a tip (metal) fixed to the stem and the stem moves axially in the medullary canal in response to axial and bending loads. It is noted that both devices perform the same function: they both transfer and distribute stresses at the tip to the calcar bone ... by permitting the stem of the prosthesis to move axially with respect to the bone thereby transferring and distributing bending stresses from the offset

loading on the hip socket ball to the calcar bone through the tip.

(Plaintiff's Exh. 568 at 35).

With regard to the Freeman patent, the Examiner concluded that patent also performs the same function as the 023 patent:

> Freeman discloses a typical stem-type femoral prosthesis made of metal with a substantially circular stem. End tip fits onto the tapered end of the stem with a matching taper surface.... It is also clear ... that [the] stem is narrower (at least in portions) than the tip.... It is presumed that the taper surfaces of the tip and stem lock the two together.... It is also noted that Freeman also, as Witzel, uses the tip for stress distribution of the forces at the distal end of the stem due to the loading of the ball.

(Plaintiff's Exh. 568 at 37).

In response to the Patent Examiner's rejection, the 023 applicant responded by, among other things, amending claim 1 in the initial patent disclosure to include the language of limitation (iii) of the present claim 1. The applicant also distinguished the 023 patent from the Lord, Witzel and Freeman patents, based on stem shaft flexibility.

In distinguishing the 023 patent from the Lord patent, the applicant indicated that the Lord device failed to enable flexibility in the stem shaft, because the diameter of the Lord stem was greater than or equal to the diameter of the distal tip:

> [W]hatever the function of the Lord distal tip, the distal tip disclosed in Lord has a diameter which is the same as, or less than, the diameter of the remainder of the femoral stem, and no part of the stem has a diameter less than any diameter of the distal tip. *Accordingly, the reference does not contemplate flexing of the stem and axial movement of the distal tip in the medullary canal in response to loads placed on the implant during service.* The subject matter of the present claims includes structures which enables the femoral stem to flex in response to loads placed on the implant during service, and provides an uncoupled distal tip which is displaced axially within the medullary ca-

nal, relative to the bone of the femur, as the femoral stem is flexed, to accommodate the flexing without deleterious effects. Thus, all of the present claims set forth that the femoral stem includes a shaft portion with a diameter smaller than the corresponding diameter of the distal tip *for enabling the aforesaid flexing of the shaft portion and axial displacement of the distal tip.*

(Plaintiff's Exh. 568 at 49–50) (emphasis supplied).

Similarly, in distinguishing the Witzel patent the applicant indicated that the distal sleeve in the Witzel device was fixed to the canal, and thereby did not provide any axial displacement of the sleeve. This results in relatively higher stresses at the distal end of the Witzel device:

> In Witzel, a small sleeve of synthetic resin material is first secured in the medullary canal, and then the shaft of the femoral stem is inserted into the sleeve. The shaft can move relative to the sleeve, but there is no displacement of the sleeve relative to the bone of the femur during service. In the construction of the present claims, the distal tip is affixed to the distal end of the stem ... and flexing of the shaft ... during service is accommodated by displacement of the distal tip relative to the surrounding bone of the femur. The difference in structure yields several advantages. Among those advantages is the distribution of stresses during service.... Thus, in the Witzel construction, the articulating surfaces between the stem and the sleeve are of limited area, resulting in higher stresses[.]

(Plaintiff's Exh. 568 at 50–51).

With regard to the Freeman patent, the applicant explained that the Freeman device was not similar to the 023 patent, because it used a distal tip affixed to the bone that acted as a "stop" to centralize the stem shaft, and which was not intended to move during use of the stem. (Plaintiff's Exh. 568 at 52).

These claims were ultimately accepted by the Patent Office and the 023 patent was issued.

Thus a review of the patent's prosecution history corroborates that the term "enabling flexing" is construed as allowing the stem shaft of the prosthesis to flex and move axially upwards, by the use of a distal tip secured to the distal end of the stem which (i) is of a larger diameter than the stem shaft, and (ii) is not affixed to the bone.

### (iii) *Evidence from Extrinsic Sources*

The scientific principles of shaft flexing were also explained by DR. ALBERT H. BURSTEIN, who is a biomechanical engineer and expert in the field of hip implant devices. Dr. Burstein has "fabricated over 3,000 total joint implants" of which 25 percent were hip implants. Dr. Burstein is a person considered skilled in the art of the subject matter of the 023 patent during the relevant time period involved in this law suit.

During direct examination concerning the 023 patent teachings as compared to the APR II, he explained that the flexing movement of the shaft—which is only on the order of a thousandth of an inch, i.e., less than a hair's breadth—follows well established biomechanical principles:

> A Now the way you prevent bending loads from being transmitted distally is to make the stem flexible. Then if it deforms a little bit it doesn't transmit much bending load. The stiffer the stem, the more bending load it can transmit when the bone deforms.
>
> So the patent teaches that the way you prevent the transmission of bending loads is to make a portion of the stem of diameter smaller than the sleeve so that it is flexible, so that you have enabled flexing of that portion of the stem that's above the sleeve.
>
> Now when you load it, this portion flexes more freely than if it would have if it were a constant big diameter and transmit proportionately less bending load down here on the bone. It transmits more bending load up on the proximal area, it transmits more, it transmits more proximally. That's a well-known principle in biomechanics and taught by the invention and it shows you how to practice that invention by reducing this diameter.

Q What does the patent teach with respect to the surface characteristics of the sleeve or the tip?

A The patent teaches in order for this to work it must be free to move up and down in the bone in accordance with how much the prosthesis normally wants to move. That is, *under load this prosthesis will move on the order of a thousandth of an inch or two, and it must be free to do so,* and in order to do so, you cannot allow the distal end sleeve or tip to become fixed to the bone. If it becomes fixed to the bone it transects the bone. So by having an affixation resisting surface, that will not allow the bone to grow into or onto the surface, it becomes free to move up and down[.]

. . . . .

Q Dr. Burstein, would you look at Column 5, lines 34–44, and tell the Court in your own words what that means or what that teaching is?

. . . . .

A What the patent is ... teaching ... is it is telling the practitioner of the art [of] how long the sleeve can be made and still function according to this patent. It is saying the sleeve or tip has to be made long enough, that is, it must have some minimum length, so that when it is in the body and you put the load on the prosthesis [the tip] pushes against the side of the bone.... The tip should not create a stress condition on the femur that the femur cannot accept. In plain language it shouldn't push to hard.

The way you control it is to make the tip long enough so it has enough conduct [sic contact] area on the surface so it shouldn't push too hard[.]

[The patent] also says there's another limit. The longer you make it, the less stem there is left over to produce the flexibility you want. So don't make it so long as to not leave enough stem left over so that you have flexibility, and it tells you essentially the longer you make it, the more reduced the flexibility will be in the leftover portion of the system.

(Tr. at 131–135) (emphasis supplied). Dr. Burstein's elucidation of flexibility is consistent with the Court's interpretation of the patent limitation.

#### (b) *Infringement Determination*

■ The defendant makes a sophisticated argument that the claim limitation language at issue requires a stem shaft of lesser diameter than the distal tip *for the purpose of* enabling flexing. According to the defendant, any flexing of the stem shaft that is the natural, inherent result of a smaller diameter shaft relative to the tip is not excluded by the claim. Thus, according to Intermedics, "it would be unfair to extend the patent to cover products that do not have a reduced shaft diameter that exists *for the purpose of enabling flexing.*" Defendant's Post–Trial Brief at 3. Indeed, Intermedics goes so far as to contend that the language of the claim limitation probably requires that the stem must be significantly narrower over a substantial portion of the shaft length than the diameter of the distal tip.

Based on its interpretation of the claim limitation language, the defendant contends that the APR II does not infringe the first claim of the 023 patent, because the stem geometry of the APR II relative to the distal sleeve does not *purposefully* enable flexing of the stem. According to the defendant, flexibility was not a design criteria of the APR II. Rather, the inventor incorporated the optional distal sleeve to achieve rigid cortical fit and fill against the cortical bone in the diaphyseal (shaft section) area of the femur for patients with a certain bone geometry. Moreover, Intermedics contends that the purpose of having exposed stem shaft above the distal sleeve in the APR II is to prevent impingement by a full-length sleeve covering the entire shaft on the anterior cortical portion of the femur. Any flexing of the APR II stem shaft due to its having a smaller diameter than the distal sleeve is, according to the defendant, the result of natural, inherent physical principles and not intentional in the design of the APR II stem and distal sleeve.

The Court disagrees with the defendant's contentions. To begin with, neither the claims language nor the specification re-

quires that the stem be significantly narrower over a substantial portion of the shaft length than the diameter of the distal tip. This is an impermissible external limitation grafted onto the claim's language. *See, e.g., Electro Medical,* 34 F.3d at 1054; *E.I. duPont de Nemours & Co. v. Phillips Petroleum Co.,* 849 F.2d 1430, 1433 (Fed.Cir.), *cert. denied,* 488 U.S. 986, 109 S.Ct. 542, 102 L.Ed.2d 572 (1988).

More importantly, the Court is not persuaded by Intermedics's contention that the APR II stem shaft flexing is the result of inherent forces as opposed to purposeful design. Notwithstanding the testimony of DR. LAWRENCE DORR, the chief designer of the APR II prosthesis and a major witness on behalf of Intermedics, and other witnesses on behalf of Intermedics, the record, including admissions and the documentary evidence, shows—and the Court so finds—that the defendant's contentions concerning shaft flexing are belied by the defendant's own admissions that the APR II distal sleeve was intended to enable flexibility in the stem shaft above the sleeve, as well as to add bulk or fill to the canal.

In a document prepared by Intermedics entitled "The APR II System—Developed by Larry Dorr, M.D.—Manufactured by Intermedics Orthopedics, Inc.", Dr. Dorr states:

> This is Dr. Larry Dorr. I would like to discuss with you the design rationale of the APR II Hip System.
>
> . . . . .
>
> What we can try to achieve, is the best relationship we can get between the stem and the bone *with the least stiff stem possible in the canal to give the bone it's best chance to be able to respond optimally when the stem and the bone have to move together.* That is to say, we would like to decrease the differential deflection that occurs between stem and the bone when load is applied to the hip through the stem. *By using a sleeve, we allow some increased flexibility in the stem which will improve this relationship.*

(Plaintiff's Exh. 210 at 13) (emphasis supplied).

In a videotape presentation with regard to the APR II, Dr. Dorr states:

> DORR: Now the broach with the sleeve attached there and there's a screw mechanism that screws on the sleeve here so it cannot disengage in the canal and with the sleeve you can see the difference in the regard to the amount of substrate metal that would be involved if we had to go to an implant that was all that size. *So that we have improved the flexibility of the implant also by using the sleeve* and only having to use this much bulk for the remainder of the implant.

(Plaintiff's Exh. 117 at 13) (emphasis supplied).

Testimony from Intermedics company officials reveals that the reason for designing the APR II was the commercial failure of the APR I, in part because it caused thigh pain resulting from toggling. The development of the APR II was, thus, also geared towards preventing toggling.

NICHOLAS CINDRICH, the President of Intermedics, testified that: "I don't read patents," and that in 1989 "APR I sales were fading fast," and Intermedics required a new hip system:

> Q Prior to leaving IOI, did you ever read the 023 patent?
>
> A Huh-uh, I don't read patents.
>
> Q At the time that IOI began its commercial launch of the APR II, was the APR I still on the market?
>
> A *Yes, whose sales were fading fast.*
>
> Q Was it your understanding that the APR II product with the distal sleeve component was important to IOI from the standpoint of rejuvenating the sales that the PAR (sic APR) product was losing?
>
> A *For all practical purposes, IOI was finding itself out of the hip business with the APR I. We had to get back into the hip business and I knew that it required a new hip system, and we just happened to call it the APR II.*
>
> . . . . .
>
> Q And why was [the APR II] better?
>
> A It was better because the APR I was a failed product. It did not perform satisfac-

torily. It was recognized by IOI through this testimony as not performing satisfactorily, *and the APR II, which used the distal sleeve as reported in this testimony, did perform satisfactorily and was the product that IOI used to get back into the hip business.*

(Tr. at 285–286) (emphasis supplied).

WARLONEX JOSE BELEN, the Intermedics Director of Marketing, testified in a deposition as follows:

Q Prior to the use of a distal sleeve component for the APR II, what was the alternative for preventing the toggling problem in connection with a hip prosthesis stem?

A We didn't have one.

(Plaintiff's Exh. 759, Deposition Transcript at 79). Testifying at the trial, Belen agreed that toggling and thigh pain were problems with the APR I, and that the APR II was designed to prevent toggling at the distal end of the stem:

Q Now, during this entire design process, coming to the APR II Hip System, as part of your review and case studies that you talked about, you also became aware that the APR I system had an extremely high occurrence of thigh pain; is that correct?

A That's correct.

. . . . .

Q And one of the objectives in designing the APR II was to stop the thigh pain; is that correct?

A Yes.

. . . . .

Q And did you have an understanding at the time you were involved in the design of APR II that toggling motion at the distal end of the stem may have contributed to thigh pain?

A That's correct. That was my hypothesis.

Q And, the APR II prosthesis, wasn't that designed so as to prevent toggling of the distal end of the stem?

A Yes.

Q And isn't it true that a design feature of the option of a distal sling (sic sleeve) were designed to put on the distal stem the

prevented (sic) the transverse motion or toggling to occur?

A Yes.

Q And prior to this use of a distal sleeve for the APR II, isn't it true that IOI had no alternative product for preventing the toggling problem in connection with the distal end of a hip prosthesis?

A True.

Q And isn't it true prior to the use of the distal sleeve on the APR II device IOI did not have a practical alternative for solving this toggling problem?

A I will say true.

(Tr. at 1018–1020). Belen also testified that an additional product feature of the APR II was to "reduce the stiffness at the distal end of the stem." (Tr. at 997).

Other documents prepared by Intermedics corroborate that the distal sleeve is designed to permit some flexibility. For example, in an Intermedics document called "An Introduction to the APR II Hip System," BRIAN OLIND, the Product Manager for the APR II Hip System, discussed the APR II with RONNIE BURCHETT, the group product manager for IOI Hip Systems:

BRIAN OLIND: Well, how does the APR II system address stem/bone ratio?

RON BURCHETT: Stem/bone ratio is addressed by allowing the distal end of the prothesis to be adjusted in diameter with the sleeves. By adding a 2mm or 4mm sleeve you can adjust the distal diameter.... *But this stem is not as stiff as a 19mm stem because it still has the 15mm core diameter.*

(Plaintiff's Exh. 219 at 3) (emphasis supplied).

Burchett also discussed the flexibility of the APR II in his deposition:

Q Based on that example is it fair to say that the use of the APR II distal sleeve allows IOI to achieve better distal fill, yet, at the same time, use a smaller diameter and, thus, more flexible stem than it otherwise would be able to use to achieve that same fill without a sleeve.

A The design parameters for the II were based on APR I. When we designed the

II we had the APR I clinical results to compare to.

The stem itself has a different geometry than the APR I; in that, the distal cross-section is circular, not a rectangle. *Because of that, this stem is more flexible than the APR I.*

. . . . .

Q Mr. Burchett, please look at Plaintiff's Exhibit 6 for a moment, which is the sample APR II stem and sleeve.

Do you have any reason to doubt that the shaft portion of the APR II stem located above the distal sleeve is capable of flexing in the body in response to bending stresses applied to the prosthesis?

A No. There should be a certain amount of flexibility. Yes.

(Plaintiff's Exh. 760, Deposition Testimony at 91–92, 195) (emphasis supplied).

FREDERICK S. GEORGETTE, the Intermedics Manager of Material, testified in a deposition as follows:

Q During the time you worked at IOI, was it your understanding that the APR II distal sleeve, when implanted in the body would be capable of a small amount of axial motion relative to the femur bone in response to bending stresses applied to the prosthesis?

A Yes.

(Plaintiff's Exh. 772 at 13). Georgette also testified to the following:

Q During the time you worked for IOI was it also your understanding that the APR II distal sleeve when implanted in the body [would] also be capable of a small amount of rotational motion relative to the femur bone in response to rotational or ... torsional motions applied to the prosthesis?

A Yes.

(Tr. at 1244–1245) (Plaintiff's Exh. 772 at 14).

KEVIN DELANEY, formerly the defendant's Vice President of Marketing and Sales, hedged when asked about the distal sleeve and increased flexibility. He didn't recall and he didn't remember anything on that subject. (Tr. at 2171). However, he did say:

Q Has Intermedics in the past addressed the issue of flexibility in any of the stems?

A I can recall it being a topic of discussion for the revision system.

Q Did Intermedics undertake any design changes to achieving increased—

THE COURT: To achieve.

MR. JONES: Yes.

Q —to achieve increased flexibility in its revision stem?

A I believe so.

Q What design changes were those?

A The feature of a slotted distal stem in the revision prosthesis was done to achieve that.

(Tr. at 2178).

Finally, the APR II Design Rationale states: "What is the purpose of the modular sleeves? Decreases stiffness, saves bone, increases surgical options." (Plaintiff's Exh. 14 at 1).

Similarly, an APR II–T document distributed at its national sales meeting in November 1992, included the following statement:

Another clinic problem often associated with non-cemented hip prostheses is thigh pain. It has been suggested that distal stiffness mismatch is one of the causes of end of stem pain. It is widely accepted that more flexible implants are needed to reduce stress shielding and post-operative thigh pain.

(Tr. at 1398) (Defendant's Exh. AAO at 079100).

All of the above evidence indicating that the APR II was designed to intend the shaft to be flexible by keeping the shaft diameter smaller than the distal sleeve diameter was corroborated by Dr. Burstein, who conducted bending tests on the APR II shaft. He found that by using the 4mm distal sleeve, the stem shaft above the distal sleeve is "300 percent more flexible" than a solid stem having the same diameter as the sleeve, (Tr. at 194, 229–30), or "a threefold increase in the flexibility of the stem when you compare it with and without the sleeve with the proper diameter." (Tr. at 359). Using the +2 mm sleeve will increase flexibility in the stem shaft by 100 percent. (Tr. at 194).

When questioned about whether the APR II practices the 023 patent claim limitation regarding enabling flexing of the stem shaft, Dr. Burstein testified that it did. He explained that the APR II prevents toggling, (Tr. at 130) and reduces stress shielding (Tr. at 130–133). In explaining how the APR II reduces stress shielding, Dr. Burstein described how the design of the APR II enabled flexing of the stem shaft:

Q. You mentioned stress shielding. Does the APR II practice or achieve the advantages of the 023 patent with respect to stress shielding?

A. Yes, it does, and it does it in the same way.

. . . . .

In addition, [the APR II] prevents loads from being transmitted distally.

Now the way you prevent bending loads from being transmitted distally is to make the stem flexible. Then if it deforms a little bit it doesn't transmit much bending load. The stiffer the stem, the more bending load it can transmit when the bone deforms.

So the patent teaches that the way you prevent the transmission of bending loads is to make a portion of the stem of diameter smaller than the sleeve so that it is flexible, so that you enable flexing of that portion of the stem that's above the sleeve.

. . . . .

Q. Does the APR II system, including the sleeve, practice the teachings with respect to the length of the sleeve contained in the 023 patent at 5, lines 34 through 44?

A. Yes.

The APR II has a sleeve that is long enough so that it does not hurt the bone, it is sufficiently long, and it is sufficiently short to leave over a portion of the stem that provides greatly increased flexibility of the stem.

. . . . .

[T]he APR II device has a sleeve, which according to the patent is long enough to result in low stresses and short enough to

result in a section of stem of reduced diameter which increases flexibility.

(Tr. 131–32 and 135–36).

Thus, a review of the evidence indicates that (1) the APR II stem is designed with a taper so that it can be fitted with a complementary tapered distal sleeve that is not affixed to the bone, (2) the diameter of the stem shaft above the distal tip is smaller than the diameter of the distal sleeve, and (3) the intention of designing the distal sleeve to have a greater diameter than the stem shaft was not only to fill the canal, but also to allow or enable the stem to be less rigid and more flexible. In this way, both toggling and stress shielding would be prevented.

(2) *Limitation (ii):* "Distal Tip Integral With The Distal End of the Stem"

(a) *Claims Construction*

(i) *Patent Language and Specification*

 Limitation (ii) of claim 1 states that the 023 patent improvement consists of "a distal tip integral with the distal end of the stem." Patent at 6:65. In order to construe the limitation, the terms "distal tip," "integral" and "distal end of the stem" have to be interpreted.

Referring to the drawings included in the specification, the patent describes the stem, reference number "22", as that portion of the femoral prosthesis that is inserted into the resected femur. At the proximal end of the stem are the prosthetic neck and the wedge-shaped affixation area, both of which are "unitary with the stem." Patent at 3:23–26. The stem is inserted into the passage reamed by the surgeon (called the "cavity"), and is advanced downwards until the stem is fully within the passage. Patent at 3:35–38. By definition, the "distal" end of the stem is that portion of the stem furthest from the point of attachment at the hip joint.

Located at the distal end of the stem is a tip, which the patent calls the "distal tip," referred to as number "40" in the specification references. The specification describes the location of the distal tip in the following manner:

A distal tip is located at the distal end of the stem, spaced axially downwardly from

the affixation surface, so as to extend downwardly into [the] passage and be positioned so that [the] distal tip is seated within harder portions of the bone of the wall of [the] femur, namely, within either dense cancellous bone or cortical bone, when the affixation surface is seated properly within the cavity.

Patent at 3:45–52.

The 023 patent's claims limitations and specification further describe the distal tip as comprising of the following characteristics:

First, the distal tip is "integral" with the distal end of the stem. The term "integral" will be explained below.

Second, the distal tip is constructed of a bio-compatible material, such as a cobalt-chrome steel alloy.

Third, the distal tip has a generally cylindrical external peripheral surface extending along the length of the distal tip. The axial length of the external peripheral surface of the tip must be long enough to provide an area of contact between the distal tip and the wall of the cavity large enough to maintain a relatively low level of stress on the wall of the femur at the location of the distal tip in response to transverse forces at the distal tip. As explained above, the axial length of the distal tip's external surface must also be short enough to expose a segment of the stem shaft above the distal tip and below the affixation surface in order to enable flexing of the shaft by means of a shaft diameter that is smaller than the diameter of the external surface of the tip.

Fourth, the external peripheral surface has a diameter complementary to the cavity in which it sits, so that the external peripheral surface of the distal tip engages, or presses against, the harder bone of the cavity wall and is confined against transverse movements within the cavity.

Fifth, the external peripheral surface has a fixation-resistant surface finish which prevents the distal tip from affixing to the wall of the cavity, thus allowing (i) the distal tip and distal end of the stem to rotate around the tip's central axis relative to the wall of the femur, and (ii) axial movement of the distal tip and distal stem relative to the wall of the femur, in response to forces applied to the prosthesis. The fixation-resistant finish is described as "a very smooth surface finish, such as that which is attained by polishing and buffing the cobalt-chrome steel alloy." Patent at 4:1–3.

Sixth, the distal tip's central bore has a taper which is complementary to the taper on the distal end of the stem, thus allowing securing of the tip onto the stem by slipping the central bore of the distal tip over the distal end of the stem. This method of securing prevents movement of the distal tip relative to the distal end of the stem.

In addition to the above, the patent provides for the distal tip to be modular. As used in the industry, "modularity" means that the distal tip can be removed and replaced by another tip on the same stem. In this way, distal tips having bigger external peripheral surface diameters but the same central bore diameter can be fitted onto one stem, thus providing the surgeon with a variety of tip sizes to accommodate the patient's inner femur cavity without having to use a different sized stem for each different sized proximal portion of the prosthesis.

Modularity in the 023 patent is created through use of the complementary tapers between the distal end of the stem and the central bore of the distal tip, which is also the method that secures the tip onto the distal end of the stem. Claim 4 of the 023 patent provides that the distal tip described by claim 1 must include "securing means for securing the distal tip to the stem for selective removal and replacement of the distal tip." Patent at 7:30–32. The specification states that "it is preferable that [the] distal tip be removable selectively from [the] stem." Patent at 4:47–49. Towards this end, through the use of the complementary tapers for securing the tip onto the stem, the distal tip can be "selected from a series of distal tips offered in a range of outside diameters so that a surgeon may choose the diameter for [the] external peripheral surface appropriate for the size of the passage into which the distal tip will be fitted." Patent at 4:64–68. The specification also describes the advantages and benefits of modularity:

The ability to remove and replace the distal tip with another distal tip selected from distal tips offered in a range of sizes enables greater versatility in fitting in that a wide variety of size combinations is made available in the joined stem and distal tip so as to enable independent sizing at the proximal portion of the stem without multiplying the number of stems needed to achieve such versatility. In providing such modularity between the stem and the distal tip, a greater choice is made available in the materials selected for the stem, as well as for the distal tip, so that the stem can be made even more flexible for better accommodation of loads during use.

Patent at 6:31–43.

Dr. Burstein explained the concept of "distal modularity" as described in the 023 patent for the Court in the following manner:

THE COURT: I heard a lot mentioned about modularity. What does that mean in lay language?

THE WITNESS: It means, Your Honor, that for every component that fits the proximal end of the femur, there are more than one component that can be put on the distal end, more than one diameter. So if we have a patient that has this size canal up on top and a big canal on the bottom, we can select a big tip, put it on the prosthesis, and put the prosthesis in the patient.

What that means is that this one part, the proximal portion, will fit people with different size canals and fit each one with a complete fit which will prevent toggling and allow it to move up and down, and these tips fit not only this size end, not only this size proximal end, but bigger proximal ends and smaller proximal ends. So with about five sizes on the proximal end and about five sizes on the distal end, you can fit 25 different sized patients. So you go into the operating room, instead of 25 different prostheses, you have five prostheses and five tips, but you can still fit 25 different size patients.

(Tr. at 363–364).

With these characteristics of the distal tip in mind, the term "integral" can be better understood. As used in the claim limitation, integral means that when the distal tip is secured to the stem, the tip and stem act in a unified manner. The patent specification explains that the "[d]istal tip is integral with the distal end of the stem, *so that all movements of the distal end of the stem result in corresponding movements of the distal tip.*" Patent at 4:44–46 (emphasis supplied).

In order to provide such unitary movement of the tip and stem in response to forces acting on the prosthesis, or to put it another way, in order to prevent any movement of the stem relative to the distal tip, claim 5 provides that the means for securing the distal tip to the stem include "a securing mechanism responsive to relative axial movement between the stem and the distal tip for securing and releasing the distal tip and the stem." Patent at 7:33–36.

Thus, in the Court's view the phrase "distal tip integral with the distal end of the stem" means that there is a tip secured to the distal end of the stem, such that the tip and stem act as one unitary piece.

(ii) *The Patent's Prosecution History and Extrinsic Evidence*

This interpretation of "a distal tip integral with the distal end of the stem" is also supported by the patent's prosecution history. In response to the Patent Examiner's rejections of initial 023 patent claims 1–6 on the ground that the claims were unpatentable over the Witzel patent, the 023 patent applicants distinguished the Witzel device by, among other things, pointing to the fact that the sleeve of the Witzel device was uncoupled to the stem and did not act in a unitary fashion with the stem:

In Witzel, a small sleeve of synthetic resin material is first secured in the medullary canal, and then the shaft of a femoral stem is inserted into the sleeve. The shaft can move relative to the sleeve, but there is no displacement of the sleeve relative to the bone of the femur during service. In the construction of the present claims, the distal tip is affixed to the distal end of the stem prior to insertion into the medullary canal, and flexing of the shaft of the femoral stem during service is accommodated by displacement of the distal tip relative to

the surrounding bone of the femur. Among those advantages is the distribution of stresses during service and the ability to use a material other than the synthetic resin material disclosed by Witzel to accommodate those stresses. Thus, in the Witzel construction, the articulating surfaces between the stem and the sleeve are of limited area, resulting in relatively higher stresses and the possibility for the formation of resin debris as the sleeve wears during use.

(Plaintiff's Exh. 568 at 50–51).

Dr. Burstein also corroborated this interpretation of "integral" by explaining that the patent uses the term integral to describe the attachment of the distal tip to the stem, and to describe the motion of the tip and stem relative to the bone:

Q Now, would you explain in lay terms what the patent teaches in column 4, lines 44 to 46?

A The patent is teaching the function and meaning of the attachment between the tip and the stem. The patent is saying that the tip and stem must be integral, and integral is defined two ways in the patent. It is what would happen if the tip and the stem were made of one piece. That's one example of integral given in the patent. So that would be if you just made it without any junction at all and didn't assemble them together but made it as a simple piece. That's what the patent means by integral.

Also, integral should be thought of as having each motion of the stem correspond to a motion of the tip itself. That is, there should be no relative, no meaningful relative motion between the tip component and the stem. So we can think of it in either way as a unitary or integral.

(Tr. at 152–53).

### (b) *Infringement Determination*

 The defendant contends that the APR II does not meet the claim limitation language, because the APR II does not utilize a distal tip. Rather, the defendant contends that the APR II utilizes a "sleeve," which is different from a "tip." Moreover, the defendant maintains that the APR II sleeve is not integral with the "end of the stem," but rather is attached and integral with the mid-point of the stem shaft.

According to the defendant, the terms "tip" and "sleeve" denote two different items in the context of orthopedic devices. The defendant claims that the term "distal tip" refers to "an end cap or other component which is relatively short as compared to the component (in this case, the stem shaft) with which it is associated." Defendant's Post–Trial Brief at 5. In addition, in the defendant's view a "tip" usually defines the end of the combined components, and encapsulates the components. On the other hand the term "sleeve," according to the defendant, denotes "generally, a hollow tubular machined part designed to fit over a substantial portion (often the majority of the length) of the second component with which it is associated." Defendant's Post–Trial Brief at 5. Moreover, the sleeve does not encapsulate the components.

With respect to the distal tip being "integral with the distal end of the stem," the defendant contends that the APR II sleeve is not integral with the distal "end" of the stem, because the complementary tapers of the APR II stem shaft and sleeve provide for connection of the sleeve at the mid-point of the stem, and not at the end of the stem.

The Court is unpersuaded by the defendant's interpretation of the claim limitation. In the Court's view, the defendant's interpretation is incorrectly based on a comparison of the APR II to the Omniflex, rather than to the 023 claims. Moreover, the defendant's interpretation impermissibly adds additional limitations to the patent claim.

Contrary to the defendant's reasoning, the limitations of the distal tip do not require that it be short relative to the stem, nor that it encapsulate the end portion of the stem that it covers. Indeed, there is no requirement at all that the 023 patent distal tip be enclosed at one end. The claims limitations only provide that the distal tip (i) be generally cylindrical, (ii) be constructed of a biocompatible material, (iii) have an axial length (a) long enough to provide an area of contact between the tip and the wall of the cavity in

order to maintain a lower level of stress on the wall at the location of the tip, and (b) short enough to expose a segment of the stem shaft above the tip in order to enable flexing of the shaft, (iv) have an outside diameter complementary to the cavity so that transverse movement of the stem is prevented, (v) have a fixation-resistant external surface finish that is a smooth finish, and (vi) have a central bore taper that is complementary to the stem taper, allowing the tip to be secured to the distal end of the stem and providing for modularity of the tip relative to the stem.

Thus, although the Court recognizes that in common usage a tip is different than a sleeve, in this case the Court believes that the 023 patent's claims limitations do not distinguish between a "tip" and a "sleeve." As long as the device that is used conforms to the claims limitations outlined above, it is considered a "distal tip" even if it is a sleeve.

This interpretation of a "distal tip" finds support in the patent's prosecution history, which indicated that the terms "tip" and "sleeve" are used interchangeably. In rejecting most of the 023 patent claims on the ground that they were unpatentable under Witzel's device, the Patent Examiner described the Witzel "tip" as performing "essentially the same function" as the 023 patent distal tip. (Plaintiff's Exh. 568 at 35). Technically, however, the Witzel device employed a sleeve, or a "sheath" as described in the 023 patent, see Patent at 3:56, 3:60–61, made of resin.

The Court's construction of a "distal tip" finds support in the testimony of Dr. Burstein, who referred to the APR II sleeve and described how a sleeve could be used as a "distal tip" within the meaning of the claim limitation:

Q What is a "sleeve" in biomedical terms?

A A sleeve is, as is the common language, is a hollow cylindrical member.

Q And does that definition satisfy or does the tip described in the claim in the 023 patent, satisfy that definition?

A Yes. The tip of the 023 patent is a hollow cylindrical member. The tip in the 023 patent could also be called quite accurately a sleeve.

THE COURT: So when you use the word "sleeve," that is synonymous with "tip" which is synonymous with "distal end"?

THE WITNESS: No, Your Honor.

THE COURT: The distal end could be the stem?

THE WITNESS: Yes, Your Honor. But even tip and sleeve need not be synonymous. It depends how the sleeve is used.

If the sleeve is attached so that it has a position at the bottom ... of the stem, it is a distal tip. It is also a sleeve.

THE COURT: So you say it is synonymous then?

THE WITNESS: If it is used in that way. In this usage it is synonymous because it is used as a distal tip. This sleeve is used as a distal tip.

Now when we say distal end, the patent is very clear on the definition, the distal end of the stem is everything below the affixation surface.

. . . . .

Q In [Plaintiff's] Exhibit 846, you used the term "distal tip." To what did you refer?

A I referred to the sleeve which is put over the distal end of the stem, and is used as a distal tip. It becomes a distal tip when it is affixed in the way described by the 023 patent, in the manner described by the 023 patent. That is now a distal tip. It is also a sleeve. You can see a sleeve in the abstract. You can see a tip only when it is attached to the prosthesis.

(Tr. at 136–138).

Accordingly, the Court finds that the defendant's construction of the term "distal tip," namely that the term encompasses a "tip" that is short relative to the stem, and which encapsulates the end of the stem, adds external limitations not found in the claims language, and is erroneous.

Likewise, the Court believes that the defendant has erroneously construed the claim limitation by contending that in order to be integral with the distal end of the stem, the

distal tip or sleeve must mechanically connect with the stem at the end portion of the stem.

The patent specifies by reference to diagrams that the stem of the prosthesis is that part of the prosthesis underneath the affixation surface, and that the distal end portion (reference number "44" in figure 3) of the stem (reference number "22") is that portion of the stem having a complementary taper with the central bore of the distal tip, *see* Patent at 4:49–56 (referring to figure 3), to which the distal tip connects. The limitations of claim 1 also define a shaft portion of the stem, which is described in the claim as that part of the stem located between the affixation surface and the distal tip.

Nothing in this language indicates that in order to be integral with the "distal end of the stem," the distal tip or sleeve must mechanically connect with the stem at the end portion of the stem. Rather, the claim defines the distal end of the stem to be that part of the stem below the stem shaft. If this were not the case, then the limitation language concerning the varying length of the distal tip relative to the cavity wall would be meaningless. Thus, once a stem shaft is created by connecting the tip to the end portion of the stem through the means of complementary tapers, the distal tip becomes integral with the distal end of the stem, irrespective of where on the stem that connection precisely occurs.

The Court, therefore, rejects the defendant's construction of the phrase "distal tip integral with the distal end of the stem." In the Court's view, the phrase means that there is a tip or sleeve of a certain configuration and make-up as set forth in the patent's claims limitations, which is secured to the distal end of the stem by means of complementary tapers between the tip or sleeve and the stem, such that the tip and distal end of the stem act and move together as one unitary piece in response to forces exerted on the prosthesis.

Under this interpretation of the claim limitation, the Court finds that the APR II sleeve is and acts in fact as a "distal tip integral with the distal end of the stem." The uncontested facts state that the central bore of the APR II sleeve is formed with a taper that is complementary to the taper on the APR II stem, such that when the sleeve is secured to the APR II stem the sleeve and stem act in unitary fashion. In addition, by purposefully creating a stem shaft above the point of attachment of the sleeve to the stem, the APR II sleeve is secured to, and integral with, the distal end of the APR II stem.

According to the uncontested facts and evidence before the Court, the APR II sleeve also meets all of the other configuration requirements of the distal tip set forth in the claims limitations.

First, the APR II sleeve is constructed of a bio-compatible material, in this case a titanium alloy.

Second, the APR II sleeve is cylindrical, and its axial length is both long enough to maintain a relatively low level of stress along the wall of the femur at the point where it contacts the wall, and short enough to create an exposed stem shaft above the sleeve in order to enable flexing of the shaft.

Third, the APR II sleeve has a diameter that is complementary to the cavity in which it sits, so that its external surface engages the harder bone of the cavity wall and prevents transverse movement of the stem and sleeve.

Fourth, the APR II sleeve is modular. The sleeve has two sizes, + 2 mm and + 4 mm. The complementary tapers between the stem and sleeve allow for one sized sleeve to be removed and replaced by another sized sleeve. Indeed, the evidence adduced at trial clearly indicates that the APR II sleeve was designed to take advantage of modularity. In addition to the previously cited testimony of Belen, the Intermedics Director of Marketing, and Cindrion, President of Intermedics, describing the necessity of marketing the APR II sleeve in order to remedy Intermedics's loss of market sales due to the APR I's commercial failure, other testimony by IOI officials and various company documents establish the need for Intermedics to market a modular distal tip.

Among the documents are an Intermedics brochure entitled "FIT WITHOUT FOR-

FEIT," with a heading "Optimal Fit that Doesn't Sacrifice Bone." This brochure includes the following promotional pitch:

> The new APR II Hip System is the first hip prosthesis that can be easily adapted *intraoperatively* for an optimal fit that does not require excessive bone removal.
>
> Better Distal Fit
>
> Surgeons have the alternative of adding a 2mm or 4mm distal sleeve for a tighter, more congruent fit. The ability to increase stem diameter without going to a larger implant can help preserve proximal bone.

(Defendant's Exh. JP at 000539).

Ronnie G. Burchett, the Group Product Manager for IOI Hip Systems, states the following in a videotape entitled "Selling Strategies in Orthopedics APR II Hip System":

> Ron Burchett: ... People, such as Osteonics and Intermedics, S–ROM, came out with a modular system, they have sleeves now of some sort or another. Everybody that doesn't have a sleeve is preaching against a sleeve. If you look at the .. trends in industry, you look at the new systems that are coming out, you look at the Howmedica systems, the Osteonics systems, other systems, you are starting to see more and more modularity, more sleeves. I think a few years from now, those same people that are preaching against another interface, a sleeve, will have a sleeve.

(Plaintiff's Exh. 895 at 3–4).

Another Intermedics document refers to Osteonics and the Omniflex modular tip, as follows:

> OSTEONICS—Osteonics has just recently joined the ranks of the top players in the hip market. Since 1988 the company has enjoyed better than 20% growth every year. Market share has increased by almost 10 points during the same period, (11.5 to 20%). The company's strong management, well-trained sales force, and innovative product designs have contributed to its share gains. The Omniflex for both pressfit and cemented use, and the Omnifit for cemented use are the company's flag-
>
> ship brands. *The Omniflex capitalized on an emerging modular trend with its choice of heads and its modular distal tips....* Osteonics will continue to have a strong presence in the hip market.
>
> . . . . .
>
> The modular approach simplifies hospital inventories, allows greater intra-operative flexibility, and in the event of some implant failures, simplifies reversions.
>
> . . . . .
>
> Overall, the trend toward providing more anatomically precise fits through press fit, modular and custom prostheses is at the beginning of the growth curve, with most of the market potential still ahead[.]

(Plaintiff's Exh. 670 at 6–9) (emphasis supplied).

Significantly, the evidence reveals that the APR II was marketed with the distal sleeve as a strong selling point. In this regard, Burchett testified as to the importance of the distal sleeve:

> Q During the time you worked for Intermedics Southern California and now as a salesman in Montana, was it your practice to always make the sleeve available to doctors in the operating room who were implanting APR II devices?
>
> A Yes.
>
> . . . . .
>
> Q To your knowledge, has IOI ever distributed any APR II literature in which the distal sleeve was not promoted as an advantageous feature of the product?
>
> A No, not to the best of my knowledge.

(Plaintiff's Exh. 760 at 13, 22).

MARC M. VREEDE, the defendant's product engineer and now a sales agent for the defendant, testified by deposition that the distal sleeve is a selling point for the APR II:

> Q In connection with the surgeons that you mentioned before, who have mentioned or used the Omniflex product with the distal tip, have you ever tried to convince them to use the APR II with distal sleeve instead of the Omniflex?

A Yes.

(Tr. at 1253; Plaintiff's Exh. 781 at 5).

Finally, as will be explained in the next section, the APR II sleeve also meets the claim limitation that its external peripheral surface must have a fixation-resistant surface finish.

### (3) *Limitation (v):* A Fixation Resistant Surface–Finish

#### (a) *Claims Construction*

##### (i) *Patent Language, Specification and Prosecution History*

■ Limitation (v) of claim 1 provides in relevant part that the distal tip have a "fixation-resistant surface-finish on the external peripheral surface" for the purpose of maintaining the distal tip unaffixed to the cavity wall of the femur, whereby allowing axial movement relative to the wall of the femur. By remaining unaffixed to the femur, axial displacement of the distal tip and the distal end of the stem is permitted in response to forces applied to the prosthesis during its use.

The defendant contends that the term "fixation-resistant surface finish" means that the finish on the distal tip's external surface must be a "very smooth" surface finish, with surface characteristics at least as smooth as those which are achieved by buffing and polishing cobalt-chrome metal. In support of this contention, the defendant cites to the following language in the 023 patent's specification: "[T]he fixation-resistant finish on the external peripheral surface is a very smooth finish, such as that which is attained by polishing and buffing the cobalt-chrome steel alloy." Patent at 3:67–4:3.

According to the defendant, the APR II sleeve does not have such a finish. The defendant claims that when manufactured, the APR II sleeve contains "circumferential markings," and that the sleeve's outer surface was not polished or buffed until June 1992. Moreover, the defendant contends that the current buffing of the sleeve is unrelated to the flexation or axial movement of the stem, and that even after buffing there is a surface roughness that does not follow the patent's teachings. Defendant's Post–Trial brief at 9–10.

The Court disagrees with the defendant's interpretation of this claim limitation, because it impermissibly seeks to add an external limitation from the specification to the broader claim language. *See Electro Medical,* 34 F.3d at 1054. Nothing in the *claims* language states that the surface must be "very" smooth. Rather, 023 patent claims 11 and 12, referring to the fixation-resistant surface finish identified in claim 1, provide that the finish "is a smooth finish on the external peripheral surface of the distal tip ... wherein the distal tip is constructed of a metal alloy and the fixation resistant finish *comprises a polished surface.*" Patent at 8:24–29 (emphasis supplied).

In describing the preferred embodiments, the patent specification states:

> The external peripheral surface is provided with a fixation-resistant surface finish so that the distal tip will not be affixed to the wall of the femur and will remain unaffixed to the femur during use of the prosthesis. [The] [d]istal tip is constructed from a biocompatible material, one such material being a cobalt-chrome steel alloy, and the fixation-resistant surface on the external peripheral surface is a very smooth surface finish, such as that which is attained by polishing and buffing the cobalt-chrome steel alloy.

Patent at 3:61–4:3.

Thus, according to the language of the claims, and as elucidated by the patent's specification, the external peripheral surface finish must (i) be a smooth finish that comprises a polished finish, and (ii) be for the purpose of maintaining the distal tip unaffixed to the femur. The claim limitation language does not require that the surface actually be polished or "very" smooth; only that it constitutes ("comprises") a polished surface.

This construction of the term "fixation-resistant surface finish" is supported by the patent's prosecution history. In discussing the Freeman patent, the Patent Examiner noted that one of the types of tips used by the Freeman device had an outer surface

that was smooth. According to the Patent Examiner, "[i]t is presumed that all non-fixating surfaces are smooth, typically polished surfaces." (Plaintiff's Exh. 568 at 36–37). The Patent Examiner also concluded that it would be obvious to anyone skilled in the art that such smooth surfaces prevent affixation to the bone: "It would have been obvious to one with ordinary skill in the art to make the non-affixing surfaces of the Freeman device polished and smooth to prohibit bone ingrowth (i.e. fixation to the bone)." (Plaintiff's Exh. 568 at 37).

Although it seems clear that the kind of surface finish described by the patent claim is a smooth finish comprising a polished surface, neither the 023 patent claims nor the patent description define what is meant by "smooth" and "polish." These definitions were, however, provided by extrinsic evidence offered to help the Court understand some of the fundamental metallurgy involved.

### (ii) Extrinsic Evidence

Dr. Burstein explained how the terms "smooth" and "polish" are used in the context of machining metals. He referred to Plaintiff's Exhibit 704, which is a publication by the American Society of Mechanical Engineers ("ASME") entitled: *An American National Standard, Surface Texture* (Surface Roughness, Waviness, and Lay), dated April 30, 1986. Appendix B of the publication includes the specification for producing various surface textures. (Plaintiff's Exh. 704 at 23).

According to the Appendix, "[s]moothness and roughness are relative, i.e., surfaces may be smooth or rough for the purpose intended; what is smooth for one purpose may be rough for another." (Plaintiff's Exh. 704 at 23). A chart is then provided in the Appendix, which indicates that a polished surface is defined as a surface having a relative roughness of 32 microinches or less. Thus, according to the ASME, a surface is smooth for the purpose of constituting a polished surface if its relative roughness is 32 microinches or less.

Dr. Burstein described the smoothness limitations of 023 patent's distal tip, and related it to the ASME standard:

Q What does the patent teach with respect to the surface characteristics of the sleeve or the tip?

A The patent teaches in order for this to work it must be free to move up and down in the bone in accordance with how the prosthesis normally wants to move. That is, under load this prosthesis will move on the order of a thousandth of an inch or two, and it must be free to do so, and in order to do so, you cannot allow the distal end sleeve or tip to become fixed to the bone. If it becomes fixed to the bone it transects the bone. So, by having an affixation resisting surface, that will not allow the bone to grow into or into the surface, it becomes free to move up and down and also free to twist ... and you do that, the patent says, by providing smooth surfaces. And the patent gives an example. It says if, for example, you are using cobalt-chrome, you might want to have the surface polished. Well, if you are using titanium, which is another material you might or might not use the same processing, but you are going to finish it so that it has the same surface finish, that is, it has a smooth surface finish.

Q Would you explain what [the ASME standard] is?

A This is a standard which is practiced by the American National Standards Institute and the American Society of Mechanical Engineers in noting the types of surface finish that can be provided by different manufacturing processes.

In simple words, if an engineer wants to provide a certain surface finish and wants to know how to go about doing it, he can [look at the standard] and determine what type of manufacturing process will provide those surface finishes.

Q What microinches are referred to after polishing?

A Polishing starts at 32 microinches and then goes down to a half microinch.

Q So polishing ranges from 32 [microinches] down?

32 [microinches] down would fall under the specification of a polished surface.

. . . . .

Now, an affixation [resistant] surface is certainly achieved with a 32 microinch finish; that you can see machining marks or any other marks on [the surface], is simply indicative of the specification of 32 microinches.

If you look with a high enough power, you will see the hills and valleys and ups and downs that constitutes a 32 microinch finish. But it is the number itself that tells you how smooth it is and the specification calls for a smoothness which certainly would promote, which certainly would provide an affixation-resistant surface.

(Tr. at 132–33, 145, 147).

Significantly, Dr. Burstein's explanation of how "smooth" and "polish" are defined within the context of the claim limitation was not refuted by the defendant during Burstein's cross-examination or by the introduction of other evidence.

Accordingly, the Court interprets the claim limitation as requiring the distal tip's external peripheral surface finish to be (i) a smooth finish that comprises or is consistent with a polished surface, i.e. a surface finish of 32 microinches or less in accordance with the ASME standard, and (ii) for the purpose of maintaining the distal tip unaffixed to the femur.

(b) *Infringement Determination*

██ Plaintiff's Exhibit 96–3 is a copy of the APR II manufacturing blueprint for the APR II distal sleeve. In the legend of the blueprint there is a notation "Mach Surf," and underneath this notation is the number "32" with a "v" next to it.

Dr. Burstein testified that the notation "Mach Surf" means machine surface, and that the number 32 with the v next to it signifies that the surface finish is to be less than 32 microinches in roughness. (Tr. at 142–43). Dr. Burstein concluded that the APR II distal sleeve surface was therefore affixation resistant because it had a surface finish that was smooth, and consistent with a polish. (Tr. at 144–147 and 233–35). His

testimony was not refuted by the defendant. Indeed, it was supported by the APR II distal sleeve surface measurements conducted by the defendant's expert Dr. Pugh. Using a profilometer to measure the distal sleeve's surface smoothness, Dr. Pugh recorded the smoothness at approximately 27 microinches. (Tr. at 234–35).

Therefore, based on the APR II distal sleeve blueprint specification, as corroborated by the unrefuted testimony of Dr. Burstein and Dr. Pugh's measurements, the Court finds that the APR II distal sleeve's external peripheral surface is to have a smoothness of less than 32 micrometers, which comprises or constitutes a polished surface. The defendant's contentions that the APR II distal sleeve's surface does not meet the claim limitation because of circumferential marks on its surface, or that the distal sleeve is not polished, miss the point concerning what degree of roughness constitutes smooth, within the scope of the limitation, and are rejected.

Moreover, contrary to the defendant's contention, the Court also finds that the surface finish of the distal sleeve of the APR II is for the purpose of maintaining the distal sleeve unaffixed to the femur.

This finding is supported by the previously cited testimony of Frederick S. Georgette, the IOI Manager of Material Sciences, who testified in a deposition that the APR II distal sleeve was designed so that when implanted in the bone, it would be capable of axial and rotational movement relative to the bone. (Tr. at 1244–45). The finding is also supported by the deposition testimony of JAMES L. DALE, the IOI Manager of Product Development, who also testified that the APR II distal sleeve was designed to avoid fixation to the femur and move axially and rotationally relative to the femur. (Tr. at 1221). Dale's deposition testimony was not refuted by the defendant.

Finally, the Court's finding is supported by the testimony of Dr. Burstein, who also concluded that the APR II distal sleeve's surface finish was for the purpose of maintaining the distal sleeve unaffixed to the bone, and to enable axial and rotational movement relative to the bone. (Tr. at 132–33).

C. *Other Evidence of Infringement: Development of the APR II Distal Sleeve After the February 1988 AAOS Meeting*

When the defendant started to design the APR II in early 1987, it did not consider a sleeve component. Belen, the Intermedics Director of Marketing, testified that prior to February 1988, he was not aware of "any writing or document at IOI recording an idea for using sleeves with the APR II system." (Tr. at 1022–1023). Nor is there any evidence that, prior to February 1988, APR II designer Dr. Lawrence Dorr recommended the use of a distal sleeve.

At a meeting of the American Association of Orthopedic Surgeons ("AAOS"), held in early February 1988 in Atlanta, James Dale and at least five of his associates at Intermedics were shown a demonstration and obtained literature describing the plaintiff's newly introduced Omniflex hip implant with the patented modular distal tip. At this meeting Dale admits receiving an Omniflex brochure on which was stated, "U.S. Patent Pending." Dale took this Omniflex literature back to the Intermedics office in Texas. Prior to its attendance at this AAOS meeting, Intermedics never worked with a distal sleeve, and there is no record of any involvement by Intermedics with a distal sleeve or tip.

Seven days after returning from the February 1988 AAOS meeting, Dale issued a memorandum to his staff instructing his hip group to develop a "modular distal stem" for a new hip implant to be known as APR II, intended to replace the failing APR I product. The memorandum is dated February 18, 1988, and is Plaintiff's Exh. 49A. In its response to the plaintiff's first set of requests for admissions (Nos. 1–30), Intermedics admitted that the Dale memorandum is the earliest written document which refers to Intermedics developing a "modular distal stem":

*Request No. 13*

(a) State the date when Defendant or any employee, agent or representative thereof first had knowledge of the device marketed by STRYKER or OSTEONICS under the designation 'Omniflex', 'Omnifit' or 'Omnifit II'.

(b) State the date(s) when Defendant or any employee, agent or representative thereof had knowledge of the '023 Patent in Suit.

. . . . .

*Response to Request No. 13*

*With regard to Defendant's first awareness of the OMNIFLEX device, that awareness occurred in or about 1988 through Plaintiff's advertisement in trade journals and at an AAOS meeting. Apparently, various persons saw those ads and attended the AAOS meeting. Defendant will produce Document Nos. IOI 000736–749, which documents are illustrative of the trade journal ads which brought the OMNIFLEX device to defendant's attention. Defendant's first awareness of the '023 patent occurred on or about January 5, 1990, when John Merkling saw a reference to it in the O.G.*

*Request for Admission No. 29*

Admit that PX–49A, *dated February 18, 1988,* is the earliest written document in IOI's possession, custody or control which states IOI's intention to manufacture a modular distal stem, sleeve or tip member for use with the APR II hip system.

*Response to Request for Admission No. 29*

Defendant denies that PX–49A refers to or states Defendant's intention to manufacture a modular distal "tip member" for use with the APR II hip system. *As presently informed, however, defendant admits that PX–49A is the earliest written document which refers to a "modular distal stem" for use with the APR II hip system.*

*Request for Admission No. 30*

Admit that PX–49A, *dated February 18, 1988,* is the earliest written document known to IOI which states IOI's intention to manufacture a modular distal stem, sleeve or tip member for use with the APR II hip system.

*Response to Request for Admission No. 30*

Defendant denies that PX–49A refers to or states Defendant's intention to manufacture a modular distal "tip member" for use with the APR II hip system. As presently informed, however, *defendant admits that PX–49A is the earliest written document which refers to a "modular distal stem" for use with the APR II hip system.*

(Plaintiff's Exhs. 150 at 13–14, 707 at 13–14) (emphasis supplied).

Ronnie Burchett also testified about the all-important 1988 AAOS meeting at which the newly patented Omniflex was first revealed:

Q Do you recall attending the 1988 AAOS meeting in Atlantic (sic), Georgia?

A Yes.

Q Do you recall seeing the Omniflex prosthesis displayed at the 1988 AAOS meeting?

A I believe so, yes.

. . . . .

Q Did you go to the 1988 AAOS meeting with a group of people from IOI?

A Yes.

Q About how many people did you go with?

A It would be a guess on my part. I would imagine there were at least 40.

Q Now, did you make any writing at all prior to February 4, 1988 which refers to a hip implant system having a modular distal sleeve?

A Other than an outline or blueprint, no, no formalized census (sic) of any sort.

Q And you have not produced any such drawing or outline to us in this matter; is that correct?

A Correct.

. . . . .

Q *To your knowledge was the Omniflex prosthesis the first product on the market to provide distal modularity via the use of a metal distal tip or sleeve component?*

A *With a metal sleeve, yes, I believe so.* (Tr. at 1472–1473) (emphasis supplied).

Significantly, none of the three persons who claim credit for conceiving the APR II hip implant—Dr. Lawrence Dorr, James Dale and Ronnie Burchett—produced any documentary evidence that the distal sleeve component was conceived prior to the February 1988 AAOS conference. Rather, the evidence indicates that the sleeve was considered only after the conference.

Dr. Dorr testified that he designed the APR II between the period of 1986 and 1989. He testified that he made drawings and templates and used certain X-rays during this period. Strangely, no such drawings or templates or X-rays were produced by the defendant. Dr. Dorr testified that he worked in concert with engineers and made models during the design period. No such models were produced by the defendant.

After a long discussion with regard to the design and function of the APR II, Dr. Dorr finally reached the subject of the distal sleeve. He stated that in fitting the implant in C bone patients, where the femur is like a "stovepipe" and is difficult to fit, he made the decision "to make a sleeve."

So, it was at that point that I made a decision that I would make a sleeve that would go onto the implant to allow me to continue my principle of a good stable fit top and bottom.

BY MR. JONES:

Q Can you show the Court from the devices that are here in the courtroom, some of the sleeves that have been developed for use with the APR II?

A When I made that sleeve, I made it so that it fit this stem in this region. . . .

(Tr. at 730).

Dr. Dorr testified that he initially made the sleeve to fit the whole length of the stem, but then he reduced the length of the sleeve and tried it on the mid-portion of the stem, not on the tip. He also testified that he got the idea for a hollow cylindrical sleeve for use with the APR II stem from the plastic sleeve of Dr. Leo Whiteside's device. However, the record in this case reveals no corroborating evidence as to that important as-

sertion. There is *no* documentary evidence of any kind by any witness on behalf of Intermedics that it or Dr. Dorr even contemplated working on a distal sleeve prior to February 1988.

Interestingly, the defendant did produce a copy of a template used by Dr. Dorr with regard to the distal sleeve (Defendant's Exh. HH). This drawing by Dr. Dorr was dated May 9, 1988, well after the disclosure by Osteonics at the February 1988 meeting. Significantly, this was Dr. Dorr's "initial attempt" during the design process. (Tr. at 773).

Further, Dr. Dorr testified that he normally and regularly attended the meetings of the American Academy of Orthopedic Surgeons, and reluctantly admitted that he attended the key February 1988 conference in Atlanta. However, he could not recall whether he made a writing recording a design for the APR II distal sleeve at any time prior to the Atlanta conference:

Q Is it a fact that you normally and usually attend the regular meetings of the AAOS?

A Yes.

Q Is it a further fact that at your deposition you could not recall whether you did or did not attend the February 1988 AAOS meeting in Atlanta?

A I couldn't recall whether I attended?

Q Yes.

A I guess I didn't recall whether I attended that day or that year. I would think I did.

. . . . .

Q And did you make a writing before February 1988, recording your idea for an APR II distal stem with complementary locking surfaces?

A Distal sleeve?

Q Distal sleeve, yes.

A I don't recall.

THE COURT: What is the question? Was there a writing made?

MR. DIAZ: Yes, did you make a writing before February 1988 recording your idea for an APR II distal sleeve with complementary locking tapered surfaces?

Q And the answer, Doctor?

A I answered, I don't recall whether I made any writings or not.

. . . . .

Q Please look at Exhibit 509. This is a memorandum from Mr. Dale of IOI to Mr. Belen. You know both of those gentlemen?

A Yes.

Q And the second page of the memo, Mr. Dale states under "APR II hip design—" or hip system, "(a), APR II hip system, under that, (a) design hip implant (20 sizes) modular distal stem."

Do you see that?

A Yes.

Q And that memo was written, I will represent to you that the February 1988 AAOS meeting was held in or about February 2nd through 9th of 1988. Do you accept that representation?

A Yes.

Q So Mr. Dale's memo, Exhibit 509, was written about two weeks after that meeting, correct?

A Yes.

MR. DIAZ: I will correct the record, the meeting was February 4th through 9th, 1988

Q And so let me repeat the question. Was Mr. Dale's memo, Exhibit 509, written about two weeks after that AAOS meeting in February of 1988?

A Yes.

Q Now, IOI has admitted that Exhibit 509, which has previously been identified as a deposition exhibit 49–A, is the first IOI document which refers to a modular distal stem for use with the APR II system. It did so in request to our request for admission 30 and it has been marked as Plaintiff's Exhibit 707 in your book. Will you accept that representation?

A Yes.

Q *Did you bring with you any writing which you made or caused to be made prior to February 18, 1988, which records or reflects your work or ideas for an APR II modular distal stem?*

A *No.*

(Tr. at 822–826) (emphasis supplied).

The second person claiming to have conceived the idea for the distal modularity in the APR II is James L. Dale who was employed by Intermedics between 1984 and 1988. He was the Manager of Product Engineering between 1986 and 1988, and in early 1988 had design responsibility for all Intermedics products.

Dale testified that in 1987 Intermedics felt there was a need to install the concept of distal modularity in the design of the APR II. Dale claims that in 1987 he originated the idea for a distal sleeve by "tak[ing] the distal portion and attach[ing] it to the stem." Dale's "creation" was made of plastic. Allegedly, he made prototypes in that material. Dale testified that he showed "his" plastic distal sleeve to Dr. Dorr at, of all places, the February 1988 AAOS meeting in Atlanta. According to Dale, Dr. Dorr did not like the idea and rejected it, because he was "concerned about plastic wear debris which has been shown to lead to problems" (Tr. at 1528–1529). Dale also claims that in 1987 he considered a tapered lock mechanism on the stem.

The Court does not credit this testimony by Dale. The first document that Dale could produce to corroborate his testimony was a drawing or diagram made by Mark Vreede in June, 1988, showing a titanium alloy sleeve (Defendant's Exh. ASF). Moreover, Dale's testimony is contradicted by his deposition testimony regarding his first knowledge of a metal sleeve:

Question: Is it fair to say that prior to seeing a copy of Plaintiff's Exhibit 6–61 (the Omniflex brochure), you had no first-hand knowledge of a prosthetic hip system—hip stem, which incorporated a metal distal sleeve or tip component?

Answer: I didn't know of any.

(Tr. at 1569).

Q Can you identify any IOI writing dated prior to February 4, 1988, which uses the phrase, modular distal tip or modular distal stem?

A No, I can't.

Q Now, can you identify any writing prior to February 18, 1988, which refers to design work carried out by IOI on a modular distal tip or modular distal stem?

A No, I can't.

(Tr. at 1580).

Dale readily admitted that he attended the AAOS meeting in Atlanta in February 1988, and received the Omniflex brochure:

Q Did you in particular go to the February 1988 AAOS meeting in Atlantic (sic)?

A Yes.

Q And did others from Intermedics also attend that meeting?

A Yes.

. . . . .

Q Now, how did—how was it that you first became aware of the Omniflex at that time?

A I saw one of their brochures which pictured this implant.

Q And under what circumstances did you see that brochure?

A Well, it was at the show. One of the fellows who was with it [sic] had picked it up somewhere and he gave me a copy.

Q Do you recall who?

A No, I don't.

Q But it was one of the Intermedics employees?

A Yes, that's true.

Q Why was that brochure given to you?

A I try to gather what I could of those kind of materials to see what our competition is doing. It is always interesting to see what type of products we were facing in the marketplace.

Q From the time you received that piece of product literature pertaining to the Omniflex in early February of '88, do you recall any mention or any use of that literature other than in this lawsuit?

A No, I don't.

Q What influence, Mr. Dale, did the Omniflex product and literature have on the APR II product?

A I can't think of any insurance (sic influence) that it had.

(Tr. at 1539–1541).

Dale also stated that he placed the Omniflex brochure in his files (Tr. at 1581). Dale's testimony that he did not keep any of the sketches or documents referring to the sleeve that he allegedly created prior to February 1988, but that he kept the Omniflex brochure, defies credulity and is a further ground for disbelieving his testimony.

Ronnie G. Burchett also claims a part in the design of the APR II and its distal sleeve. Burchett joined Intermedics in 1986 as Product Manager Marketing for Hips and was made Group Manager in 1989. In that position he was responsible for overseeing the development of hip implants. He left Intermedics in February 1992 and is presently a sales representative for the defendant in the State of Montana.

Burchett admitted that he saw the Omniflex at the February 4–9, 1988 AAOS meeting. According to his testimony, he was there with at least forty other Intermedics employees—not the five testified to by other witnesses.

Burchett also testified that he was collaborating with Dr. Dorr, a Dr. Gustke, Belen and Dale in the design of the APR II. Apparently, by coincidence, in late 1987, he "wanted a two-piece component . . . (with) a proximal body and a separate distal stem" attached to the body by a Morse type of taper. Then, again coincidentally, during the hunting season in the fall of 1987 he drew a sketch on a yellow legal pad on co-employee Fred Tripp's dining room table. Burchett testified that "It was determined at that point by myself that it should be some kind of metallic sleeve mechanism." There are no sketches, records or documents of any kind emanating from this idea of Burchett, until after Intermedics obtained the Omniflex brochure at the AAOS meeting in February 1988. The Court does not credit this testimony.

In addition, Burchett relates that in the fall of 1987 Dale thought about a plastic sleeve as something similar to a finger trap. The Court also does not credit this testimony. The record, the documentary evidence and the lack of corroborative documentary evidence reveal otherwise. Burchett is the third person to conceive of the idea of a distal sleeve prior to February 1988, without any documentary or paper trail.

The Court finds that there is no Intermedics document prior to February 9, 1988, stating specifically or in substance that there is a need to incorporate distal modularity in the APR II hip implant; nor is there any such document referring to a distal sleeve. There are no Intermedics drawings, or sketches, or memoranda, or records of any kind with regard to a modular distal sleeve prior to February 1988. All of the Intermedics documents referring to distal modularity and the distal sleeve started to appear only after the Atlanta AAOS meeting in February 1988.

The first documentary record of Intermedics's involvement with the distal sleeve is Plaintiff's Exh. 49A, the February 18, 1988 memorandum from Dale to Belen discussing, among other things, the development of a modular distal stem. The second Intermedics record of a distal sleeve is a memorandum by Burchett to Dale on March 16, 1988 (Defendant's Exh. PX), some five weeks after the AAOS meeting of February 1988. Following this memorandum is the diagram of the hip implant with a distal sleeve, made on May 9, 1988. (Defendant's Exh. HH). Subsequently, a memorandum from Burchett dated June 8, 1988 mentions a "distal locking sleeve." A June 15, 1988 teleconference between Dale and Dr. Dorr refers to an APR prototype with a modular sleeve (Defendant's Exh. ARZ) and a July 12, 1988 teleconference note discusses the distal sleeve (Defendant's Exh. ASA). On August 10, 1988, Dale received a memorandum from Mark Vreede. Under the words APR II sleeve was the notation "working on prototype drawings for a taper lock sleeve." (Plaintiff's Exh. 72). There was no prior IOI document referring to a taper lock sleeve. However, the Omniflex brochure kept by Dale in his file, contained a similar notation. Also, Vreede's notebook entry of August 1, 1988 contained the words "round distal sleeve" similar to the language in the Omniflex brochure.

### D. Conclusions and Findings as to Literal Infringement

The Court finds that the APR II device incorporates each and every feature and component of claims 8, 10 and 12 of the 023 patent, and therefore literally infringes on the patent claims. In sum, the Court makes the following findings based on the record, testimony and other evidence stated above:

#### A. Limitation (iii)

1. The term "enabling flexing" is construed as allowing the stem shaft of the device to flex and move axially upwards, by the use of a distal tip attached to the distal end of the stem which (i) is of a larger diameter than the stem shaft, and (ii) is not affixed to the bone.

2. The Court finds that (1) the APR II stem is designed with a taper so that it can be fitted with a complementary tapered distal sleeve that is not affixed to the bone, (2) the diameter of the stem shaft above the distal tip is smaller than the diameter of the distal sleeve, and (3) the intention of designing the distal sleeve to have a greater diameter than the stem shaft was not only to fill the canal, but also to allow or enable the stem to be less rigid and more flexible. In this way, both toggling and stress shielding would be prevented.

#### B. Limitation (ii)

1. The phrase "distal tip integral with the distal end of the stem," is construed to mean that there is a tip secured to the distal end of the stem, such that the tip and stem act as one unitary piece.

2. The Court finds that the defendant's construction of the term "distal tip," namely that the term encompasses a "tip" that is short relative to the stem, and which encapsulates the end of the stem, is erroneous and adds unintended limitations to the claims language.

3. The Court construes the claim limitation so that the 023 patent's claims limitations do not distinguish between a "tip" and a "sleeve." As long as the implement that is used conforms to the claims limitations, it is considered a "distal tip" even if it is a sleeve.

4. The Court finds that the APR II sleeve is, and acts, in fact as a "distal tip integral with the distal end of the stem."

5. The Court finds that the defendant has erroneously construed the claim limitation by contending that in order to be integral with the distal end of the stem, the distal tip or sleeve must mechanically connect with the stem at the end portion of the stem. Nothing in the limitation language indicates that in order to be integral with the "distal end of the stem," the distal tip or sleeve must mechanically connect with the stem at the end portion of the stem. Rather, the claims language defines the distal end of the stem to be that part of the stem below the stem shaft. Thus, once the tip is connected to the end position of the stem through the means of complementary tapers, the distal tip becomes integral with the distal end of the stem, irrespective of where on the stem that connection precisely occurs.

6. The Court finds that the central bore of the APR II sleeve is formed with a taper that is complementary to the taper on the APR II stem, such that when the sleeve is secured to the APR II stem the sleeve and stem act in unitary fashion. In addition, by purposefully exposing a stem shaft above the point of attachment of the sleeve to the stem, the APR II sleeve is secured to, and integral with, the distal end of the APR II stem.

7. The Court finds that the APR II sleeve also meets all of the other configuration requirements of the distal tip set forth in the claims limitations.

#### C. Limitation (v)

1. The Court construes the claim limitation as requiring the distal tip's external peripheral surface finish to be (i) a smooth finish that comprises or is consistent with a polished surface, i.e. a surface finish of 32 microinches or less, and (ii) for the purpose of maintaining the distal tip unaffixed to the femur.

2. The Court finds that the APR II distal sleeve's external peripheral surface is to have a smoothness of less than 32 micrometers, which comprises or constitutes a pol-

ished surface. The defendant's contentions that the APR II distal sleeve's surface does not meet the claim limitation because of circumferential marks on its surface, or that the distal sleeve is not polished, miss the point concerning what degree of roughness constitutes polish, and are rejected.

3. The Court finds that the surface finish of the distal sleeve of the APR II is for the purpose of maintaining the distal sleeve unaffixed to the femur.

4. The Court finds that there was a literal infringement by Intermedics in its APR II and APR II–T, of claims 8, 10 and 12 of the 023 patent.

### D. *The February AAOS Meeting*

1. The Court finds that there is no Intermedics document prior to February 18, 1988, stating specifically or in substance that there is a need to incorporate a distal modular sleeve in the APR II hip implant; nor is there any such document referring to a distal sleeve. There are no Intermedics drawings or sketches or memoranda or records of any kind with regard to a modular distal sleeve prior to February 1988. All of the Intermedics documents referring to the modular distal sleeve started to appear only after the Atlanta AAOS meeting in February 1988.

2. The Court finds that the representatives of Intermedics first learned about the Omniflex and its distal modular sleeve and the pending 023 patent at the Academy of Orthopedic Surgeons meeting in February 1988. The Intermedics personnel took the Osteonics brochure back to their office. They then copied the concept of distal modularity, including a tapered stem and the modular distal sleeve component, and introduced it into their APR II hip implant.

3. The Court does not credit the testimony of Dr. Dorr, James Dale or Ronnie Burchett that they created, conceived or designed the concept of a tapered stem or the modular distal sleeve.

4. The Court finds that after Intermedics deliberately copied the distal modularity concept of the Omniflex, their APR II hip implant became an instant commercial success and salvaged the defendant's hip implant business. The difference between the APR I and APR II is, essentially, the addition of the tapered stem and modular distal sleeve in the APR II.

### 2. Infringement Under the Doctrine of Equivalents

#### A. *The Legal Standard*

Under the doctrine of equivalents, a Court may find infringement when the accused device performs substantially the same function in substantially the same way to achieve substantially the same result that the patent in suit does. *Conroy,* 14 F.3d at 1574; *London v. Carson Pirie Scott & Co.,* 946 F.2d 1534, 1538 (Fed.Cir.1991) (citing *Graver Tank,* 339 U.S. at 608, 70 S.Ct. at 856). The purpose of the doctrine of equivalents is to ensure that the patentee is not deprived of the benefits of his or her patent by competitors "who appropriate the essence of an invention while barely avoiding the literal language of the claim." *London,* 946 F.2d at 1538; *Loctite Corp. v. Ultraseal Ltd.,* 781 F.2d 861, 869 (Fed.Cir.1985).

There are two aspects to the doctrine of equivalents. The first aspect, described above, concerns protecting the patent from infringement in situations where, although the literal language of the claims are not copied, the essence of the patent is. The second aspect of the doctrine concerns ensuring that the exclusiveness of the patent's claims are not extended to cover a device which, although falling within the literal meaning of the claims, is "so far changed in principle" from the patented device that it performs the same function in a substantially different way. *See Graver Tank,* 339 U.S. at 608–609, 70 S.Ct. at 856 (setting forth both aspects of the doctrine of equivalents). This second aspect has become known as the "reverse doctrine of equivalents."

The Federal Circuit has explained the relationship between the doctrine of equivalents and the reverse doctrine of equivalents in the following manner:

Infringement is defined in 35 U.S.C. § 271(a) as the unlicensed making, using

or selling of a patentee's claimed invention. Recognizing frailties of language and limitations on human foresight, the law acknowledges that one may appropriate another's patented contribution not only with a product precisely described in a patent claim (literal infringement) but also with a product that is not quite so described but is in *fact* "substantially the same thing, used in *substantially* the same *way,* to achieve substantially the same result" (doctrine of equivalents). The law also acknowledges that one may only appear to have appropriated the patented contribution, when a product precisely described in a patent claim is in fact "so *far* changed in principle" that it performs in a "substantially different way" and is not therefore an appropriation (reverse doctrine of equivalents).

*SRI Int'l v. Matsushita Elec. Corp. of America,* 775 F.2d 1107, 1123 (Fed.Cir.1985) (in banc) (emphasis in original).

The Federal Circuit has also explained, however, that application of the doctrine of equivalents is the exception, not the rule, and should not be available as the second prong of every infringement charge. "[I]f the public comes to believe (or fear) that the language of patent claims can never be relied on, and that the doctrine of equivalents is ... regularly available to extend protection beyond the scope of the claims, then claims will cease to serve their intended purpose." *London,* 946 F.2d at 1538.

 There are two limitations on the doctrine of equivalents. First, the doctrine of equivalents will not extend to an infringing device that is found in the prior art at the time the patent was issued. Second, under the doctrine of prosecution history estoppel, the patentee is not allowed to recapture through equivalence certain claims coverage given up during prosecution. *Loctite,* 781 F.2d at 870.

 What constitutes equivalency, or for that matter non-equivalency under the reverse doctrine of equivalents, is to be determined against the context of the patent, the prior art, and the particular circumstances of the case. *Graver Tank,* 339 U.S.

at 609, 70 S.Ct. at 856; *SRI Int'l,* 775 F.2d at 1124. The inquiry into equivalency is a factual one, and does not require "complete identity of every purpose and in every respect" between the patent and the accused device. *Graver Tank,* 339 U.S. at 609, 70 S.Ct. at 857. Factors to consider in the inquiry include (i) the purpose for which an ingredient is used in a patent, (ii) the qualities it has when combined with the other ingredients, (iii) the function which it is intended to perform, (iv) whether the accused product resulted from independent research, and (iv) whether persons reasonably skilled in the art would have known of the interchangeability of an ingredient not contained in the patent with one that was. *SRI Int'l,* 775 F.2d at 1124.

 When a patentee establishes literal infringement, the accused infringer may undertake the burden of going forward to establish the fact of non-infringement under the reverse doctrine of equivalents. If the accused infringer makes a *prima facie* case, the patentee, who retains the burden of persuasion on infringement, must rebut that *prima facie* case. *SRI Int'l,* 775 F.2d at 1123–24.

 Thus, where literal infringement has been established, a defense of non-infringement based on the reverse doctrine of equivalents may be raised by the accused infringer. The key issue of inquiry under the reverse doctrine of equivalents is whether the principle of the patent has been so far changed in the accused device that the accused device performs the function of the claimed invention in a substantially different way. *SRI Int'l,* 775 F.2d at 1124. Merely using a device, however, which meets the patent claims in a different way than that described in the patent specification does not preclude liability for infringement of the patent. *Id.* ("One who takes a claimed structure and merely uses it in a way that differs from that in which a specification-described embodiment uses it, does not thereby escape infringement.").

### B. *The Defendant's Equivalency Contentions*

The defendant explicitly raises the defense of non-infringement under the reverse doc-

trine of equivalents, and contends that the APR II functions in a substantially different way from the 023 patent.

According to the defendant, the principal objective of the 023 patent is to "more advantageously address the problem of proximal stress shielding commonly associated with cementless hip prostheses" by incorporating a stem and modular distal tip component in combination, and purposefully designing the stem geometry and tip surface characteristics to "impart relatively enhanced flexibility to the prosthesis stem shaft to insure that it flexes meaningfully and so that the distal portion of the prosthesis pistons within the femoral implant." Defendant's Post Trial Brief at 12. The defendant further contends that the mode of operation that is the "principle" of the 023 patent is the use of a distal tip of "the shortest length possible" to address proximal stress shielding by *"purposefully enhancing* the otherwise *inherent flexation* of the stem under load." Defendant's Post–Trial Brief at 12.

On the other hand, the defendant contends that the APR II addresses the problem of proximal stress shielding by trying to prevent proximal motion and stem loosening through use of better proximal fixation techniques and collar loading. According to the defendant, the APR II does not operate on the principle of enhancing stem flexation through design of the stem and distal tip. Rather, the APR II operates on the principle of inhibiting movement of the prosthesis along its entire route, in order to promote better affixation of the prosthesis at the proximal end of the femur. To achieve this, the defendant claims that the APR II incorporates a larger wedge-shaped affixation surface, with an anatomic curvature and an improved porous coating. Moreover, the defendant contends that the role of the distal sleeve in the APR II is to fill the canal and prevent relative motion between the implant and the femur, and not to enhance flexing of the stem. Defendant's Post–Trial Brief at 13.

In addition to raising a defense to literal infringement under the reverse doctrine of equivalents, the defendant raises two other defenses in response to Osteonics's allegation of infringement under the doctrine of equivalents. The first defense is that the APR II does not meet the function-way-result test for equivalence set forth in *Graver Tank* and its progeny. The second defense is based on prosecution history estoppel. According to the defendant, when claim 1 was amended to add the limitation language reciting a stem shaft diameter smaller than the distal tip diameter for the purpose of enabling flexing of the stem shaft, the patentee surrendered any coverage of devices having similarly differentiated stem shaft and distal tip diameters that are not for the purpose of enabling flexing of the stem shaft.

Except for the issue of prosecution history estoppel, the Court is of the opinion that the contentions and defenses raised by the defendant with regard to the doctrine of equivalents are the same as the contentions raised in its defense under the reverse doctrine of equivalents. Accordingly, the Court will not consider the contentions and defenses raised by the defendant with respect to the doctrine of equivalents independently from its consideration of Intermedics's defense under the reverse doctrine of equivalents.

### C. *Equivalence of the APR II and the 023 Patent*

As explained in the previous section dealing with claims interpretation, the primary objectives of the 023 patent are to eliminate toggling of the prosthesis and to prevent stress shielding in the proximal area of the femur. The principle it uses to prevent stress shielding is reduction of stress at the distal end of the stem by enabling the stem shaft of the prosthesis to flex and move axially upwards and rotationally on its axis, relative to the bone. This is accomplished by the use of a modular distal tip attached to the distal end of the stem which (i) is of a larger diameter than the stem shaft above it, (ii) is not affixed to the bone, and (iii) is integral with the stem through connection by complementary tapers between the tip's central bore and the stem shaft. Toggling is eliminated by requiring the distal tip to be the same size as the cavity it sits in, so that it engages the inner wall of the femur.

There is no basis to the defendant's contention that the 023 patent requires "the

shortest tip possible" to enhance shaft flexibility. Such an interpretation is inappropriate because it adds an external limitation to the claim not found in the claim language. *See* discussion in Section II.1.B(2)(b). Rather, as explained previously, the length of the tip must be long enough to maintain a relatively low level of stress on the femur wall, and short enough to enable shaft flexing. Contrary to the defendant's assertions, the APR II is not "so far changed in principle" from the 023 patent, that it can be said to perform the same functions and achieve the same results, in substantially *a different way.*

Based on the evidence described in the previous section of this Opinion and the findings made therein, the APR II uses a modular distal sleeve which is unattached to the bone, thus allowing micromotion of the stem axially upwards and rotationally about its axis, relative to the bone. The modular distal sleeve surface finish is fixation resistant, and is configured to have a diameter greater than that of the stem shaft above it, thus enabling flexibility of the stem. It is also long enough to maintain a low level of stress along the femur wall. Moreover, the sleeve is made to be the same size as the cavity it sits in, thus preventing transverse motion of the stem. Finally, it is secured onto the stem shaft be means of complementary tapers between the stem and the central bore of the sleeve.

Thus, notwithstanding the changes from the APR I that are incorporated in the proximal portion of the APR II to achieve a tighter fit at the proximal end of the femur, the APR II operates on the same principle of preventing stress concentration at the distal end of the stem as does the 023 patent. That is to say, the intention of the APR II stem and sleeve design is to prevent stress from concentrating at the distal end of the stem by allowing flexibility and axial motion of the stem. The APR II also operates on the same principle as the 023 patent to prevent toggling; namely, use of the distal sleeve to confine transverse movement of the stem. Indeed, the same functions are performed by the APR II as the 023 patent (allowing flexing and axial micromotion of the stem), with the same results achieved (prevents stress at

the distal end of the stem and, therefore, reduces stress shielding at the proximal end of femur), in substantially the same way (use of a particularly configured modular distal sleeve that is integral with the stem but does not affix to the bone).

The Court's conclusion that the APR II operates on the same principle as the 023 patent in the same way, is further supported by consideration of two of the factors of equivalency set forth in *Graver Tank* and *SRI Int'l:* namely, whether the APR II resulted from independent research, and whether persons reasonably skilled in the art would have known of the interchangeability of an ingredient not contained in the 023 patent with one that was, such as, for example, the interchangeability of a distal sleeve and a distal tip. As explained earlier, the APR II and its distal sleeve were *not* developed independently of the 023 patent; they were copied from the Omniflex brochure distributed at the February, 1988 AAOS meeting in Atlanta. Moreover, Dr. Burstein testified, as someone reasonably skilled in the art, that the APR II distal sleeve, as well as the sleeve's surface finish, is interchangeable with the 023 patent's distal tip. Similarly, he testified that the anatomic configuration of the proximal portion of the APR II prosthesis does not render it different in principle than the 023 patent.

Thus, the Court concludes that the defendant has not met its burden with respect to the reverse doctrine of equivalents, and its defense of non-infringement based on that doctrine is rejected. For similar reasons, there is also no merit to the defendant's contentions that there is no infringement under the doctrine of equivalents.

### D. *Prosecution History Estoppel*

■ The Court also rejects the defendant's contention that the doctrine of prosecution history estoppel precludes a finding of infringement of equivalents in this case. As explained above, prosecution history estoppel limits the range of equivalents covered by a patent claim when the claim has been distinguished from relevant prior art during prosecution of the patent. Whatever subject matter was distinguished from the patent claim is deemed surrendered by the patentee, and

cannot be recaptured by claims of infringement under the doctrine of equivalents. *See Southwall Techs.*, 54 F.3d at 1578–79 (citing cases).

■ In the Court's view, prosecution history estoppel is not applicable in this case for two reasons. First, as the Court has already determined, Intermedics intended to enable flexing of the APR II stem shaft when it designed the stem diameter to be less than the distal sleeve diameter. A finding of literal infringement of the claim limitation precludes a defense of prosecution history estoppel. *Id.*, at 1578; *Loctite*, 781 F.2d at 870.

■ Second, assuming *arguendo* there has been no literal infringement, it is the Court's opinion that by amending the language of claim 1 to include the limitation regarding stem-tip diameters, the patentee did not surrender any device which has a stem shaft diameter less than the distal tip diameter with the difference in diameters being other than for the purpose of enabling flexing of the stem shaft.

When a court applies the doctrine of prosecution history estoppel, "a close examination must be made as to, not only what was surrendered, but also the reason for such a surrender." *Southwall*, 54 F.3d at 1580 (quotations and citations omitted). The fact that claims were narrowed does not always mean that the doctrine of prosecution history estoppel "completely prohibits a patentee from recapturing some of what was originally claimed." *Loctite*, 781 F.2d at 871 (quotations and citations omitted).

Here, a close examination of the prior art distinguished by the patentee reveals that the reasons for adding the claims limitation language was to clarify that, unlike the prior art, the 023 distal tip was integral with the stem and not affixed to the bone, thus enabling the corresponding axial movement of the tip and stem in response to the shaft flexation resulting from the tip-stem diameter design. The sleeve of the Witzel device and the tip of the Freeman device, which were distinguished by the patentee, were affixed to the bone. Moreover, the Witzel stem was not integral with the sleeve. Thus, although each device did have a stem diame-

ter smaller than the distal tip diameter, affixing the tip or sleeve to the bone counteracted any flexing of the stem. In the Court's view, what was surrendered by the patent claim amendment was any device having a smaller stem shaft diameter than the diameter of the distal tip, but where the tip or sleeve was either affixed to the bone or not connected in integral fashion with the stem. Nothing in the history of the 023 patent's prosecution indicates that the plaintiff surrendered a stem with a smaller diameter than the tip which was not intended to enable flexing.

### E. Conclusion and Findings as to Equivalents

The Court finds that the APR II is not "so far changed in principle" from the 023 patent, that it can be said to perform the same functions and achieve the same results, in substantially *a different way*. In sum, the Court makes the following findings based on the record, the testimony and the other evidence stated above:

1. The Court concludes that the defendant has not met its burden with respect to the reverse doctrine of equivalents. The Court also concludes that there is no merit to the defendant's contentions that the APR II does not infringe the 023 patent under the doctrine of equivalents.

2. The Court finds that the APR II uses a modular distal sleeve which is unattached to the bone, thus allowing micromotion of the stem axially upwards and rotationally about its axis, relative to the bone. The modular distal sleeve surface finish is fixation resistant, and is configured to have a diameter greater than that of the stem shaft above it, thus enabling flexibility of the stem. It is also long enough to maintain a low level of stress along the femur wall. Moreover, the sleeve is made to be the same size as the cavity it sits in, thus preventing transverse motion of the stem. Finally, it is secured onto the stem shaft by means of complementary tapers between the stem and the central bore of the sleeve.

3. The Court finds that the APR II operates on the same principle of preventing stress concentration at the distal end of the stem as does the 023 patent. That is

to say, the intention of the APR II stem and sleeve design is to prevent stress from concentrating at the distal end of the stem by allowing flexibility and axial motion of the stem. The APR II also operates on the same principle as the 023 patent to prevent toggling; namely, use of the distal sleeve to confine transverse movement of the stem. The Court also finds that the same functions are performed by the APR II as the 023 patent (allowing flexing and axial micromotion of the stem), with the same results achieved (prevents stress at the distal end of the stem and, therefore, reduces stress shielding at the proximal end of femur), in substantially the same way (use of a particularly configured modular distal sleeve that is integral with the stem but does not affix to the bone).

4. The Court concludes that prosecution history estoppel in not applicable in this case. First, it is precluded because the Court had determined the APR II literally infringes the 023 patent claims at issue. Second, assuming there has been no literal infringement, the Court finds that by amending the language of claim 1 during the prosecution of the patent, the patentee did not surrender any device which has a stem shaft diameter less than the distal tip diameter, with the difference in diameters being other than for the purpose of enabling flexing of the stem shaft. Rather, the Court finds that what was surrendered by the patent claim amendment was any device having a smaller stem shaft diameter than the diameter of the distal tip, but where the tip or sleeve was either affixed to the bone or not connected in integral fashion with the stem.

## III. AS TO UNENFORCEABILITY: INEQUITABLE CONDUCT AND INVALIDITY

In addition to the defense of non-infringement, the defendant also alleges that the 023 patent is unenforceable. The grounds for this contention are (1) the 023 patent applicants, namely inventors Averill and Cohen, Osteonics's patent liaison Zarnowski and Osteonics's patent counsel Jacob (the "applicants" for the purposes of this section), engaged in inequitable conduct before the Pat-

ent Office when they applied for the patent, and (2) the patent is invalid because (i) the claims limitations at issue are indefinite, and (ii) the patent's claims have been rejected by the Patent Office upon reexamination. The Court shall consider each of these asserted grounds of unenforceability.

### 1. Inequitable Conduct

The defendant alleges that the conduct of the applicants with regard to the filing and prosecution of the 023 patent application violated the applicants' duty to disclose information material to patentability.

Essentially, Intermedics contends that the applicants intentionally withheld material information from the Patent Office regarding the Whiteside Total Hip System ("Whiteside device"). The Whiteside device was a hip prosthesis developed by DR. LEO WHITESIDE and marketed by the Dow Corning Wright Corp. ("Dow Corning") several years prior to the 023 patent application in January, 1988. According to Intermedics, the Whiteside device employed a modular distal sleeve and many of the other features of the 023 patent claims, and therefore was "highly material" prior art that should have been disclosed in the 023 patent application and prosecution. Intermedics contends that the applicants' failure to do so constitutes inequitable conduct and renders the 023 patent unenforceable.

On the other hand, Osteonics contends that reference to the Whiteside device was not material to the examination by the Patent Office of the 023 patent claim, and that the device was cumulative of other prior art referred to in the patent's application and prosecution. The plaintiff further contends that there was no intent to deceive the Patent Office in connection with the non-disclosure of the Whiteside reference.

▮ In addition, Osteonics contends that the defendant's contentions regarding its alleged inequitable conduct have already been ruled upon and rejected by United States Magistrate Judge Michael L. Orenstein's decision of March 1, 1993, *Stryker Corp. v. Intermedics Orthopedics, Inc.,* 148 F.R.D. 493 (E.D.N.Y.1993). That decision dealt with

the issue of compelling Osteonics's patent counsel to respond to questions focusing on Intermedics's defense of inequitable conduct. Judge Orenstein ruled that in order to vitiate the attorney-client privilege and compel responses, the defendant had to establish a *prima facie* case of common law fraud. *See id.* at 497 (citing *American Optical Corp. v. United States,* 179 U.S.P.Q. 682, 684, 1973 WL 20128 (Ct.Cl.1973)). After reviewing the evidence before him, Judge Orenstein held that the defendant had not established a *prima facie* case of fraud because there was no evidence of an intent by the applicants to deceive the Patent Office, and the Whiteside device was only "modestly" material. *Stryker,* 148 F.R.D. at 498–99 & n. 10. Accordingly, Judge Orenstein denied the defendant's motion to compel disclosure of the privileged communications.

■ Osteonics contends that Intermedics did not appeal Judge Orenstein's findings and ruling, and therefore his decision is now the "law of the case" with regard to Intermedics's defense of inequitable conduct. The Court disagrees. The strong public interest in enforcing the duty of candor when dealing with the Patent Office militates against precluding the defense of inequitable conduct on the basis of the "law of the case." *Cf. Thompson–Hayward Chemical Co. v. Rohm and Haas Co.,* 745 F.2d 27, 32–33 (Fed.Cir.1984) (where plaintiff filed two infringement suits covering the same patent and the Federal Circuit determined in the appeal of one of the suits that the plaintiff's patent was invalid due to inequitable conduct, the defendant's failure to raise the patent's invalidity in an answer to the amended complaint in the second suit, filed after the decision in the first suit, does not prevent the Court from considering the plaintiff's inequitable conduct in the second suit). Indeed, Judge Orenstein noted that his decision "does not preclude defendants from presenting their defense of inequitable conduct before the trial judge." *Stryker,* 148 F.R.D. at 499 n. 11.

Accordingly, the Court will consider Intermedics's defense of inequitable conduct.

## A. *Applicable Legal Standard*

■ Pursuant to 37 C.F.R. § 1.56, "[e]ach individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the [Patent] Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability as defined in this section." The intentional failure to disclose such material information is deemed inequitable conduct before the Patent Office, and subjects the patent to unenforceability. *Molins PLC v. Textron, Inc.,* 48 F.3d 1172, 1178 & n. 6 (Fed.Cir.1995) (citing cases).

Inequitable conduct includes "affirmative misrepresentation of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive." *Id.* (citing *J.P. Stevens & Co. v. Lex Tex, Ltd.,* 747 F.2d 1553, 1559 (Fed.Cir.1984), *cert. denied,* 474 U.S. 822, 106 S.Ct. 73, 88 L.Ed.2d 60 (1985)). In this case, the defendant alleges that the applicants failed to disclose certain prior art in the 023 patent application, namely the Whiteside device. To prevail on its claim of inequitable conduct, Intermedics must offer clear and convincing proof "of the materiality of the prior art, knowledge chargeable to the applicant[s] of that prior art and of its materiality, and the applicant[s'] failure to disclose the prior art, coupled with an intent to mislead the PTO." *Molins,* 48 F.3d at 1178; *accord LaBounty Mfg., Inc. v. United States Int'l Trade Comm'n,* 958 F.2d 1066, 1070 (Fed.Cir.1992) (the failure to disclose prior art constitutes inequitable conduct if the defendant shows by clear and convincing evidence that (1) the prior art withheld from the Patent Office was material, and (2) that the patentee and/or its patent counsel manifested a deceptive intent to withhold the material information).

■ Proof of inequitable conduct may be rebutted by a showing of non-materiality, lack of knowledge of materiality or lack of an intent to deceive. The Federal Circuit has described the relevant burdens of proof in the following manner:

[O]ne who alleges a 'failure to disclose' form of inequitable conduct must offer

clear and convincing proof of: (1) prior art or information that is material; (2) knowledge chargeable to applicant of that prior art or information and of its materiality; and (3) failure of the applicant to disclose the [prior] art or information resulting from an intent to mislead the PTO. That proof may be rebutted by a showing that: (a) the prior art or information was not material (e.g., because it is less pertinent than or merely cumulative with prior art or information cited to or by the PTO); (b) if the prior art or information was material, a showing that applicant did not know of that art or information; (c) if applicant did know of that art or information, a showing that applicant did not know of its materiality; (d) a showing that applicant's failure to disclose art or information did not result from an intent to mislead the PTO.

*FMC Corp. v. Manitowoc Co.*, 835 F.2d 1411, 1415 (Fed.Cir.1987).

■ Once the threshold findings of materiality and intent are established, "the court must weigh them to determine whether the equities warrant a conclusion that inequitable conduct occurred." *Molins*, 48 F.3d at 1178. A determination of inequitable conduct is appropriate when "in light of all the particular circumstances, the conduct of the patentee is so culpable that its patent should not be enforced." *LaBounty Mfg.*, 958 F.2d at 1070. *See also FMC Corp.*, 835 F.2d at 1415 ("Thus, a balancing of overlapping considerations is involved in determining, in view of all the circumstances, the presence or absence of inequitable conduct.").

With regard to the requirement of materiality, the patent regulations set forth a detailed definition of the term. *See* 37 C.F.R. § 1.56(b) (1994). The current definition, however, is the result of a revision to the regulation in 1992. The patent in suit was prosecuted from January 1988 until December 1989. Accordingly, the standard of materiality in effect at the time of the 023 patent's prosecution must be used for the purposes of determining whether Osteonics's conduct was inequitable. That standard was set forth in the former regulation, *see* 37 C.F.R. § 1.56 (1991) (revised as of March 16, 1992), and defined information as being material when "there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent." *See Molins*, 48 F.3d at 1179 n. 8 (explaining the materiality standard under the old and revised regulation); *Merck & Co., Inc., v. Danbury Pharmacal, Inc.*, 873 F.2d 1418, 1421 (Fed.Cir.1989).

■ Moreover, to be material "[t]he matter misrepresented need only be within a reasonable examiner's realm of consideration." *Id.* If the information allegedly withheld "is not as pertinent" as that considered by the examiner, or is "merely cumulative" to that considered by the examiner, it is not material. *Molins*, 48 F.3d at 1179.

The materiality of information is often described in terms of a spectrum ranging from high materiality to low materiality. In addition, materiality is often determined based upon the result of a Patent Office proceeding reassessing patentability in light of information not originally disclosed. For example, the reasonable rejection of claims in reliance on a reference, originally undisclosed to the Patent Office, during a reissue proceeding establishes the materiality of that reference. *Id.* (citing *J.P. Stevens*, 747 F.2d at 1562). With regard to the failure to disclose prior art, determinations that the undisclosed prior art is material have been made in the following circumstances: (i) the withheld reference is highly material when no single piece of cited prior art taught the combination present in the reference, (ii) the undisclosed prior art is material when it discloses more relevant features than cited prior art, and (iii) the withheld reference is highly material where it is the only prior art cited in foreign patent applications, or where it has been used in rejecting the claims in the foreign application. *See Molins*, 48 F.3d at 1180 (summarizing findings of materiality and citing cases).

With regard to the element of an intent to deceive, the Federal Circuit recognizes that direct proof of wrongful intent is rarely available, and an intent to deceive may instead be inferred from evidence of the circumstances surrounding the applicant's conduct. *Id.*,

*LaBounty Mfg.*, 958 F.2d at 1076. Intent "is most often proven by 'a showing of acts the natural consequences of which are presumably intended by the actor.'" *Molins*, 48 F.3d at 1180; *Merck & Co.*, 873 F.2d at 1422 (quoting *Kansas Jack, Inc. v. Kuhn*, 719 F.2d 1144, 1151 (Fed.Cir.1983)).

However, knowledge of the prior art alone is not culpable intent. *See Allen Organ Co. v. Kimball Int'l, Inc.*, 839 F.2d 1556, 1568 (Fed.Cir.), *cert. denied*, 488 U.S. 850, 109 S.Ct. 132, 102 L.Ed.2d 104 (1988). Nor does a finding that the conduct amounts to gross negligence itself justify an inference of an intent to deceive. *Molins*, 48 F.3d at 1181 & n. 11. Rather, "'the involved conduct, viewed in light of all the evidence, including evidence indicative of good faith, must indicate sufficient culpability to require a finding of intent to deceive.'" *Id.* (quoting *Kingsdown Medical Consultants, Ltd. v. Hollister, Inc.*, 863 F.2d 867, 876 (Fed.Cir. 1988) (in banc), *cert. denied*, 490 U.S. 1067, 109 S.Ct. 2068, 104 L.Ed.2d 633 (1989)).

Inferences of an intent to deceive are often related to the strength of the materiality of the withheld reference. Thus, the failure to cite to the Patent Office a material reference cited elsewhere in the world "justifies a strong inference that the withholding was intentional." *Molins*, 48 F.3d at 1182. Similarly, submitting information to the Food and Drug Administration ("FDA") while withholding it from the Patent Office is evidence of an intent to deceive. *Merck & Co.*, 873 F.2d at 1420, 1422.

### B. *Determination of Inequitable Conduct*

In the Court's view, there was no inequitable conduct on the part of the patentees during prosecution of the 023 patent because the Whiteside device is not material and the defendant has failed to show that the patentees acted with the requisite intent to deceive the Patent Office.

### (1) *Materiality of the Whiteside Device*

Dr. Leo Whiteside testified by videotape deposition. He has been associated with Dow Corning and the development of prosthetic devices for many years, and is still associated with that company. Dr. Whiteside testified that initially, his Whiteside Total Hip System entailed a stem-type femoral device consisting of a cobalt-chromium metal stem with a cobalt-chromium modular head, proximal porous coating and a distal cylindrical stem. The principal method of preventing proximal stress shielding in the original Whiteside device was (i) to use a cylindrical non-porous stem made of a less flexible metal, which press fit into the medullary canal so as to be rigid and which would not bear axial loading because it slipped relative to the bone, and (ii) to provide fixation of the device at the proximal end of the femur. (Defendant's Exh. ATL at 17–18 and 65–66).

Dr. Whiteside disclosed a femoral component sleeve to Dow Corning in 1984. He testified that he derived the concept of a sleeve, which he called a "femoral component spacer sleeve," from one of the knee implants he had developed. The purpose of the spacer sleeve was to space and fill the distal end of the canal, which tended to be larger than the proximal end of the canal in older patients:

> [T]he medullary canal of the femur gets large as the patient ages. I found I needed something to add to the distal portion of the femoral component in order to make it fit into a femur with a large medullary canal, in order to make the entire implant fit in a large medullary canal.

(Defendant's Exh. ATL at 20). Moreover, the sleeve would allow centering of the stem in a cemented implant, and also a better press-fit of the distal stem portion in a non-cemented implant when the upper femur and canal sizes did not match. (Defendant's Exh. ATL at 75–78). Promotional material by Dow Corning advertised the Whiteside femoral sleeve—composed of the hard plastic methylmethacrylate or acrylic—as used to center the stem in the distal femoral canal, minimize distal stem toggle, allow for a uniform cement mantle, and enhance proximal stress transfer and prosthesis fixation. (*See, e.g.*, Defendant's Exh. CI). Although the acrylic sleeve fit over the metal stem and was "attached" by friction to it, it is not secured to the stem.

According to the defendant, the Whiteside device is "highly material" on the following grounds: (1) the Whiteside device employs the concept of distal modularity; (2) the 023 patent has been subjected to reexamination on the basis, *inter alia*, of the Whiteside device, (3) although marketed as a cemented implant, the Whiteside device could be employed as a cementless implant without any structural change, and thereby meet the purposes of the 023 patent, and (4) there are so many commonalities between the Whiteside device and the 023 patent, that the Whiteside device should have been revealed to the Patent Office.

Moreover, the defendant contends that the Whiteside device is not a cumulative reference, and that in particular the Witzel patent referred to by the applicants in the patent prosecution is not cumulative of the Whiteside device.

The Court is not persuaded by the defendant's contentions. With regard to the distal modularity feature of the Whiteside device, the Court believes that although the Whiteside device used a modular sleeve, i.e., several sleeves with different sized outer diameters could fit each of the various-sized Whiteside stems, (*see* particularly Defendant's Exhs. CJ, CK, CL [delineating the various "femoral sleeves" corresponding to each sized stem], Defendant's Exhs. CI and CL [describing the "femoral sleeve" as allowing for "independent prosthetic sizing of proximal and distal femur"], and Defendant's Exh. ATK at 44–48 [video deposition testimony of KENNETH W. RUSSELL describing the various sleeve sizes]), this feature in and of itself, in the Court's view, would not make the Whiteside reference material.

The more fundamental or pertinent aspect of the distal modularity practiced by the 023 patent is that the distal tip locks onto the stem so that it acts integrally with the stem. The integral nature of the 023 patent's distal tip to the stem is not practiced by the Whiteside device because the friction fit of the sleeve to the stem does not lock the sleeve onto the stem. The Whiteside stem can move relative to the sleeve and does not act in an integral fashion with it. Dr. Whiteside admitted in his videotaped deposition that he did not design his device so that the sleeve and stem are integral. (Plaintiff's Exh. 807 at 31–33).

This difference in distal modularity was explained by Dr. Burstein in the context of distinguishing the Whiteside device and Witzel patent from the 023 patent:

Q Dr. Burstein, you testified—let me ask you this: Is the distal modularity taught by the 023 patent, the same incorporated into the Whiteside Total Hip System whether implanted cementless or uncemented?

A No, completely different.

Q Please explain the difference to the Court between the Whiteside and the 023, in distal modularity?

A The 023 patent has an integral tip. What the Whiteside patent does is provide a spacer sleeve which can articulate against the prosthesis and against the bone. Distal modularity in the Whiteside device is an inappropriate space filler which fails after use. Distal modularity in the 023 patent is a metal component attached to the stem that does not fail in the use. It does not generally cause the kind of debris that the Whiteside does.

. . . . .

Q *In both Witzel and Whiteside the stem is capable of moving up and down in the sleeve; is that correct?*

A *Yes, with the added fact that Whiteside's sleeve is also capable of moving in addition. So Whiteside has two moving surfaces. Witzel has only one.*

Q With respect to the patent in suit, can the stem move up and down within the sleeve or tip?

A No. There is no relative motion between the sleeve and tip. All the relative motion occurs between the sleeve and bone.

Q Is there any mechanism or feature in Whiteside that makes the sleeve integral with the stem?

A No.

. . . . .

Q You testified that the Whiteside total system was not implanted as a unitary device into the prepared femur.

Would you please clarify that answer to the Court.

A The Whiteside device, when it consists of these two components [stem and sleeve] is never unitary. These two components are never fixed together. There is no way to fix these two components together.

Unitary to me means fixed together at one unit. These are always separable.

(Tr. at 3831–3834) (emphasis supplied).

Indeed, there is some question as to whether the Whiteside "femoral sleeve" can even be considered a "distal tip." Initially, it is noted that the sleeve was approved by the FDA as a cemented implant. By being cemented, it would have been integral with the bone. However, even considering its cementless use, the sleeve may not be considered a "distal tip" because it lacks an integral nature with the stem. Dr. Burstein explained that a sleeve becomes a distal tip when it is integrally affixed to the distal end of the stem. *See* section III, *supra* (Tr. at 136–138). Since the Whiteside sleeve is not integrally affixed to the stem, it may also be deemed not to be a modular distal tip, but only a modular sleeve.

Thus, for the reasons stated above, the Court concludes that there is no substantial likelihood that a reasonable examiner would have considered the Whiteside device important in deciding whether to allow the 023 application to issue as a patent on the basis of the modularity of the Whiteside sleeve component.

 The Court also finds no merit to the defendant's contentions as to the Whiteside reference's materiality on the basis of the 023 patent's reexamination, for two reasons. First, the Court is not bound by the findings of the reexamination proceeding, because the proceeding entails a different record with different standards of proof than the instant judicial proceeding. *See Standard Havens Prods., Inc. v. Gencor Industries, Inc.,* 953 F.2d 1360, 1366 n. 2 (Fed.Cir. 1991) (citing cases), *cert. denied,* —— U.S. ——, 113 S.Ct. 60, 121 L.Ed.2d 28 (1992).

Second, reexamination of the patent on the basis of an undisclosed reference does not warrant a finding of materiality. Rather, only when the claims are reasonably rejected on the basis of the undisclosed reference after reexamination will the reference be considered material. *See J.P. Stevens,* 747 F.2d at 1562. In this case, upon reexamination the Patent Examiner withdrew the rejection of the 023 patent claims under Whiteside. *See Office Action in Reexamination,* No. 90/003379, at 10 (PTO May 13, 1995) ("Reexamination Decision"), submitted to the Court in a letter dated June 5, 1995 from the defendant's trial counsel.

The defendant next contends that the Whiteside device is material, because when used as a cementless implant it could achieve the purposes of the patent, namely "to fit and fill the medullary canal and, thus, to avoid distal stem toggling and proximal stress shielding." Defendant's Post–Trial Brief at 21. The Court disagrees with this contention, because, even when used in a cementless manner, the Whiteside sleeve does not achieve the purpose of the 023 patent.

 Initially, the Court notes that the defendant is correct in asserting that when considering prior art devices, the intended use of the referenced device is irrelevant if it could be employed without structural change to achieve the patent's purposes. *See LaBounty Mfg.,* 958 F.2d at 1075 (undisclosed prior art is material if, when inverted from its normal condition, it would perform the functions of the patent in suit) (quoting *Dwight & Lloyd Sintering Co. v. Greenawalt,* 27 F.2d 823, 828 (2d Cir.1928) ("The use for which the [anticipatory] apparatus was intended is irrelevant, if it could be employed without change for the purposes of the patent.")). Thus, although approved for cemented implant by the FDA, the Whiteside sleeve's use in a cementless fashion may also be relevant to the materiality determination of the prior art.

A review of the evidence and trial record, however, reveals that even when used in a cementless fashion, the Whiteside device and its sleeve do not achieve the purposes of the 023 patent, because the design of the Whiteside sleeve—as admitted by Dr. Whiteside—

is intended to allow relative motion between the stem and the sleeve, and the sleeve and the bone. (Plaintiff's Exhibit 807 at 18, 32). This design ultimately does not prevent toggling, and does not address proximal stress shielding in the more efficient manner that the 023 patent does.

For example, when added to the metal stem of the device, the Whiteside sleeve, which is made of acrylic, press fits into the reamed canal and thus prevents transverse motion of the distal stem, i.e., prevents toggling. However, this is a temporary condition. The metal stem is harder than the acrylic sleeve, and because it moves relative to the sleeve and the sleeve moves relative to the bone, the sleeve eventually cracks and breaks, thus allowing transverse motion of the distal stem. Dr. Burstein described the breakdown of the sleeve as resulting from "abrasion against the bone," which "eventually ... causes a gap between itself and the bone and no longer limits transverse motion." (Tr. at 3636). Dr. Whiteside admitted in his deposition testimony that the reason the device and acrylic sleeve were discontinued were due to the breakdown of the sleeve. (Plaintiff's Exh. 807 at 19, 34; Tr. at 2316–17 and 3654–55).

More importantly, the acrylic sleeve is not intended to relieve proximal stress shielding in the manner taught by the 023 patent. Dr. Whiteside testified in his deposition that while he believes there is some distal axial micromotion and distal torsional micromotion when his stem and sleeve are implanted cementlessly, (Defendant's Exh. ATL at 135–36), this micromotion is the result "of a rigid stem and flexible bone," and not the result of a stem and distal tip design based on enabling flexing of the stem with corresponding axial displacement of the stem and tip. Indeed, in his deposition Dr. Whiteside testified that his design did not enable flexing of the device in this manner:

Q Is it fair to say, Doctor Whiteside, that in the design of Dow Corning Wright Exhibit Number 2 you moved the fulcrum point proximally, comma, you used a rigid cobalt chrome alloy material, comma, you placed the collar at a more horizontal angle and you shortened the neck all for the purpose of helping to minimize or avoid bending stresses at the junction of the distal and middle thirds of the stem of that prosthesis?

A Yes.

Q Is it, also, fair to say that your prosthesis, Dow Corning Wright Exhibit 2, was designed to avoid flexing at the appropriate mid-point area of the shaft of the stem of the prosthesis?

A Yes.

Q And one of the ways you did that was to concentrate bending stresses at what you considered to be the largest cross-sectional area of the stem, is that correct?

A Yes.

. . . . .

Q But, whatever ... causes axial micromotion, it's not caused by flexing of the stem in the mid-shaft portion, correct?

A That's right.

(Plaintiff's Exh. 807 at 14–15, 24–25).

Dr. Burstein conducted a comparison of the Whiteside device to the 023 patent claims, (see Tr. 3629–3661, 3823–3834 and Plaintiff's Exhs. 845, 845E, 845F), and his analysis corroborates not only that the Whiteside sleeve does not achieve the purposes of the 023 patent claims, but also that there is very little similarity between the 023 patent and the Whiteside device.

Dr. Burstein concluded that although the Whiteside device was a femoral type implant consisting of a proximal portion to be affixed to the proximal end of the femur and a stem portion inserted into the medullary canal (Tr. at 3631, lines 5–6 ["the Whiteside device has the two features"]), the similarities between the 023 patent and the Whiteside device ended there. Significantly, Burstein concluded that the Whiteside sleeve was not "a distal tip integral with the distal end of the stem," because the stem moved relative to the sleeve (Tr. at 3632–33; 3650–53). As a result of not including this fundamental limitation of the 023 patent claims, which is incorporated into each of the patent's other dependent claims, the Whiteside device did not meet any of the other patent claims limitations. (See Plaintiff's Exhs. 845E and 845F, com-

paring the Whiteside device and 023 patent claims).

In addition, Dr. Burstein concluded that the Whiteside plastic sleeve ultimately will disintegrate due to abrading against the bone, thereby failing to prevent toggling (Tr. at 3636), and allowing movement of the sleeve relative to the stem and bone (Tr. 3638, 3652–54). In contrast to the 023 patent distal tip, Dr. Burstein explained that the Whiteside sleeve also was not secured onto the stem in an integral manner, but rather fit by frictional means. Moreover, the means of attachment of the Whiteside sleeve onto the stem is not responsive to any relative axial movement between the stem and sleeve, and thus does not secure the sleeve onto the stem by axial motion of the stem. (Tr. at 3640–41). Nor is the Whiteside sleeve attached to the stem by means of complementary tapers.

Dr. Burstein further explained that, despite the Whiteside sleeve's length and its cylindrical structure, the sleeve fails to meet the limitations of 023 patent claims 10 and 12. According to Dr. Burstein, because the sleeve abrades against the bone it fails to maintain low stress at its contact point with the bone, and eventually fails to rotate about its central axis relative to the bone. (Tr. 3644–45). The sleeve is also not made of metal, and whatever smoothness it has will become roughened due to abrading with the bone. (Tr. 3646).

Finally, Dr. Burstein concluded that the differences between the 023 patent and the Whiteside device implanted cementlessly would "most certainly not" have been obvious to a person having the ordinary skill in the art as of January, 1988. (Tr. at 3648, and 3658–60 [stating that Dr. Whiteside's admission that he first became aware of a metallic distal tip being integral with the distal end of a stem through a Morse taper lock when he purchased the Omniflex, is supportive of the non-obvious nature of the 023 patent vis-a-vis the Whiteside device] ).

The Court notes the deposition testimony of Kenneth Russell, a mechanical engineer who works on customizing hip prostheses for Dow Corning Wright (Defendant's Exh. ATK). Russell worked with Dr. Whiteside on the Whiteside device. His testimony concerned alleged similarities between the Whiteside device and the 023 patent. Despite his testimony, the Court finds that Dr. Burstein's testimony and portions of Dr. Whiteside's support the conclusion that the Whiteside device was not *material* prior art, because of fundamental differences in (1) the structure of the Whiteside sleeve from the 023 distal tip, and (2) the intended biophysical methods underlying the Whiteside device and the 023 patent for eliminating proximal stress shielding. Based on these differences, the Court finds that there is *not* a substantial likelihood that a reasonable examiner would consider the Whiteside device *implanted cementlessly* important in deciding whether to allow the 023 patent application to issue as a patent.

For the reasons stated above, the Court also is unpersuaded by the defendant's contention that the Whiteside device is material because it possesses "numerous features and attributes" common to the 023 patent. Indeed, in light of Dr. Burstein's nuancing of Russell's testimony concerning these alleged similarities, and in light of Dr. Whiteside's admissions concerning the lack of flexibility of his device and the non-integral nature of his sleeve with the stem, the Court rejects many of the alleged similarities delineated by the defendant at pages 76–80 of the Defendant's Post–Trial Proposed Findings of Fact and Conclusions of Law.

Finally, having determined that the Whiteside device is not material prior art, the plaintiff's contention that the Whiteside device is cumulative to other prior and referred to during the course of the 023 patent's prosecution, and the defendant's opposing contention that the Whiteside device is not cumulative, particularly in light of the Witzel patent, need not be considered by the Court.

#### (2) *Intent to Deceive*

Assuming, *arguendo,* that the Whiteside device is material, the Court believes it is only slightly material. Moreover, even if such a materiality is bestowed on the Whiteside device, the Court still does not find the plaintiff's conduct to be inequitable because the defendant has not shown by clear and

convincing evidence that the plaintiff intended to deceive the Patent Office.

Intermedics contends that an inference can be drawn from the circumstances of this case that the 023 patent applicants intended to deceive the Patent Office by not disclosing the Whiteside device, because (1) the applicants knew of the Whiteside device at the time they submitted and prosecuted the patent application, (2) Osteonics cited the Whiteside device as a "substantial equivalent" in Premarket Notification documents submitted to the FDA pursuant to 21 C.F.R. § 807 Subpart E (hereinafter referred to as a "510(K) notification"), which sought FDA approval to market certain embodiments of the 023 patent, and (3) Averill and Zarnowski discussed the Whiteside device prior to filing the 023 patent application. According to Intermedics, the "extreme materiality" of the Whiteside reference does not require strong circumstantial evidence of intent to find that the requisite culpable level of intent to deceive the Patent Office exists here. The Court disagrees.

That the applicants knew of the Whiteside device and discussed it prior to submitting the patent application is not indicative of an intent to deceive. The sole basis of the defendant's contention of an intent to deceive is the alleged "extreme materiality" of the Whiteside prior art coupled with disclosing the Whiteside device to the FDA in a 510(K) notification while not disclosing it to the Patent Office.

Moreover, with regard to the 510(K) notification, the Court finds that it was reasonable for the applicants to disclose the Whiteside device to the FDA but not to the Patent Office. The 510(K) notification at issue concerns a January 17, 1987 notice to market the Omnifit II Hip Prosthesis *as a cement fixation.* (Defendant's Exh. CB). In the section of the notification listing equivalency to commercially distributed products, Osteonics listed, among other products, the Whiteside Total Hip System. (Defendant's Exh. CB at S/O 000795). The Whiteside device was marketed for cemented implantation. However, the 023 patent is a cementless implant. Thus, given the differences between the Whiteside device and the 023 patent described above, the Court cannot say it was deceiving for the plaintiff to have disclosed the Whiteside device to the FDA with respect to the Omnifit II cemented implant, but not to have disclosed the Whiteside device to the Patent Office with respect to the 023 patent cementless implant.

In the Court's view, Osteonics's conduct was consistent because six months later, on July 13, 1987, Osteonics submitted a 510(K) notification regarding the Omniflex cementless implant. (Plaintiff's Exh. 502 at 10). In that notification, the Whiteside device was not listed among the commercial equivalents. (Plaintiff's Exh. 502 at 15–16). Moreover, the defendant did not offer any evidence showing that the patent applicants knew that the Whiteside device could be used in a cementless fashion. Indeed, given that the FDA had approved the Whiteside device only for a cemented implant, and that there was no written surgical protocol for cementless implant of the Whiteside device, (Plaintiff's Exh. 807 at 3), the evidence supports the plaintiff's position that it was reasonable to disclose the Whiteside device in the cemented implant Omnifit II 510(K) notification, but not in the cementless implant Omniflex 510(K) notification or the 023 patent application. In this regard, the Court's conclusion is similar to that of Magistrate Judge Orenstein. *See Stryker,* 148 F.R.D. at 498.

In addition, there is no evidence of bad faith on Osteonics's part in failing to make the disclosure. Its consistent behavior before the FDA indicates a good faith belief that the Whiteside device was not an equivalent of the 023 patent. Accordingly, assuming the Whiteside device is slightly material, the Court finds that under the circumstances, Osteonics did not intend to deceive the Patent Office by failing to disclose the Whiteside device in its 023 patent application. Unlike the situation in *Merck & Co.,* where the prior art disclosed to the FDA but withheld from the Patent Office was shown by the plaintiff's own tests to be equivalent to the patent claims, *see id.,* 873 F.2d at 1419, there is a rational and substantial difference here between the withheld Whiteside reference and the 023 patent claims.

Based on the above, the Court concludes that the defendant failed to show by clear and convincing evidence that Osteonics intended to deceive the Patent Office by withholding the Whiteside reference. The Court finds that Osteonics's failure to disclose the Whiteside prior art to the Patent Office does not constitute inequitable conduct.

## 2. Invalidity

The defendant contends that claims 8, 10 and 12 of the 023 patent are invalid on the grounds that (1) upon reexamination, the Patent Office has rejected these claims pursuant to 35 U.S.C. § 102(b) (1988), as being anticipated by prior art, and (2) certain claims limitations that the three claims are dependent on are indefinite within the meaning of 35 U.S.C. § 112 (1988). Osteonics contends that, to the contrary, the 023 patent is valid because the Court is not bound by the Patent Office's reexamination determination, and the three claims limitations at issue are distinct and definable.

### A. *Invalidity Under 35 U.S.C. §§ 102 and 103*

At the time the parties submitted their post-trial memoranda, the Patent Office was reexamining the 023 patent claims in light of certain prior art at the request of JOHN R. MERKLING, in-house patent counsel for Sulzer–Medica, Inc., the parent holding company of Intermedics. On May 13, 1995, the Patent Office issued its determination in the reexamination, and rejected claims 1–6 and 8–14 of the 023 patent pursuant to 35 U.S.C. § 102(b). The grounds for the rejection were that the claims were anticipated by the Hoffman–Daimler ("HD") patent and the Lee, et al. ("Lee") patent. *See* Reexamination Decision at 2. The Patent Office withdrew rejection of the claims under the Whiteside device and Kenna patent. *Id.* at 10.

As previously explained, the Court is not bound by the findings of the reexamination proceeding. Thus, contrary to the defendant's contention, the Court's determination of validity need not be consistent with the Reexamination Decision, particularly when in the present case a trial has been conducted in an adversarial manner, and all admissible evidence has been adduced to support the parties' positions. The Court, therefore, will consider the validity or invalidity of the 023 patent claims at issue under sections 102 and 103.

Unfortunately, the defendant has not set forth any legal or factual support in its post-trial submissions regarding the 023 patent's invalidity under 35 U.S.C. §§ 102 and 103 other than asserting that reexamination may warrant invalidity. However, the extent of the defendant's contentions regarding invalidity under sections 102 and 103 can be ascertained from its Trial Brief. In that brief, the defendant contends that 023 patent claims 8, 10, 12 are invalid pursuant to 35 U.S.C. § 102, because they are anticipated by the HD patent, and pursuant to 35 U.S.C. § 103 because they are obvious with respect to the Whiteside device and/or the HD patent. Having already decided that the Whiteside reference would not have been obvious to one skilled in the art at the time of the 023 patent's application, the Court will focus its invalidity analysis on the defendant's contentions that claims 8, 10 and 12 are invalid because they were anticipated and/or made obvious by the HD patent. In light of the Reexamination Decision, the Court will also discuss anticipation of these claims by the HD and Lee and Ling patents.

### (1) *Legal Standard*

Pursuant to 35 U.S.C. § 282 (1988), a patent is presumed valid. At trial, the burden is on the party asserting invalidity to prove by clear and convincing evidence that the patent is invalid. *North American Vaccine v. American Cyanamid Co.*, 7 F.3d 1571, 1579 (Fed.Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1645, 128 L.Ed.2d 365 (1994); *Loctite,* 781 F.2d at 872.

Under 35 U.S.C. § 102, a patent is deemed invalid if, among other things, the patent's invention is "anticipated" by (a) being known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention of the patent's subject by the patent's applicant, 35 U.S.C. § 102(a), and (b) being patented or described in a printed publication in this or a foreign country, or in public use or on sale in this country, more than a year prior to the

date of the patent application in the United States, 35 U.S.C. § 102(b).

■ In addition, 35 U.S.C. § 103 provides that, even if a patent's invention is not anticipated under section 102, a patent is deemed invalid if the subject matter of the patent and any prior art would have been "obvious" to a person of ordinary skill in the art at the time the invention was created. Obviousness under section 103 and anticipation under section 102 are not unrelated. A disclosure that anticipates an invention under section 102 may also render it obvious under section 103. *In re Baxter Travenol Labs,* 952 F.2d 388, 391 (Fed.Cir.1991) ("anticipation is the ultimate of obviousness"); *Connell v. Sears, Roebuck & Co.,* 722 F.2d 1542 (Fed. Cir.1983).

■ Anticipation under section 102(b) is a question of fact that must be proved by clear and convincing evidence. It requires "the presence in a single prior art disclosure of each and every element of a claimed invention." *Electro Medical,* 34 F.3d at 1052; *Standard Havens,* 953 F.2d at 1367. That "a certain thing *may result* from a given set of circumstances" is not enough for a finding of anticipation. *Electro Medical,* 34 F.3d at 1052 (emphasis in original). Rather, the claim limitation must necessarily be present in the prior art so that it would be recognized by persons of ordinary skill. *Id.* However, the intended use of the alleged anticipatory prior art is not relevant, and the court should focus on whether the prior art could be employed without any change for the purposes of the patent. *LaBounty Mfg.,* 958 F.2d at 1075.

■ Obviousness, on the other hand, is a question of law based on an underlying factual inquiry. *Id.* The test for obviousness looks to the individual and combined teachings of the prior art references. *In re Young,* 927 F.2d 588, 591 (Fed.Cir.1991). The factual inquiry involves consideration of the following factors set forth by the United States Supreme Court in *Graham v. John Deere Co.,* 383 U.S. 1, 17–18, 86 S.Ct. 684, 693–94, 15 L.Ed.2d 545 (1966): (1) the scope and content of the prior art; (2) the differences between the prior art and the claims;

(3) the level of ordinary skill in the art at the time of invention; and (4) objective evidence of non-obviousness, such as long-felt but unsatisfied need, commercial success and copying. *See also Electro Medical,* 34 F.3d at 1053; *Miles Laboratories, Inc. v. Shandon Inc.,* 997 F.2d 870, 877 (Fed.Cir.1993).

(a) *The Hoffman–Daimler Patent*

■ In its pre-trial submissions, the defendant contends that all of the limitations in claim 1 of the 023 patent are found in the HD reference. In addition, the defendant contends that the HD stem has a conical taper that mates with a tapered distal rubber tip, thus anticipating claim 8 of the 023 patent. According to the defendant, the HD reference also anticipates 023 patent claim 10, because the HD rubber tip has a length that is long enough to distribute stress on the femoral wall over the length of the tip and maintain a low level of stress at the point of contact between the tip and wall. Finally, with regard to 023 patent claim 12, Intermedics contends that the shaft of the HD reference is made of a metal alloy that is polished.

Although it was the defendant's burden at trial to prove by clear and convincing evidence that the HD reference anticipated the 023 patent claims 8, 10 and 12, the defendant failed to offer any evidence or testimony with respect to such anticipation. Specifically, no evidence or witness on the defendant's behalf rebutted the testimony of Dr. Burstein—a person of ordinary skill in the art at the time of the invention—that the HD reference did not anticipate 023 patent claims 8, 10 and 12. Having failed to meet its burden of proof, the Court finds that the HD reference does not anticipate the 023 patent claims at issue. Likewise, because the defendant failed to offer any evidence concerning the alleged obviousness of the 023 patent claims vis-a-vis the HD reference, the Court finds that, at the time of the patent's application, the HD reference was not obvious with regard to the 023 patent invention to a person of ordinary skill in the art.

However, to complete the record, the Court will review some of the key differences between the 023 patent and the HD refer-

ence adduced at trial. In the Court's view these differences support the Court's finding that the HD reference does not anticipate the 023 patent, and that the HD reference and the 023 patent are not obvious to one skilled in the art.

The first difference is that the HD rubber distal tip is not integral with the distal portion of the stem. Dr. Burstein compared the HD patent teachings and its preferred embodiment with the 023 patent claims. He concluded that although the rubber tip, which is referred to as a shock absorber, is vulcanized and bonded onto the stem, the stem still moves relative to the tip. (Plaintiff's Exh. 843 and 843A; Tr. at 255, 257). Specifically, he described the ability of the stem to move transversely relative to the bone, and thereby not prevent toggling. Such a motion was also corroborated by the Reexamination Decision, which stated that where there is no physical connection at the interface between the distal tip and the femur wall other than a press fit, there will be movement of the distal tip if the forces acting on the stem are greater than the forces resulting from the press fit. Reexamination Decision at 4. Toggling will ultimately loosen the Hoffman–Daimler prosthesis fixation and cause it to fail.

Thus, the HD tip not only fails to meet a key limitation of the 023 patent, but, as a result, also fails to achieve one of the patent's key purposes. Indeed, the Court must note that it disagrees with the Reexamination Decision and believes the decision is in error, to the extent that it rejects interpreting the claim limitation "integral with the distal end of the stem" to mean that all movement of the distal end of the stem results in a corresponding movement of the distal tip. Reexamination Decision at 4. As explained in Section II.1.B.(2), *supra*, the Court believes that this is the proper interpretation of the limitation.

Another fundamental difference is that the HD distal tip is not made of a fixation resistant metal alloy, whose finish is "smooth." The tip is made of vulcanized rubber. Significantly, Dr. Burstein's analysis concluded that the rubber wears and causes debris inside the canal. Such wear would eradicate whatever smooth finish the rubber tip may initially have had, assuming such a finish was the equivalent of a polish.

Finally, Dr. Burstein also testified that the HD reference was never commercialized. (Tr. at 255).

Accordingly, for these reasons the Court finds that the HD reference does not anticipate 023 patent claims 8, 10 and 12. In addition, the Court finds that the fundamental differences between these claims and the HD reference, as well as the HD reference's lack of commercial success, would not render the 023 patent obvious vis-a-vis the HD reference to a person of ordinary skill in the art.

(b) *The Lee and Ling Patents*

██ The Lee and Ling references concern two patents, one issued in the United States (Defendant's Exh. JW) and the other in Great Britain (Defendant's Exh. AOA) (both patents will be referred to as the "Lee and Ling" patents or prior art). The defendant contends that the Lee and Ling patents anticipate the 023 patent, and that they are obvious vis-a-vis the 023 patent invention to a person of ordinary skill in the art.

The only evidence that the defendant offered to support its contentions with respect to the Lee and Ling prior art was the testimony of John Merkling. On direct examination he identified the Lee and Ling patents as prior art that he had cited to the plaintiff's counsel in a letter dated May 25, 1990 (Defendant's Exh. JT at 6–7) which, in his view, invalidate the 023 patent (Tr. at 2467–68). On cross examination Merkling testified that the Lee and Ling tip, called a "spacer," could also be made of metal (Tr. at 2504), and that although the Lee and Ling tip "push fits" onto the stem, it interlocks with the stem by complementary tapers (Tr. at 2502–05).

In the Court's view, Merkling's testimony, even assuming it is accurate and that he was a person of ordinary skill in the art during the relevant time period, clearly does not constitute clear and convincing evidence that the Lee and Ling patents anticipate the 023 patent and would be obvious prior art to one ordinarily skilled in the art. Because the defendant has failed to meet its burden of proof, the Court finds that the Lee and Ling

references do not anticipate the 023 patent claims at issue. Likewise, the Court finds that, at the time of the 023 patent's application, the 023 patent was not obvious vis-a-vis the Lee and Ling references to one ordinarily skilled in the art.

However, as in the case of the HD reference, in order to complete the record the Court takes note of a key difference between the 023 patent and the Lee and Ling reference adduced at trial through the testimony of Dr. Burstein. In the Court's view, this difference supports the Court's finding that the Lee and Ling patents do not anticipate the 023 patent, and that they and the 023 patent are not obvious to one skilled in the art.

Dr. Burstein testified that he did not consider John Merkling a person of ordinary skill in the orthopedic hip implant art during the period 1988 through 1994. (Tr. at 3662). Moreover, he stated that the defendant had not solicited the testimony of any witness having ordinary skill in the art that 023 patent claims 8, 10 and 12 were rendered obvious by the Lee and Ling patents. (Tr. at 3664).

Significantly, Dr. Burstein testified that the Lee and Ling patents do not entail 023 patent claims 8, 10 and 12, and that the differences between the Lee and Ling prior art and the 023 patent would not have been obvious to one of ordinary skill in the art at the time of the 023 patent application. (Tr. at 3665; see also Plaintiff's Exh. 1074 (summarizing Dr. Burstein's comparison of the Lee and Ling prior art with the 023 patent claims)).

In distinguishing the Lee and Ling prior art, Dr. Burstein focused, among other things, on the Lee and Ling tip or spacer. The tip press fits onto the stem, and, according to Dr. Burstein, is not integral with the distal end of the stem because it is not locked onto the stem and "[t]here is no corresponding one to one motion" between the tip and the stem (Tr. at 3669–70). Indeed, Dr. Burstein stated that the attachment mechanism between the Lee and Ling tip and stem is not a taper lock. (Tr. at 3670). In addition, reading the specification from the Lee and Ling British patent (Defendant's Exh. AOA

at 5:42–60), Dr. Burstein noted that the tip "is not intended to be a close fit in the medullary canal like the already well known bone cement plugs." (Tr. at 3668). Thus, Dr. Burstein testified that the purpose of the spacer is to "stabilize the [stem] tip, keep it from wobbling back and forth too much," and is "clearly not intended to bear load." (Tr. at 3669). Among other ramifications, the intentional design of the Lee and Ling tip and stem does not prevent toggling, because the design requires that the tip and stem not be closely fitted in the medullary canal. (Tr. at 3671). The Court finds that this is so, whether or not the tip is made of metal, since, according to the Lee and Ling patent specification, even a metal tip would not be closely fit in the canal.

For similar reasons to those given above, the Court believes that the Reexamination Decision erroneously rejects 023 patent claims 8, 10 and 12 on the basis of anticipation by the Lee and Ling patents. Among other things, the Court disagrees with the Reexamination Decision's conclusion that the spacer meets the limitations of 023 patent claim 1 because it is a tip integral with the stem (Reexamination Decision at 8). The Court also disagrees with the Reexamination Decision's conclusion that, as a result of referencing to British patent 1409053 ("GB 053"), the Lee and Ling tip engages the wall of the canal and thereby prevents transverse movement of the stem (Reexamination Decision at 8). The Lee and Ling patent specification describes that the tip is not intended to be a close fit in the medullary canal, and the excerpt quoted from GB 053 by the Reexamination Decision does not necessarily preclude transverse movement of the stem relative to the bone.

The defendant did not offer any other evidence to support its contentions regarding anticipation and obviousness, or to refute Dr. Burstein's testimony with regard to the Lee and Ling patents. Accordingly, based on the above the Court finds that the Lee and Ling patents do not anticipate the 023 patent claims, and do not render the 023 patent obvious to one of ordinary skill in the art.

Further, the Court finds that the combined teachings of the prior art references, namely, Whiteside, Witzel, HD and Lee and Ling, do not render the 023 patent obvious. None of these prior art references involve a distal tip that is integral with the stem in the manner of the 023 distal tip.

### B. *Invalidity Under 35 U.S.C. § 112*

The defendant next alleges that the 023 patent is invalid pursuant to the second paragraph of 35 U.S.C. § 112, because two of the claims limitations found in claim 1 of the patent are vague and indefinite. On the other hand, the plaintiff contends that the claims limitations are not vague, and meet the specificity requirements of the second paragraph of section 112.

### (1) *The Legal Standard*

The second paragraph of 35 U.S.C. § 112 provides that the patent specification "shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter" which the applicant regards as his invention.

▆▆▆ Indefiniteness under section 112 is a question of law. The "distinctly claiming" requirement of the statute means "that the claims must have a clear and definite meaning when construed in light of the complete patent document." *Miles Laboratories*, 997 F.2d at 874–75. The person claiming invalidity under the second paragraph of section 112 must show by clear and convincing evidence that the claims at issue are indefinite. *Morton Intern, Inc. v. Cardinal Chem. Co.*, 5 F.3d 1464, 1470 (Fed.Cir.1993).

▆▆▆ Whether a claim is invalid for indefiniteness "depends on whether those skilled in the art would understand the scope of the claim when the claim is read in light of the specification." *North Am. Vaccine*, 7 F.3d at 1579 (citing *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1576 (Fed.Cir.1986)). "[I]f the claims, read in the light of the specification, reasonably apprise those skilled in the art both of the utilization and scope of the invention, and if the language is as precise as the subject matter permits, the courts can demand no more." *North Am. Vaccine*, 7 F.3d at 1579–80. Moreover, the degree of precision neces-sary for adequate claims "is a function of the nature of the subject matter." *Miles Laboratories*, 997 F.2d at 875.

The defendant contends that the limitations of claim 1 which provide (a) for "the shaft portion having a diameter smaller than the corresponding diameter of the distal tip for enabling flexing in the shaft portion," (limitation (iii)), and (b) that the external peripheral surface of the distal tip have a "fixation resistant surface finish" (limitation (v)) are vague and indefinite.

### (2) *Definiteness Analysis*

▆▆▆ With respect to limitation (iii) of claim 1, Intermedics contends that the claim is indefinite because it does not specify the degree of flexation that must be attained. In the defendant's view, the patent specification does not assist in determining the scope of the limitation, *i.e.*, the degree of flexibility, because the specification is equally as vague. According to the defendant, "the claim, even when construed in light of the specification, does not indicate how much narrower (or how relatively narrow) the shaft portion proximal to the distal tip should be . . . . [and] is so indefinite it does not indicate how much narrower one can make the stem shaft, or how much flexation he may incorporate into the stem shaft under load, before he has crossed over the line and comes within the claims'[s] scope." Defendant's Post–Trial Brief at 26.

The Court disagrees with this contention. In effect, the contention is based on the defendant's previously rejected construction of the limitation as requiring a much narrow-er stem shaft above the distal tip, and that the design of an infringing device must pur-posefully seek to enable flexation of the shaft by utilizing a stem shaft diameter smaller than the distal tip's outer diameter. *See* Section IV.1B.(1), *supra.*

There simply is no limitation in the 023 patent with respect to the narrowness of the stem shaft above the distal tip, and the de-fendant's contention that the limitation is indefinite because it does not indicate the degree of narrowness is rejected.

The Court also believes that the specification is not vague as to the degree of shaft flexibility required to come within the limitation's scope. Flexibility, like size and weight, is a relative concept. The entire passage in the 023 patent specification dealing with flexibility refers to three items that flexibility is relative to: (i) shaft bending and axial displacement, (ii) excessive stiffening of the proximal femur by the prosthesis, and (iii) a sleeve length that is short enough to allow flexibility but also of sufficient length to maintain relatively low contact stresses along the point of contact between the tip and cavity wall. The specification reads as follows:

> Flexibility in the shaft enables the stem to respond in the manner indicated [bending, and moving axially upward] so that the combination of the prosthesis and the femur can manage the forces to be applied to the prosthesis. It is desirable that the shaft have sufficient flexibility to preclude excessive stiffening of the femur by the prosthesis along the implant site. In the preferred configuration, the diameter of the shaft of the stem above the distal tip is made smaller than the diameter of the external peripheral surface of the distal tip itself so as to render the shaft flexible, while still providing a contact area between the distal tip and the wall of the femur great enough to maintain relatively low contact stresses.

Patent at 5:44–57.

Thus, flexibility must be read as consisting of the range of shaft flexation encompassed by the limitation's scope that will prevent "excessive stiffening" of the femur along the implant site and by allowing bending load and stress to be transmitted to the proximal portion of the femur. At the same time, such flexibility must enable the shaft stem to bend and be displaced axially upward in response to loads on the prosthesis. Moreover, such flexibility must still allow a contact area between the distal tip and the wall of the femur great enough to maintain relatively low contact stresses at the point of contact between the tip and the cavity wall. By making flexibility a function of these three variables, the specification allows someone skilled in the art to be "reasonably apprised" of and to ascertain the scope of the flexibility within the claim limitation.

Dr. Burstein testified that claims 8, 10 and 12, when interpreted in light of the specification, could reasonably apprise a person skilled in the art of the scope of the claimed invention (Tr. at 239). Specifically, he testified that flexibility could also be ascertained from the specification and limitation language: "In addition, any realistic size increment that would be used in surgery, such as one millimeter of the radius, gives rise to a 100 percent change in the stiffness. So I don't see how it could be interpreted as being indefinite." (Tr. at 241).

Accordingly, the Court finds that while the parties dispute the meaning of limitation (iii) of claim 1, the limitation is "not so lacking in clarity as to be invalid under section 112." *North Am. Vaccine*, 7 F.3d at 1579.

With regard to limitation (v) of claim 1, Intermedics contends that the limitation's requirement of a "fixation-resistant surface finish" is indefinite because, allegedly, the plaintiff has interpreted the limitation to encompass "any metallic surface finish which has not been configured or processed to positively promote bone ingrowth." Defendant's Post–Trial Brief at 27. According to the defendant, this overly broad and vague interpretation of the limitation renders the claims 8, 10 and 12 invalid.

The Court disagrees with the defendant's contention. The Court has already construed the language of limitation (v) in light of its specification to mean that the distal tip's external peripheral surface finish must be (i) a smooth finish that compromises or is consistent with a polished surface, i.e., a surface finish of 32 microinches or less in accordance with the ASME standard, and (ii) for the purpose of maintaining the distal tip unaffixed to the bone. *See* Section II.1.B.(3), *supra*. The Court need not repeat its analysis here. Suffice it to say that, in light of the limitation's language and specification referring to a finish that "comprises a polished surface," the meaning of a fixation-resistant surface finish within the scope of the limitation can be ascertained by one of ordinary skill in the art.

Accordingly, for the reasons stated above, the Court finds that claims 8, 10 and 12 are definite, and are therefore not invalid under the second paragraph of section 112.

### 3. Conclusion and Findings as to Unenforceability

The Court finds that the 023 patent is enforceable and valid. In sum, the Court makes the following findings based on the record, testimony and other evidence stated above:

#### A. *Inequitable Conduct.*

1. The Court concludes that United States Magistrate Judge Michael L. Orenstein's decision of March 1, 1993, *Stryker Corp. v. Intermedics Orthopedics, Inc.,* 148 F.R.D. 493 (E.D.N.Y.1993), does not preclude the defendant from raising a defense of inequitable conduct.

2. The Court concludes that the Whiteside reference is not material prior art on the basis of its modular sleeve. The Court also concludes that the Whiteside reference is not material prior art on the basis of the Patent Office's Reexamination Decision, because that decision withdrew the rejection of the 023 patent claims under the Whiteside reference. The Court further concludes that the Whiteside reference is not material prior art, because even when used in a cementless manner the Court finds that the Whiteside sleeve does not achieve the purposes of the 023 patent. The Court finds that the sleeve is not integral with the distal end of the stem. The design of the Whiteside sleeve is intended to allow relative motion between the stem and the sleeve, and the sleeve and the bone. This design ultimately does not prevent toggling, and does not address proximal stress shielding in the more efficient manner that the 023 patent does. Finally, the Court concludes that the Whiteside reference is not material prior art on the basis of similarities with the 023 patent, because the Court finds fundamental differences in (1) the structure of the Whiteside sleeve from the 023 distal tip, and (2) the intended biophysical methods underlying the Whiteside device and the

023 for eliminating proximal stress shielding.

3. The Court concludes, based on the findings in the previous paragraph, that even assuming, *arguendo,* that the Whiteside reference is material, it is only slightly material.

4. The Court finds that the plaintiff acted reasonably with regard to including the Whiteside reference in its January 17, 1987 510(K) Notification to the FDA, but not including the reference in the 023 patent application.

5. The Court does not infer any culpable conduct from the plaintiff's non-disclosure of the Whiteside reference, in light of the slight materiality of the reference and the plaintiff's reasonable conduct with regard to the 510(K) Notification to the FDA. The Court finds that the defendant did not show by clear and convincing evidence that the plaintiff intended to deceive the Patent Office by withholding the Whiteside reference.

#### B. *Invalidity.*

1. The Court concludes that it is not bound by the findings of the 023 patent reexamination proceeding, because the proceeding entails a dissimilar record with different standards of proof than this judicial proceeding. *See Standard Havens Prods., Inc. v. Gencor Industries, Inc.,* 953 F.2d 1360, 1366 n. 2 (Fed.Cir.1991); *Ethicon, Inc. v. Quigg,* 849 F.2d 1422, 1427 (Fed.Cir.1988).

2. The defendant failed to offer any evidence or testimony, and therefore did not prove by clear and convincing evidence, that the Hoffman–Daimler reference anticipated the 023 patent claims 8, 10 and 12. Having failed to meet its burden of proof, the Court finds that the Hoffman–Daimler reference does not anticipate the 023 patent claims at issue. Likewise, because the defendant failed to offer any evidence concerning the alleged obviousness of the 023 patent claims vis-a-vis the Hoffman–Daimler reference, the Court finds that the Hoffman–Daimler reference was not obvious vis-a-vis the 023 patent invention to a

person of ordinary skill in the art, at the time of the patent's application.

3. The Court finds that the Hoffman–Daimler rubber distal tip is not integral with the distal portion of the stem. The Court also finds that the Hoffman–Daimler tip not only fails to meet this key limitation of the 023 patent, but also fails to achieve one of the 023 patent's key purposes as a result, namely preventing toggling. The Court further finds that the Hoffman–Daimler distal tip is not made of a fixation resistant metal alloy, whose finish is "smooth" within the scope of the claim limitation. Based on these findings, the Court finds that the Hoffman–Daimler reference does not anticipate 023 patent claims 8, 10 and 12.

4. The Court finds that the fundamental differences between the 023 patent and the Hoffman–Daimler reference cited in the foregoing paragraph, as well as the Hoffman–Daimler reference's lack of commercial success, would not render the 023 patent obvious vis-a-vis the Hoffman–Daimler reference to a person of ordinary skill in the art.

5. The Court finds that John Merkling's testimony, even assuming it is accurate and that he was a person ordinarily skilled in the art during the relevant time period, does not constitute clear and convincing evidence that the Lee and Ling patents anticipate the 023 patent and would be obvious prior art to one ordinarily skilled in the art. Because the defendant has failed to meet its burden of proof, the Court finds that the Ling and Lee references do not anticipate the 023 patent claims at issue. Likewise, the Court finds that the Lee and Ling references were not obvious vis-a-vis the 023 patent invention to one ordinarily skilled in the art, at the time of the patent's application.

6. The Court finds that the Lee and Ling tip is not integral with the distal end of the stem. The Court also finds that the Lee and Ling tip is not intended to be a close fit in the medullary canal, and that therefore the design of the Lee and Ling does not prevent toggling. The Court finds that this is so whether or not the tip is made of metal, since according to the Lee and Ling patent specification even a metal tip would not be closely fit with the canal. Based on the foregoing findings, the Court finds that the Lee and Ling patents do not anticipate the 023 patent claims, and do not render the 023 patent obvious to one of ordinary skill in the art.

C. *Indefiniteness.*

1. The Court believes that by making flexibility a function of three variables, namely (i) prevention of "excessive stiffening" of the femur along the proximal implant site, (ii) shaft stem bending and axial displacement upward in response to load on the prosthesis, and (iii) allowing a contact area between the distal tip and the wall of the femur great enough to maintain relatively low contact stresses at the point of contact between the tip and the cavity wall, the specification allows someone skilled in the art to be "reasonably apprised" of and to ascertain the scope of "flexibility" encompassed within limitation (iii) of claim 1. Accordingly, the Court finds that limitation (iii) of claim 1 is not so lacking in clarity as to be invalid under section 112.

2. The Court has construed the language of limitation (v) of claim 1 to mean that the distal tip's external peripheral surface finish must be (i) a smooth finish that compromises or is consistent with a polished surface, i.e., a surface finish of 32 microinches or less in accordance with the ASME standard, and (ii) for the purpose of maintaining the distal tip unaffixed to the bone. In light of this interpretation, the Court finds that the meaning of a "fixation-resistant surface finish" within the scope of the limitation can be ascertained by one of ordinary skill in the art.

3. Accordingly, for the reasons stated in the previous 2 paragraphs, the Court finds that claims 8, 10 and 12 are definite, and are not therefore invalid under the second paragraph of section 112.

## IV. WILLFUL INFRINGEMENT

Section 284 of the patent statute permits the Court to "increase the damages up to

three times the amount found or assessed." 35 U.S.C. § 284. Moreover, "in exceptional cases" the Court may award reasonable attorney fees to the prevailing party. 35 U.S.C. § 285. Such awards of increased damages and attorneys' fees have been made when the infringement was found to be willful. *Electro Medical,* 34 F.3d at 1056 (citing *Read Corp.,* 970 F.2d at 826). Thus in considering the amount of damages to award to the plaintiff here, the Court may increase the award and may also award attorneys fees if it finds Intermedics's infringement of the 023 patent was willful.

■ According to the Federal Circuit, the existence of willful infringement is a finding of fact which must be proven by clear and convincing evidence. *Ven Tel, Inc. v. Hayes Microcomputer Products, Inc.,* 982 F.2d 1527, 1543 (Fed.Cir.1992) (citing cases). Willfulness is shown when, "upon the totality of the circumstances, clear and convincing evidence establishes that the infringer acted in disregard of the patent, that the infringer had no reasonable basis for believing it had a right to engage in the infringing acts." *Electro Medical,* 34 F.3d at 1056. *See also Ryco, Inc. v. Ag–Bag Corp.,* 857 F.2d 1418, 1428 (2d Cir.1988) (The fact finder looks to the totality of circumstances to see whether "a reasonable person would prudently conduct himself with any confidence that a court might hold the patent invalid or not infringed.").

■ Factors that are relevant in determining willfulness for the purpose of increasing damages include: (1) whether the infringer deliberately copied the ideas or design of another; (2) whether the infringer, when it knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed, and (3) the infringer's behavior as a party to the litigation. *Hayes Microcomputer,* 982 F.2d at 1543; *Bott v. Four Star Corp.,* 807 F.2d 1567, 1572 (Fed.Cir.1986).

■ The element of a good-faith belief in the patent's invalidity or non-infringement is related to the affirmative duty imposed by the law of due care to avoid infringement of the known patent rights of others. *Electro*

*Medical,* 34 F.3d at 1056 (citing cases). Usually, this duty of due care includes seeking and obtaining competent legal advice before engaging in activity that may result in infringement. *Id.; Amsted Indus. Inc. v. Buckeye Steel Castings Co.,* 24 F.3d 178, 181 (Fed.Cir.1994). However, "that an opinion of counsel was obtained does not always and alone dictate a finding that the infringement was not willful." *Amsted Indus.,* 24 F.3d at 182 (internal quotations and citations omitted); *Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.,* 976 F.2d 1559, 1580 (Fed.Cir.1992). Rather, what matters "is the nature of that opinion and what effect it had on an infringer's actions." *Amsted Indus.,* 24 F.3d at 182. Moreover, the emphasis is on "competent" legal advice. *Minnesota Mining,* 976 F.2d at 1580.

Generally, to defeat an accusation of willful infringement, the accused infringer will attempt to show its good-faith by asserting that it relied on the opinion of counsel. As the Federal Circuit has explained:

A party who has obtained advice of competent counsel, or otherwise acquired a basis for *bona fide* belief that a patent is invalid, can be said to serve the patent system in challenging that patent in a law suit conducted fairly, honestly, and in good faith. Such a party should not have increased damage or attorney fees imposed solely because a court subsequently holds that belief unfounded, particularly when the issues may be fairly described as close.

*Kloster Speedsteel AB v. Crucible Inc.,* 793 F.2d 1565, 1581 (Fed.Cir.1986), *cert. denied,* 479 U.S. 1034, 107 S.Ct. 882, 93 L.Ed.2d 836 (1987).

Intermedics contends that, if it is found to have infringed on the 023 patent, it did not willfully infringe because it did not copy the patent, and it relied on the opinion of its patent counsel, John Merkling, in forming a good-faith belief that it was not infringing the patent.

With regard to the defendant's contention that Dr. Dorr and Intermedics did not copy the ideas or the design as presented in either the 023 patent or the Omniflex commercial embodiment when they developed the APR II and its distal sleeve, the Court has already

determined that such copying did occur. As explained in great detail in section II.1.C., *supra*, the Intermedics design and supervisory personnel *did* intentionally copy the design in the 023 patent and the Omniflex commercial embodiment after receiving an Omniflex brochure at the February 1988 AAOS meeting in Atlanta, Georgia.

With regard to the issue of the opinion of counsel, Intermedics contends that "after being put on notice of Plaintiff's infringement claim in May 1990, Intermedics asked John Merkling, a registered patent attorney employed by its parent company ... to study the patent and the allegations and to advise the company.... That opinion was reported to Intermedics which, in turn, reasonably considered and acted in reliance upon it..... Considering the totality of the circumstances, Defendant's actions were very reasonable and certainly do not support an allegation of willfulness." Defendant's Post–Trial Brief at 29.

Merkling is a patent attorney who also has a Bachelor of Science degree in Mechanical Engineering. He practiced patent law and joined Intermedics in 1989. His job was to work with patents and to render opinions. Merkling testified on behalf of Intermedics on the issue of willful infringement. (Tr. at 1897 *et seq.*).

On April 26, 1990, Robert E. Paulson, in his capacity as plaintiff's patent counsel, wrote a letter to Nicholas Cindrich, the President of Intermedics. In the letter, Paulson informed Cindrich of the 023 patent, and stated that it was Osteonics's belief that the APR II infringed on the 023 patent. A copy of the 023 patent was enclosed. Paulson ended the letter by requesting that Intermedics cease and desist from any further infringement and account to Osteonics for all past infringing sales. (Defendant's Exh. ART).

On May 9, 1990, Merkling responded to Paulson, stating that he was examining the patent and requested "the claims of the patent which you believe to be infringed." (Defendant's Exh. JV). Thereafter, in May 1990, Merkling did an investigation and "gathered the facts." He ordered the file of patent 023 at issue, and the APR II drawings

and blueprints. Merkling also ordered a prior art search. In discussions with Jose Belen he was advised of the Whiteside Hip System. Merkling then formulated an opinion and responded to Paulson in a letter dated May 25, 1990. In the letter he stated that, "I have concluded that the APR II System does not infringe the claims of the '023 patent. I have also concluded that the claims are invalid on prior art not considered by the Examiner, either on that art alone or in combination with the art heretofore considered by the Examiner." (Defendant's Exh. JT).

However, in January, 1990, prior to being notified by plaintiff's counsel, Intermedics concedes that Merkling had already been made aware of the 023 patent. In the defendant's supplemental responses to the plaintiff's discovery requests (Plaintiff's Exh. 1030), it is conceded that Merkling saw a reference to the 023 patent, including a drawing, on or about January 5, 1990. Despite his knowledge of the 023 patent on January 5, 1990, Merkling did not conduct any investigation as to possible infringement of the APR II nor did he hold up the national launch of the APR II, which took place in January–February 1990. Merkling caused no investigation to be made in January 1990, despite the fact that, with knowledge of the 023 patent, he also knew that the APR II was the first time that Intermedics used a distal sleeve on a hip implant product.

In support of its "opinion of counsel" defense, the defendant offered the testimony of DONALD W. PETERSON, a patent attorney and former patent and general counsel to the Monsanto Chemical Company. In Peterson's view, Merkling took a very competent approach in response to Paulson's accusation of infringement, and Peterson claims he would have acted in the same manner. Further, according to Peterson, it was reasonable for Intermedics to rely on the opinion of Merkling.

However, notwithstanding his testimony concerning Merkling's competency, Peterson conceded that in most business situations a prudent manager would have searched patent files to learn about potential U.S. patents

before a national launch. (Tr. at 2873–74). Indeed, Peterson testified that as a patent attorney for the Monsanto Chemical Company, prior to launching a major new product Monsanto would have required an investigation and searched the patent files. (Tr. at 2872–73). In this case, Intermedics did not conduct a patent search, nor did it obtain an opinion, prior to the national launch of the APR II.

"Smoking gun" evidence on the issues of infringement and willfulness appear in the form of a letter from J.D. WEBB, the Intermedics Manager of Product Development to Russell J. Egan, its patent counsel, dated January 23, 1989, one year prior to the launch of the APR II. Annexed to the letter was an Osteonics brochure showing the Omnifit, the predecessor to Omniflex, with the distal sleeve and marked U.S. Patent Pending. The letter reads, in part, as follows:

Re: APR II FEMORAL STEM AND MODULAR SLEEVE

Dear Russ,

Enclosed is a drawing showing the APR II femoral implant and assembled modular sleeve. The femoral component can be used with or without the modular sleeve in place. The modular sleeve is used when the metaphysis or proximal portion of the femur is the correct size to accept the proximal portion of the implant, but the intramedullary canal is larger in diameter than the distal portion of the implant. The sleeve is then assembled onto the stem resulting in an implant with the same proximal dimensions and a distal stem with a larger diameter.

*Also enclosed are two brochures from competitors showing components attempting to achieve the same end result.* However, their sleeves are shorter and closed at the end.

*I am supplying this information to you for consideration of a patent and also to insure that we are not infringing on any other patents.* We are planning on releasing this product to the marketplace in July of this year.

If you have any questions please feel free to contact me.

(Plaintiff's Exh. 1065) (emphasis supplied).

Thus, as of January 23, 1989, one year prior to the launching of the APR II, the defendant knew that the plaintiff had a competing hip implant with a distal tip, which was awaiting a patent issuance. Egan, the defendant's patent counsel, followed up this information with a letter to John McKinney, dated February 3, 1989 (Plaintiff's Exh. 1066), requesting a search "for a femoral implant and modular sleeve," and enclosing "copies of the brochure from competitors showing their components for attempting the same end result."

The Court finds that the defendant Intermedics had notice of the plaintiff's pending patent as of January 23, 1989, and further that it had actual notice of the patent—and of Osteonics's exclusive rights—as of January 5, 1990. Accordingly, as of January 5, 1990 Intermedics had the affirmative duty to exercise reasonable care to determine whether it would be infringing the 023 patent. Here, not only did the defendant ignore its own patent attorney's requests for a search of similar technology, but it also failed to seek competent legal advice and conduct a patent search until after the cease and desist letter of April 26, 1990. Significantly, at the time of the APR II launch in January 1990, it knew about the Omniflex hip implant with the modular distal tip it now sought to feature, but ignored this obvious patent problem and forged ahead with the new product, in an attempt to salvage its rapidly deteriorating hip implant position in the market.

The Court has previously determined that the patented Omniflex provided the impetus for the development of the infringing APR II. This finding is highly relevant on the issue of willfulness, as exemplified by the district court's decision in *American Medical Systems, Inc. v. Medical Engineering Corp.*:

Finally, the court finds relevant to the willfulness calculus the actions of Mr. Goldberg. The record amply demonstrate that MEC was working, albeit without much success, on a pouch and tube configuration prior to Goldberg seeing AMS' product at the 1985 AUA convention.

*There can be little question that seeing AMS' product at the convention, and later in hand, provided much of the impetus for what turned out to be the final Flexi–Flate wet pack product.*

*Am. Medical,* 794 F.Supp. 1370, 1398 (E.D.Wis.1992) (emphasis supplied), *aff'd* 6 F.3d 1523 (Fed.Cir.1993), *cert. denied* —— U.S. ——, 114 S.Ct. 1647, 128 L.Ed.2d 366 (1994).

In addition to impetus, the intense market pressure and commercial sales urgency faced by Intermedics is also very relevant to the issue of willfulness. *See, e.g., Datascope,* 879 F.2d at 828 (a finding of no willful infringement was reversed where "the district court seriously underestimated ... the court's own finding about the market pressure and urgency faced by SMEC."), *cert. denied,* 493 U.S. 1024, 110 S.Ct. 729, 107 L.Ed.2d 747 (1990); *Spindelfabrik v. Schubert & Salzer,* 829 F.2d 1075, 1085–1085 (Fed.Cir.1987) (the inability to design around a patented subject matter, coupled with market pressure and an urgent need to introduce a compelling product, supports a finding of willful infringement), *cert. denied,* 484 U.S. 1063, 108 S.Ct. 1022, 98 L.Ed.2d 987 (1988).

■■ Based on the totality of the circumstances, the Court finds that the plaintiff Osteonics proved by clear and convincing evidence that the defendant Intermedics (1) deliberately copied the ideas and designs of the 023 patent and the Omniflex, its commercial embodiment, (2) knew of the 023 patent in January, 1990 but failed to investigate the scope of the patent or seek the opinion of competent counsel so that it could form a good faith belief that the 023 patent was invalid or that Intermedics was not infringing with the national launch of the APR II, (3) did not have a good faith belief at the time it launched the APR II that the 023 patent was invalid or that Intermedics was not infringing with the APR II, and (4) continued its pattern of deliberate disregard for the patent rights of Osteonics during the course of this litigation. Intermedics's behavior thus constitutes intentional and deliberate infringement of the 023 patent without regard to the consequences of its actions.

Accordingly the plaintiff has established willful infringement by the defendant Intermedics with regard to the manufacture, launch and sale of the APR II and the APR II–T.

## V. DAMAGES

The statute governing the amount of damages in this patent infringement action is 35 U.S.C. § 284, which provides in pertinent part: "Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court."

In interpreting this statute, the United States Supreme Court has defined damages as "compensation for the pecuniary loss the patent owner suffered from the infringement, without regard to the question whether the defendant has gained or lost by its unlawful acts." *Aro Mfg. Co. v. Convertible Top Replacement Co.,* 377 U.S. 476, 507, 84 S.Ct. 1526, 1543, 12 L.Ed.2d 457 (1964) (internal quotations and citations omitted). Through Section 284, "Congress sought to ensure that the patent owner would in fact receive full compensation for 'any damages' he suffered as a result of the infringement." *General Motors Corp. v. Devex Corp.,* 461 U.S. 648, 654–655, 103 S.Ct. 2058, 2062, 76 L.Ed.2d 211 (1983). *See also Rite–Hite Corp. v. Kelley Co., Inc.,* 56 F.3d 1538, 1544 (Fed.Cir.1995) (in banc).

■■ The Federal Circuit has established two approaches for determining the measure of damages in patent infringement cases. The first approach, the lost profits method, is used when the record permits an accurate determination of the patentee's loss of sales and profits because of the infringement. The second approach, employed when actual lost profits cannot be determined, is to award damages on the basis of a reasonable royalty. *See Rite–Hite,* 56 F.3d at 1554; *Kearns v. Chrysler Corp.,* 32 F.3d 1541, 1549 (Fed.Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1392, 1393, 131 L.Ed.2d 244 (1995). However, under the statute a "reasonable royalty" is the floor below which a damage

award may not fall. *Rite–Hite*, 56 F.3d at 1554. Moreover, an award of damages may be split between lost profits as actual damages to the extent they are proven and a reasonable royalty for the remainder of the damages. *Id.* at 1544–45 (citing *State Indus., Inc. v. Mor–Flo Indus., Inc.*, 883 F.2d 1573, 1577 (Fed.Cir.1989), *cert. denied*, 493 U.S. 1022, 110 S.Ct. 725, 107 L.Ed.2d 744 (1990)).

The amount of a prevailing party's damages in a patent infringement case is a finding of fact which the plaintiff-patentee bears the burden of proving, by a preponderance of the evidence. *BIC Leisure Prods. v. Windsurfing Int'l*, 1 F.3d 1214, 1217 (Fed. Cir.1993); *SmithKline Diagnostics, Inc. v. Helena Laboratories Corp.*, 926 F.2d 1161 (Fed.Cir.1991).

The Court will first review the evidence concerning Osteonics's alleged lost profits. It will then briefly consider a reasonable royalty, for the purpose of ensuring that the amount of damages proven is not less than a reasonable royalty. After determining the amount of damages, the Court will then consider whether increasing the damage award and awarding attorneys' fees to the plaintiff are appropriate.

## 1. Lost Profits

### A. *The Legal Standard*

The general rule for determining actual damages to a patentee that is itself producing the patented item is to determine "the sales and profits lost to the patentee because of infringement." *Rite–Hite*, 56 F.3d at 1545 (citing cases); *Del Mar Avionics, Inc. v. Quinton Instrument Co.*, 836 F.2d 1320, 1326 (Fed.Cir.1987).

To recover lost profit damages, "the patentee must show a reasonable probability that 'but for' the infringement, it would have made the sales that were made by the infringer." *Rite–Hite*, 56 F.3d at 1545 (citing cases); *Kearns*, 32 F.3d at 1551. The plaintiff must prove its claim to lost profits by a preponderance of the evidence. *Yarway Corp. v. Eur–Control USA, Inc.*, 775 F.2d 268, 275 (Fed.Cir.1985). The plaintiff's burden includes the presentation of proper evidence for the computation of the loss of profits. *Standard Havens*, 953 F.2d at 1373.

However, under this burden, the plaintiff is not required to prove the causal relationship between the infringement and its loss of profits with "absolute certainty." *Standard Havens*, 953 F.2d at 1372. Courts recognize that the determination of damages "is not an exact science," and, therefore, " 'the amount need not be proven with unerring precision.' " *Del Mar*, 836 F.2d at 1327 (quoting *Bio–Rad Laboratories, Inc. v. Nicolet Instrument Corp.*, 739 F.2d 604, 616 (Fed. Cir.), *cert. denied*, 469 U.S. 1038, 105 S.Ct. 516, 83 L.Ed.2d 405 (1984). Rather, "[t]he trial court is required to approximate, if necessary, the amount to which the patent owner is entitled." *Del Mar Avionics*, 836 F.2d at 1327.

In addition, the risk of the uncertainty in calculating damages is borne by the wrongdoer instead of the injured party, *Kori Corp. v. Wilco Marsh Buggies & Draglines, Inc.*, 761 F.2d 649, 655 (Fed.Cir.), *cert. denied*, 474 U.S. 902, 106 S.Ct. 230, 88 L.Ed.2d 229 (1985) (citing *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563, 51 S.Ct. 248, 250–51, 75 L.Ed. 544 (1931)); *see also Beatrice Foods Co. v. New England Printing and Lithographing Co.*, 899 F.2d 1171, 1175–76 (Fed.Cir.1990) (citing cases), and "[w]hen the amount of the damages cannot be ascertained with precision, any doubts are resolved against the infringer." *Del Mar*, 836 F.2d at 1327; *Kaufman Co., Inc. v. Lantech, Inc.*, 926 F.2d 1136, 1141 (Fed.Cir.1991) (both citing *Lam, Inc. v. Johns Manville Corp.*, 718 F.2d 1056, 1065 (Fed.Cir.1983)).

Further, the patentee is not required to negate "every possibility" that the purchaser might not have purchased a product other than the patentee's, absent the infringement. *Rite–Hite*, 56 F.3d at 1545–46; *Minnesota Mining*, 976 F.2d at 1577. The patentee must, instead, only show that there was a reasonable probability that the sales would have been made, "but for" the infringement. *Rite–Hite*, 56 F.3d at 1545–46. Indeed, "when the patent owner and infringers were the only suppliers of the patented

product, it is reasonable to infer that the patent owner would have made the sales made by the infringer." *Del Mar,* 836 F.2d at 1327 (citing *Lam,* 718 F.2d at 1065).

■ The generally accepted, though not exclusive, manner that a patentee can establish "but for" causation entitling it to lost profits, is by meeting the four-factor test enunciated by the Sixth Circuit in *Panduit Corp. v. Stahlin Bros.,* 575 F.2d 1152 (6th Cir.1978). *See Rite–Hite,* 56 F.3d at 1545–46, 1548; *Kearns,* 32 F.3d at 1551. The "*Panduit* test" requires that the patentee establish the following four factors: (1) demand for the patented product; (2) the absence of acceptable non-infringing substitutes; (3) the patent owner's manufacturing and marketing capability to exploit the demand; and (4) the amount of profit the patent owner would have made *Rite–Hite,* 56 F.3d at 1545–46; *Kearns,* 32 F.3d at 1551 (citing *Panduit,* 575 F.2d at 1156).

Satisfying the *Panduit* test "permits a court to reasonably infer that the lost profits claimed were in fact caused by the infringing sales, thus establishing a patentee's *prima facie* case with respect to 'but for' causation." *Rite–Hite,* 56 F.3d at 1545. The burden then shifts to the infringer to show that "the inference is unreasonable for some or all of the lost sales." *Id.*

■ Finally, the Federal Circuit recently explained in *Rite–Hite* that the "but for" test for compensability of damages must be read in light of the "reasonable limits of liability" imposed on damages by the law. *Id.* at 1546–47. These limits include reasonable, objectively foreseeable damages. Accordingly, when deriving lost sales due to infringement, the court can compensate the plaintiff for "a particular injury that was or should have been reasonably foreseeable by an infringing competitor in the relevant market," absent a persuasive reason to the contrary. *Id.* (holding that lost sales of a patentee's product which directly competed with the infringing product but which was not covered by the infringed patent, was a reasonably foreseeable injury and clearly compensable).

Osteonics seeks lost profit damages for the time period January 1, 1990 until March 31, 1993. The plaintiff's principal damages witness was Dr. MARION STEWART, an economist specializing in microeconomics involving industrial competition, narrowly focused in a particular industry. He is also an expert in the more specialized field of "harm and damages" in patent infringement cases. Presenting the defendant's position on the issue of lost profits as damages was JAMES J. NAWROCKI, who is a certified public accountant and a consultant in litigation specializing in valuation of damages, lost profits, and reasonable royalties in the intellectual property field. Nawrocki reviewed all the documents and exhibits and depositions in this case, interviewed the Intermedics personnel and rendered opinions to the defendant. His company was paid in excess of $200,000 for his services in this case.

Dr. Stewart testified with regard to the plaintiff's damages in two categories, (1) lost profits, including the *Panduit* factors, and (2) reasonable royalty. He covered the period of January, 1990 through March 1993 and calculated pre-judgment interest through July 15, 1993. Dr. Stewart calculated the lost profits sustained by Osteonics in the 023 patent infringement case based on a review of the financial data produced by both parties, the deposition testimony, and discussions with Osteonics personnel, including ALBERT J. ZARNOWSKI, the Osteonics Director of Product Development prior to October 1991, and presently Director of Special Products. Dr. Stewart's efforts were a major undertaking. He and his staff worked on this matter for approximately 1100 hours. The results of his analyses are compiled in Plaintiff's Exhibit 709(A). The following analysis of lost profits is based on Dr. Stewart's testimony and analyses, the documentary evidence, the testimony of the Intermedics's witnesses and the totality of the evidence.

### B. *Evidence Regarding Osteonics's Lost Profits*

#### (1) *Panduit Factor One:* Demand for the Patented Product

■ Under the first *Panduit* factor, the plaintiff must establish demand for the patented product. This factor presupposes that

the patented product and infringing product are sufficiently similar to compete in the same market for the same customers, and thus that demand for the infringer's and patent owner's products are interchangeable. *BIC Leisure*, 1 F.3d at 1218–19. Accordingly, in considering the first factor, evidence of sales of the infringing product may suffice to show demand for the patented product. *Id.* (citing *Gyromat Corp. v. Champion Spark Plug Co.*, 735 F.2d 549, 552 (Fed.Cir.1984)).

As an initial matter, the Court notes that the patented product, as reflected in its commercial embodiment the Omniflex hip implant, and the infringing device, the APR II, are sufficiently similar to directly compete in the same market for the same customers. *See, e.g.*, Tr. at 1029 and 1030 (the Omniflex and APR II directly compete in the "high priced state-of-the-art market"); Tr. at 839 (both the Omniflex and APR II compete by selling to surgeons in the community); Tr. at 1252–53 (testimony that in promoting the APR II to surgeons, comparison to the Omniflex is made); Plaintiff's Exh. 670 at 5–7 (describing Intermedics's competitors in the hip implant market); and Defendant's Exh. YC at IOI 077200 (stating that the APR II competes in the in the "high priced state-of-the-art" hip implant market).

In this case there was overwhelming evidence of demand for the patented product, reflected, among other ways, in sales of the patent's commercial embodiment, the Omniflex, sales of the APR II infringing product, and comparisons of the sales of these two products to their respective predecessors, the Omnifit and APR I.

According to the record, from February 1988 until April 1993 Osteonics sold approximately 29,000 Omniflex hip systems, at a value of approximately $100 million dollars. (Tr. at 376). By April 1993 APR II sales—consisting of the entire APR II, including the acetabular component, the stem and the distal sleeve—had reached approximately $38 million dollars. (Defendant's Exhibit AOJ at Appendix IV—delineating sales of APR II components for years 1990–1993); Plaintiff's Exhibit 940A (showing a 19% royalty rate plus accumulated interested on sales of the APR II)). The increases in sales and sales volume of the products shows demand for the patented product.

An even more interesting indicator of demand for the patented product is the comparison of demand for the Omniflex relative to its predecessor the Omnifit, and for the APR II relative to the APR I. By 1990, Omniflex unit sales had grown to well over 600 units per month (Plaintiff's Exh. 709 at 15), and Omniflex dollar sales were three times the amount of Omnifit dollar sales. (Tr. at 637). Plaintiff's Exh. 813 is a chart formulated by Dr. Stewart from Osteonics's records comparing sales of the Omniflex to sales of the Omnifit. It shows, among other things, the increased demand for the Omniflex relative to the Omnifit from January 1988 until September, 1990. The vacillation in Omniflex sales relative to the Omnifit after September 1990 was attributed by Dr. Stewart to inventory buildup or "pipeline fill" (Tr. at 627–628) and to the introduction of hydroxyapatite coating on first the Omnifit and the Omniflex affixation surfaces (Tr. at 597–99 (hydroxyapatite forms a bio-chemical bond with bone tissue and is, thus, more conducive to bone ingrowth than conventional porous coatings)). However, despite this vacillation in Omniflex sales after September 1990, Dr. Stewart testified that "there's at least a gradual upward trend over time for the total of OMNIFLEX plus the non-modular." (Tr. at 606).

A similar comparison of the APR II sales to the APR I shows the rapid decline of the outmoded, non-distal sleeved APR I and the steep and rapid rise of sales of the APR II after the introduction of the APR II in January 1990. (See Plaintiff's Exh. 709A at 17, and Plaintiff's Exh. 815). According to Dr. Stewart, the comparisons of the APR II and APR I sales present a controlled experiment showing demand for the APR II. (Tr. at 467–68). In the Court's view, this evidence also clearly demonstrates demand for the patented product. Indeed, the Court notes from the data a correspondence between the increased sales of the APR II and the decline in sales of the Omniflex.

The industry and the defendant also recognized the increased demand for the patented product. The authoritative Frost & Sullivan

Market Outlet Series for 1992, (Plaintiff's Exh. 604), described Osteonics's increasing market share potential:

Osteonics had an estimated 11% share of the total hip market in 1990, on almost $60 million in sales, with leading designs in both porous coated and standard surface segments. In 1988, the company released the Omniflex, a new modular hip system available in both porous coated and standard surface designs that allows more precise fit via a modular head and a modular distal tip on the femoral stem. By 1989, the Omniflex was Osteonics' leading porous coated hip and the Omnifit, its leading cemented design. Osteonics has succeeded in this market owing to strong management, a well-trained sales force and a reputation for state-of-the-art product.

Osteonics's increase in market share for hip implants was recognized by Intermedics. In an Intermedics document entitled "Orthopedic Market Overview," offered as Plaintiff's Exh. 670, Intermedics described the rapid rise of the Omniflex as a "20% growth every year," and an increase in market share "by almost 10 points." According to the document, it was Intermedics's opinion that "Osteonics will continue to have a strong presence in the hip market." (Plaintiff's Exh. 670 at 6–7). Among other things, Intermedics realized that the Omniflex "capitalized on an emerging modular trend with its choice of heads and its modular distal tips," and that the market's future lay in capitalizing on modularity: "Overall, the trend toward providing more anatomically precise fits through press fit, modular and custom prostheses is at the beginning of the growth curve, *with most of the market potential still ahead.*" (Plaintiff's Exh. 670 at 6, 9) (emphasis supplied).

The evidence adduced at trial supports IOI's forecast and establishes that the market share of hip implants featuring modular distal tips or sleeves increased from 0% in 1988 to 18.6% in 1992. (Defendant's Exh. AOJ at 081703; Tr. at 3372).

When asked to what he attributed the demand for the Omniflex, Albert Zarnowski answered—the patented modular distal tip. (Tr. at 376). The Court agrees and finds that demand for the APR II was also driven by the modular distal sleeve feature of the device. The evidence supporting this finding includes the plethora of evidence cited earlier in this Opinion when discussing the literal infringement of limitation (iii) of claim 1, *see* section II.1.B.(1)(b), *supra.* In particular, the Court recalls the testimony of Cindrich, the President of Intermedics, who testified that the APR II distal sleeve was what brought his company back into the hip implant market after the APR I's commercial failure. (*See* Tr. at 285–286). Further support is found, among other evidence, in (a) the testimony and evidence cited in the discussion of the literal infringement of limitation (ii) of claim 1, section II.1.B.(2)(b), *supra,* particularly the hip market forecast report in Intermedics's Orthopedic Market Overview (Plaintiff's Exh. 670 at 9), and (b) the multitude of Intermedics's marketing and sales literature which stress the value of the modular distal sleeve, *see, e.g.,* the brochure entitled "FIT WITHOUT FORFEIT" (Defendant's Exh. JP at 000539), and the excerpts from IOI salesperson's sales pitches, compiled in Plaintiff's Exh. 895 and excerpted from the sales presentation training videotapes that are Plaintiff's Exhibits 665 and 666, which were reviewed by Dr. Stewart (Tr. at 483–89).

Despite the overwhelming evidence of demand for the patented product, the defendant contends that the plaintiff has failed to meet its burden with respect to the first *Panduit* factor. Essentially, Intermedics contends that the plaintiff has not shown that the APR II was selected by surgeons because of its sleeve option. According to the defendant, most of the surgeons do not use the sleeve when implanting the APR II, and sleeve usage with the APR II is currently in the 12 to 15 percent range. Moreover, the defendant claims that it markets the APR II by stressing a variety of its features, including proximal fit, anatomical shape and the collar.

The Court is unpersuaded by the defendant's contentions, because they are belied by the defendant's own marketing and sales strategy—among other evidence—which emphasize selling the APR II as one unit. In-

deed, the APR modular distal sleeve was the key functional feature of the APR II, because without it the defendant's representations about the APR II's ability to prevent toggling and to fit and fill the bone cavity would have been rendered meaningless. (*See* Tr. at 1267 [one of the "biggest selling features" of the APR II is the distal sleeve]; Tr. at 1034 [the ability to make the advertising claim of "fit and fill" or "fit without forfeit" could not be made without the APR II distal sleeve]).

During his testimony, Nawrocki agreed that the APR II is marketed as a total system, including the acetabular and femoral components, and that the Intermedics sales agents generally try to sell all of the components of the APR II. (Tr. at 3589). Intermedics Director of Marketing Belen also testified that both the APR II and APR II–T are marketed as a complete system rather than by individual components and that the sleeves are part of the entire system. (Tr. at 1035).

Further, the evidence is clear that Intermedics never manufactured or marketed an APR II hip implant without a sleeve option. Robert J. Guerrin, an owner of the co-defendant Marli, testified in a deposition as follows:

> Q Were you aware of any literature put out by IOI which promotes just the stem and sleeve portion of the APR II hip system?
>
> A No.
>
> Q So all the literature that IOI puts out about the APR II hip system promotes the entire system as a whole?
>
> A Yes.
>
> Q Is that the way you market it at Marli?
>
> A Yes.

(Plaintiff's Exh. 774).

Defense witness Guerrin, now a top sales representative for the defendant, testified that the APR II system is sold as a whole, and that he receives commissions on the sales of all the components:

> Q The commissions that you and Marli received—receive on the APR II and II–T systems, that includes sales of all the components of the system; is that correct?
>
> A Yes.

> Q Now, the APR II System we have been talking about so it is clear, that system includes the sleeve, the stem, the acetabular component, the femoral head and the bone screws; is that correct?
>
> A Yes.
>
> Q And isn't it true that at Marli you market the APR II System as a whole?
>
> A Yes.
>
> Q And wouldn't you like to sell the surgeon the entire hip implant system rather than just certain components?
>
> A Yes.
>
> Q And that's because you want to attain more commissions; is that correct?
>
> A Yes.
>
> Q And isn't it true at least at the time of your deposition in April of 1992, that when you visited surgeons to sell the APR II, you would typically try to bring in the whole system to show them, including the femoral and acetabular components?
>
> A Femoral and acetabular?
>
> Q Yes.
>
> A Yes.
>
> Q Now, isn't it true that your sales for APR II are more often a package that is a system, including the acetabular and other components, rather than simply the stem alone?
>
> A Yes.
>
> Q And isn't it true that each of IOI's ads and brochures for the APR II and II–T hip systems, at least up to April of 1992, touted the APR II as an entire Hip System?
>
> A Yes.
>
> Q Wouldn't you agree that in most circumstances the final decision as to whether or not the sleeve is to be used is made during surgery?
>
> A Yes.
>
> Q And if the final decision is not made until the surgeon is in the process of doing the surgery, isn't it fair to say that he needs to have the sleeve available in the operating room?
>
> A Yes.
>
> Q And as a sales agent for the APR II System, wouldn't you consider it your re-

sponsibility, if you were attending the surgery, to make sure that the sleeves were available in the operating room for the surgeon?

A Yes.

(Tr. at 1852–1857).

DR. HENRY M. TISCHLER, an orthopedic surgeon, called by the defendant, testified about the implants made available in the operating room:

THE WITNESS: When all the components are sent, they are. So everything is there. All the stems are there. All the sleeves, all the cups, all the non-porous stems, everything is there.

Q The entire system is there?

A Yes.

Q Including the sleeve and the stem?

A Yes.

(Tr. at 2086–2087).

DR. GEORGE MULFINGER, a defense witness, testified that his hospital purchased the whole system including the sleeve and the acetabular component. (Tr. at 1305). Defense witness Cadarette, an Intermedics sales representative in California, testified that he tries to sell the complete unit, including the acetabular component. (Tr. at 1383–1384).

Based on the above, the Court finds that the plaintiff has met the first *Panduit* factor, establishing demand for the patented product.

(2) *Panduit Factor Two:* The Absence of Acceptable Non–Infringing Substitutes

■ The second *Panduit* factor requires that there be no acceptable noninfringing substitutes of the patented product for purchasers in the market. The Federal Circuit has explained that the "mere existence of a competing device does not necessarily make the device an acceptable substitute." *Standard Havens,* 953 F.2d at 1373. Rather, to be "acceptable," the alternative product must contain the patented product's advantages, and purchasers must be motivated to purchase the alternative product because it contains the patented product's advantages. *Id.* (citing cases). Thus, to prove the second

factor, "the patent owner must show either that (1) the purchasers in the marketplace generally were willing to buy the patented product for its advantages, or (2) the specific purchasers of the infringing product purchased on that basis." *Id.*

■ According to the Federal Circuit, the second *Panduit* factor also presupposes that the patentee and the infringer sell substantially similar products in the same market. *BIC Leisure,* 1 F.3d at 1219. To be acceptable to the infringer's customers in an elastic market—that is, a market where there are changes in demand corresponding to changes in price and/or supply—"the alleged alternative 'must not have a disparately higher price than or possess characteristics significantly different from the patented product.'" *Id.* (quoting *Kaufman,* 926 F.2d at 1142).

■ Moreover, despite the presence of acceptable, noninfringing substitutes, a patent owner may satisfy the second *Panduit* factor by substituting proof of its market share for proof of the absence of acceptable substitutes. *BIC Leisure,* 1 F.3d at 1219 (citing *State Indus.,* 883 F.2d at 1578).

■ The plaintiff contends that there are four products besides the Omniflex which contain the 023 patent's modular distal tip feature and its advantages, and therefore can be considered acceptable competitive substitutes: namely, the accused APR II, the Howmedica Precision Osteolock Hip System, the Smith & Nephew Richards Modular Hip System and the Endotec Buechel–Pappas Femoral Stem System. According to the uncontroverted testimony of Dr. Burstein, these are the only products on the market which feature a metal modular distal tip or sleeve that is capable of being integrally locked on to the distal portion of the stem. (Tr. at 271, 3704–05). The Court also notes that the plaintiff has never licensed a competitor under the 023 patent.

However, all four of these products are infringing products, and have been formally accused of infringement by Osteonics in pending law suits. (Tr. at 3705). Thus, the Court finds that there are no acceptable *non-*

*infringing* substitutes for the patented device.

The defendant contends that there are numerous acceptable noninfringing substitutes available. According to the defendant, the surgeons who testified on its behalf indicated that they considered as acceptable substitutes to the Omniflex and APR II other products which did not necessarily feature a modular distal tip. Rather, these alleged alternatives were chosen on the basis of features such as an anatomical implant or ability to fill the canal. Moreover, the defendant claims that Intermedics and Osteonics were "second tier competitors" who faced a number of competitive products sold by Zimmer, Howmedica and DePuy. Defendant's Post–Trial Brief at 35.

The Court is not persuaded by the defendant's contentions, and finds that they are contradicted by the defendant's own documents. With regard to Intermedics's claims concerning competitive substitutes, the Court agrees with the defendant that the hip implant field is a crowded market. However, in the Court's view the defendant fails to focus on the segment of this crowded market in which the patented product competes: namely, the porous, high priced state-of-the-art hip implant market. (Defendant's Exh. YC at IOI 077200).

According to the defendant's marketing strategies, Intermedics has identified only three primary competitors to the APR II in this market, in addition to the Omniflex. They are the Howmedica PCA–E, the Zimmer Multilock, and the Depuy A.L. (Defendant's Exh. YC at IOI 077200–03; Plaintiff's Exh. 670 at 5–6). However, none of these three competitors' products contains a modular distal tip or sleeve as featured in the 023 patent, the Omniflex and the APR II. In its analysis of each of these competitors' products, Intermedics describes as a weakness their lack of "modularity other than head options." (Defendant's YC at IOI 077202–03). At the same time, recognition is given to Osteonics's increase in market share resulting from its capitalization of the emerging trend in distal modularity. (Plaintiff's Exh. 670 at 6–7; Defendant's Exh. YC at 077200).

The Court reiterates that the mere existence of a competing device does not necessarily make the device an acceptable substitute. Rather, to be "acceptable," the alternative product must contain the patented product's advantages. *Standard Havens,* 953 F.2d at 1373. Here, the only products containing the advantages of the patented product—namely, preventing distal stem toggling and proximal stress shielding, and allowing the independent sizing of the proximal and distal portions of the prosthesis, through use of a distal tip or sleeve that is integral with the stem—are the products formally accused of infringement. None of the products offered by the defendant as acceptable substitutes contain these advantages.

The defendant's expert Nawrocki did not consider the issue of relieving toggling and stress shielding in his determination as to available acceptable non-infringing implants. Indeed, Nawrocki included the Whiteside device as an available non-infringing hip implant with a modular distal sleeve. However, as discussed in section III.1.B(1), *supra,* Dr. Whiteside testified that he and most of the orthopedic community stopped using his hip implant in 1989 or 1990, before the APR II was launched. (Tr. at 2213–2214 and 3432).

With regard to the defendant's claims concerning the preferences of surgeons purchasing competitive substitutes, the Court has explained in its discussion above regarding the first *Panduit* factor that the APR II was marketed and sold by stressing its distal modularity, a key improvement and feature from the APR I. The marketing emphasis on the APR II modular distal sleeve, the sales figures for the APR II and Omniflex, and the numerous references to the importance of distal modularity as an emerging industry trend, further support the conclusion that purchasers in the marketplace bought the patented product because of its advantages, and, also, that the infringing products were bought on that basis.

The defendant offered a number of witnesses including orthopedic surgeons who favored the use of the APR II, mostly without the sleeve, and Intermedics sales agents, who testified to the same effect. While this evi-

dence is relevant in certain aspects, and has been considered by the Court, it is not controlling on the material issues in this case. The evidence of 1993 preferences by the APR II surgeon customers and by interested Intermedics sales representatives that they "would have" bought the APR II in 1990, even if offered without the infringing modular distal features, is not probative on the issue of acceptable non-infringing substitutes under *Panduit*. *See id.* at 5162 (the date on which the determination of available substitutes must focus is the date of first infringement). Indeed, despite this testimony each of the defendant's surgeon customers also stated that distal modularity was a factor in their decision, as did the Intermedics sales persons.

In addition to the above, further evidence of the absence of acceptable non infringing alternatives is found in the proof of Osteonics's market share. *BIC Leisure*, 1 F.3d at 1219. According to the defendant's estimate, Osteonics's share in the porous stem hip implant market was 11.3% of unit shares, with the Omniflex holding 6% of the market share as compared to 8.2% held by the APR II. (Plaintiff's Exh. 670 at 5, 7).

Accordingly, for all the reasons set forth above the Court finds that the plaintiff established the second *Panduit* factor, namely, that there were no acceptable non-infringing substitutes available at the time of the initial infringement and throughout the period of infringement claimed in this case.

### (3) *Panduit Factor Three:* Osteonics's Manufacturing and Marketing Capacity

 The third *Panduit* factor concerns the manufacturing and marketing capability of the patentee to meet the demand for the patented product. Under this factor, the patentee must show that it had the capacity to meet the demand, as measured by the total sales of the patentee and the infringer. *Datascope*, 879 F.2d at 825.

The Court finds that Osteonics had the capacity to manufacture, market and sell additional Omniflex units equal to the entire volume of the APR II infringing sales. With regard to manufacturing, the defendant's expert Nawrocki conceded that the plaintiff "could have gotten over the hurdle of the manufacturing capability." (Tr. at 3172–3173). Dr. Stewart also agreed that Osteonics had the manufacturing capability to meet the demand (Tr. at 456). Zarnowski, the Osteonics Director of Special Products, testified that by July 7, 1989, Osteonics had rectified a short supply of Omniflex implants, and that during the years 1990 to 1993 Osteonics could have manufactured an additional 20,000 hip implant systems per year. (Tr. at 381). The defendant failed to refute his testimony.

With regard to marketing and sales capacity, Dr. Stewart reviewed the territories covered by the defendant's sales agents, and the relevant records and maps, and concluded that the "Osteonics distributors (sales agents) were covering the same territories that the IOI agents were covering." (Tr. at 457–458; Plaintiff's Exh. 817A). Zarnowski testified that Osteonics had sold an average of 33,000 hip implants each year, and that it had the sales capacity to sell an additional 10,000 implants in 1990. With some extra effort, Zarnowski testified that Osteonics could have sold 15,000 more hip implants that it did each year.

The defendant's contentions that Osteonics did not have the marketing capability to meet the demand, because they did not have the relationship with the surgeons necessary to make the sale, are rejected. The Court finds that, with some effort, the plaintiff could have developed those relationships.

For the reasons stated above, the Court finds that Osteonics had the capacity to manufacture and market the demand for the patented product, as measured by the total sales of the Omniflex and APR II.

### (4) *Panduit Factor Four:* The Amount of Profit Osteonics Would Have Made

 Both Osteonics and Intermedics agree that in determining the amount of Osteonics's lost profits resulting from the infringing sales, an incremental profits calculation is the proper measure of profit loss. (Tr. 3174–75). Incremental profits are the difference between gross revenues resulting from regaining the sales lost due to infringement and the incremental cost of making those sales. This measure of profit loss is

appropriate when the patentee's fixed costs do not rise, or only slightly increase, relative to increases in production. *State Indus.*, 883 F.2d at 1580 (citing *Paper Converting Mach. Co. v. Magna–Graphics Corp.*, 745 F.2d 11, 22 (Fed.Cir.1984)).

Dr. Stewart calculated the plaintiff's incremental lost profits for the period January 1, 1990 until March 31, 1993. His methodology first involved converting sales of the APR II and its components into lost sales of the Omniflex and its components. Dr. Stewart and his staff accomplished this conversion by first reviewing several thousand APR II delivery tickets, representing only "a minority" of the APR II sales (Tr. at 499), from which he excluded illegible items and sales prior to January 1990. Dr. Stewart then computed a ratio of sales of stems to other components sold with the stems, and using actual monthly sales figures of the APR II stem and sleeve for the period, applied the ratio to derive, in his view, an accurate as possible estimate of the actual sales by IOI of the products that were sold with the APR II stems. (Tr. at 499–500). Using data provided by Zarnowski, Dr. Stewart next matched the IOI APR II products with the equivalent Osteonics Omniflex products. (Tr. at 501; Plaintiff's Exh. 709A at 249). With this information, he was then able to convert the infringing APR II sales to lost Omniflex sales of 14,422 stems and sleeves, as well as accompanying femoral and acetabular components (Tr. at 502–03; Plaintiff's Exh. 709A at 36). From the figures of lost sales components, he calculated the dollar amount of the lost sales revenue to be $41,406,484. (Tr. at 506; Plaintiff's Exh. 818B).

Based on IOI's and Osteonics's records, Dr. Stewart included acetabular cup components in his calculations for only 92.4% of the lost Omniflex sales, and modular collar components for only 26% of the lost Omniflex sales.

After calculating the lost revenue, Dr. Stewart next calculated the incremental cost to Osteonics for each of the additional products it would have made with regard to these lost sales. The costs of goods sold was derived from data supplied by Osteonics which actually kept detailed track of the cost of each component manufactured for the given year that was associated with a particular item. (Tr. at 507). These costs are all variable costs that were readily determinable from Osteonics's books and records, such as labor and materials costs. (Tr. at 510–11). Dr. Stewart calculated the incremental cost of goods for each additional component to be $11,102,675. Subtracting the incremental cost of goods from the lost revenue figure of $41,406,484 leaves a gross loss profit figure of $30,303,809. (Plaintiff's Exh. 818B).

Dr. Stewart also subtracted $5,576,112 in costs from the gross loss profit figure which he determined were also variable costs. Dr. Stewart testified that to determine these variable costs, he essentially "went line-by-line through Osteonics's profit and loss statements" with Osteonics's vice-president of finance, and asked " 'would this cost increase if you increased output by the amount equivalent to the lost sales?' " (Tr. at 512). These costs include $3,290,054 in incremental executive compensation, labor premiums and working capital expenses, (Tr. at 512–17), and $2,286,058 in certain common costs to the corporation that are incremental output-sensitive, such as additional employee bonuses and the cost of training additional salespersons. (Tr. at 517–519). Subtracting these additional variable costs from the gross lost profit figure of $30,303,809 results in an incremental lost profit to Osteonics of $24,727,698 before adding interest. Incremental lost profits as a percentage of lost revenue (the "incremental lost profit rate") is thus, according to Dr. Stewart's calculations, 59.7%.

The defendants dispute Dr. Stewart's 59.7% rate, and instead contend that the incremental lost profit rate is only 55.3%. Moreover, according to Nawrocki, Osteonics's incremental lost profits are the sum of $16,214,463. Nawrocki's calculations and data are compiled in Defendant's Exh. AOJ. The disparity between the plaintiff's and the defendant's calculations results from the following differences in methodology: (1) the defendant calculated lost profits beginning in May, 1990 and not January, 1990; (2) the defendant excluded lost sales of Omniflex acetabular components; and (3) the defendant added approximately $5.2 million of ad-

ditional variable costs in the areas of marketing, sales and general administration, which Nawrocki determined based on a regression analysis of the plaintiff's costs.

Upon reviewing the evidence, the Court believes that the defendant has erroneously calculated the plaintiff's incremental lost profits, and, except for the issue of when the damages should begin accruing as discussed below, finds that the plaintiff's calculations are both accurate and reliable.

With regard to the defendant's exclusion of the Omniflex acetabular components, the Court is of the view that these components should be included in the lost sales calculations because they are a functional component of the patented product, and were almost always sold with the Omniflex.

In *Rite Hite*, the Federal Circuit explained that the "entire market value rule," permits recovery of damages based on the value of the patentee's entire apparatus, even if it contains several features, when the patent-related feature is the basis for customer demand. *Id.* at 1548. This rule applies to include compensation for unpatented components of the patented device that, although physically separate from the patented components, are "normally sold with the patented components," and are considered together with the patented components to be "components of a single assembly ... or they together constitute a functional unit." *Id.* at 1550 (citing cases).

As discussed previously, the reason for the growth and demand of Omniflex sales is the Omniflex's modular distal tip, which is the key patented component of the 023 patent. Moreover, as reflected in such documents as the Omniflex surgical protocol (Plaintiff's Exh. 739) and the Omniflex promotional brochure (Plaintiff's Exh. 622D) the acetabular component and the remaining patented components of the Omniflex are considered a single functioning unit.

In addition, the evidence adduced during the trial reveals that the acetabular component, though physically separate from the patented components of the Omniflex, is "normally sold with the patented components." Zarnowski testified that the Omni-

flex acetabular component is sold in 94% of the Omniflex sales. (Tr. at 375). His testimony was not refuted. By comparison, Dr. Stewart calculated that 92.4% of the APR II sales included the acetabular component:

Q Keeping to page 36 of your book [Plaintiff's Exh. 709A], based on the numbers there, can you calculate about how often acetabular components were sold with an APR II stem?

A Yes, sir, I can.

Q And about what percentage of the time based on your analysis, was an acetabular component sold with an APR II stem?

A Based on my analysis of the IOI delivery tickets and the totals that are reflected here, approximately 92.4 percent of the time IOI sold its acetabular components along with its APR II stem.

Q Did you hear the testimony of Mr. Zarnowski today?

A Yes, I did.

Q With respect to the Omniflex system, about 94 percent of the time an acetabular components was sold with an Omniflex stem?

A I do recall his testimony on that subject. Yes, sir.

Q How does that compare with your calculation of the percentage of time the acetabular was sold with an APR II stem?

A Obviously they are quite close.

(Tr. at 503–504).

The defendant contends that the Omniflex acetabular components should be excluded from the damage calculation, because surgeons mix and match Omniflex stems with other manufacturers' acetabular components (called "hybridization"). The evidence refutes this contention and indicates that any such hybridization of Omniflex components is minimal. Dr. Burstein testified that such mixing and matching is uncommon in the industry, and occurs about 10% of the time. (Tr. 268–69). Zarnowski testified that the Omniflex surgical protocol strongly advises against such mixing and matching. (Tr. at 374–75). Further, the two Osteonics documents cited by the defendant to support its claim, Defendant's Exhs. ABT at S/O 2701 and ABU at S/O 2742, are inconclusive. The

documents do not specify which of the several Osteonics hip implants are being mixed and matched, nor to what extent. Indeed, Defendant's Exh. ABU mentions only the Omnifit in its discussion of hybridization of components. Moreover, in the Court's view, Dr. Stewart's accounting for 92.4% of acetabular components in the lost Omniflex unit sales takes into account the hybridization of components.

■ Accordingly, the Court finds that the Omniflex acetabular components should be included in the lost profit calculation, because these components were normally sold with the Omniflex and have a functional relationship to the patented invention. They were not sold as a matter of convenience or business advantage. *Rite–Hite*, 56 F.3d at 1550.

With regard to the defendant's including additional variable costs in the calculation for lost profit, the Court finds that Dr. Stewart's method of a line-by-line review of Osteonics's profit and loss statements to be more accurate than Nawrocki's multi-regression analysis.

The key summaries comprising Nawrocki's lost profits calculations are found in Schedules I–V of the Lost Profits section of the defendant's Summary of Damages Binder (Defendant's Exh. AOJ at IOI 081708–19). Schedule II includes the costs of sales, variable manufacturing costs and incremental variable costs. (Defendant's Exh. AOJ at 081710). According to Nawrocki, Dr. Stewart's method of calculating variable costs by talking with company officials is very subjective (Tr. at 3175). He thought a more objective way of ascertaining variable costs was to conduct a regression analysis, so that the costs' behavior relative to each other over time could be analyzed (Tr. at 3176). Nawrocki admitted that despite the different methods used, he and Dr. Stewart were in agreement in most areas. The "real difference" between their methodologies lay in "the areas of sales, marketing, and general administrative expenses." (Tr. at 3176). Based on the regression analysis, Mr. Nawrocki added an additional $5,202,440 in incremental operating costs to account for increased costs in marketing, sales, general

administration and research and development. (Defendant's Exh. AOJ at 081711).

Dr. Stewart reviewed Nawrocki's analysis, and testified that it was an inappropriate methodology for determining variable costs in this case because (i) regression analysis does not measure causality but only correlation of movement, and therefore includes the risk of false or "nonsense correlations," (Tr. at 538–39) and (ii) there is evidence that Nawrocki omitted a variable in his analysis which may have led him to falsely conclude there was a correlation. (Tr. at 541). According to Dr. Stewart, when the corporate books and records are available, there is direct evidence of varying costs and his line by line search for variable costs is more appropriate than Nawrocki's regression analysis.

The Court finds that Dr. Stewart's method is a more accurate measure of ascertaining variable costs, because it involves an item by item review of Osteonics's profit and loss statements, and does not have a risk of nonsense correlation. Moreover, to the extent his calculations may raise doubts concerning the accuracy of his accounting method, the Court resolves them against Intermedics, the infringer. *Kaufman*, 926 F.2d at 1141.

■ With regard to the issue of the time period for calculating the lost profits, the defendant contends that Osteonics's lost profits should be calculated starting from May, 1990, which is the time that Intermedics received notice from Osteonics that it was infringing the 023 patent. Osteonics contends, on the other hand, that its lost profits should be calculated starting from January, 1990, which is the time that Osteonics began distributing Omniflex product literature nationwide containing the patent marking.

Section 287(a) of the patent statute provides that a patentee cannot recover damages until it has properly marked its product as patented, or if it fails to mark the product, until it gives notice of infringement to the infringer. Although recently amended, the relevant portion of the statute in effect during early 1990 has not been changed.

It reads as follows:

Patentees, and persons making or selling any patented article for or under them, may give notice to the public that the same is patented, either by fixing thereon the word "patent" or the abbreviation "pat", together with the number of the patent, *or when, from the character of the article, this can not be done, by fixing to it, or to the package wherein one or more of them is contained, a label containing a like notice.* In the event of failure so to mark, no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice.

35 U.S.C.A. § 287(a) (West Supp.1995). *See Am. Medical Sys.,* 6 F.3d at 1537, ("[W]e construe section 287(a) to preclude recovery of damages only for infringement for any time prior to compliance with the marking or actual notice requirements of the statute."). The purpose of the marking provisions is to provide *in rem* notice to the world and public of the patent's existence. *Id.* at 1537, 1538.

Osteonics contends that it was not medically feasible to mark the 023 patent number on the Omniflex components, because etching and engraving on the implant would have a "deleterious effect" on the implant's performance. (Tr. at 391). Instead, in accordance with what it describes as "accepted practice in the orthopedic implant industry," Plaintiff's Post–Trial Brief at 23, Osteonics claims that it met the marking requirement of the statute by displaying the 023 patent mark in nationally distributed Omniflex literature beginning in January, 1990, around the time of the nationwide commercial launch of the APR II. In this way Osteonics contends, notice was given to the "interested public" of the patent.

The Court disagrees with the plaintiff's contention that by distributing literature containing the patent mark it met the statute's marking requirement. In the Court's view, the evidence in this case indicates that the plaintiff failed to properly meet the statute's marking provisions.

Osteonics's Zarnowski was the only witness to testify on the issue of marking the patent. He testified that implant manufacturers do not place the patent markings on their devices. When asked how Osteonics marked its patents, he testified as follows:

Q Now, *does Osteonics place a patent notice or marking on the packaging for the product?*

A It's Osteonics's general practice to identify its patents *in its product literature.*

Q And have you placed the patent markings on your product literature?

A In general, yes.

(Tr. at 391) (emphasis supplied). Zarnowski then testified that the exhibits referenced in Plaintiff's Exh. 1023 were all examples of Osteonics's Omniflex literature identifying the patent marking. (Tr. at 393–93).

The only reference appearing on Plaintiff's Exh. 1023, that is after the date the 023 patent was issued, is Plaintiff's Exh. 751, a brochure describing the Omniflex. Towards the end of the trial, Zarnowski testified that Plaintiff's Exh. 751 was Osteonics "first public notification of the actual patent number." (Tr. at 3866). He then described the brochure's distribution as follows:

Q What individuals or entities were brochures like Plaintiff's Exhibit 751 made available to?

A These would have been freely distributed to surgeons, nurses, hospital personnel, anyone that asked for them.

(Tr. at 3866). Zarnowski then testified that the brochure was first made available in February, 1990. He corroborated the distribution date by, among other things, showing that a purchase requisition dated January 18, 1990, indicates that 7500 of the brochures were sent to a vendor for distribution. (*See* Plaintiff's Exh. 757; Tr. at 3866–68).

That is the extent of the evidence on marking the 023 patent. Significantly, it does not show that a label containing the patent mark was fixed to the Omniflex package wherein one or more of the devices were contained for distribution, as the statute requires. Nor was there any evidence offered at the trial by the plaintiff that Plaintiff's Exh. 751 or the

other literature containing the patent marking was placed *in the packaging* of the Omniflex that was distributed to vendors and end-users. *See Calmar, Inc. v. Emson Research, Inc.,* 850 F.Supp. 861, 867, 868 (C.D.Cal.1994) (indicating that placing literature referring to the patent mark in the package containing the patented product may be sufficient to meet the statute's marking requirements).

Instead, the evidence shows that the patent mark was put in literature describing the Omniflex, which was then freely distributed to surgeons, nurses, hospital personnel, and anyone that asked for them, *separately from* the Omniflex devices themselves. This type of constructive notice is insufficient under the statute, as a matter of law. In the Court's view it is a variance of marking without distribution, a practice which the Federal Circuit has disapproved. *Am. Medical Sys.,* 6 F.3d at 1538. If the Court were to follow the plaintiff's reasoning, then a patent owner could place an advertisement of the patented product in the newspaper or a trade journal which refers to the patent mark, and thereby meet the marking requirements of the statute without having to mark the product's packaging. This is a result the statute does not envision.

The Court finds that the plaintiff has failed to meet the marking requirement of section 287(a). Under the statute, Osteonics is precluded from recovering damages prior to the date that Intermedics, the infringer, "was notified of the infringement." *Amsted Indus.,* 24 F.3d at 185. According to the Federal Circuit, proper notice under section 287(a) must be "an affirmative act on the part of the patentee which informs the defendant of his infringement." *Id.* at 187. "For the purposes of section 287(a), notice must be of 'the infringement,' not merely notice of the patent's existence or ownership. Actual notice requires the affirmative communication of a specific charge of infringement by a specific accused product or device." *Id.*

Thus, proper notice in this case under section 287(a) for the purpose of recovering damages, was given to Intermedics by Paulson's letter of April 26, 1990, which informed Cindrich, Intermedics's president, of the defendant's infringement of the 023 patent by selling the APR II. To the extent that Osteonics contends that notice under section 287(a) was given to Intermedics in January, 1990, when Merkling first became aware of the 023 patent, the contention is rejected as such notice would have been insufficient as a matter of law.

Accordingly, the Court finds that Osteonics's lost profit damages must be calculated beginning in May, 1990 and not January, 1990. Dr. Stewart has tabulated Osteonics's lost profits on a month-by-month basis. *See* Plaintiff's Exh. 709A at 294–95, and compare to Plaintiff's Exh. 818B. Osteonics's incremental lost profits for the months January, 1990 to April, 1990 total $1,306,622. Subtracting this figure from the $24,727,698 total incremental lost profit figure results in an incremental lost profit figure of $23,421,076. In the Court's view, this figure was proven accurately and reliably by the plaintiff.

### C. Conclusion and Findings on Lost Profits.

Based on the above, the Court concludes that the plaintiff has met its burden of showing a reasonable probability that "but for" the infringement, it would have made the sales that were made by Osteonics. The plaintiff proved its lost profits damages by a preponderance of the evidence. Osteonics has satisfied all four of the *Panduit* factors. The satisfaction of all four factors "compels us to find that it is reasonable to infer that the patentee probably would have made the sale but for the infringing sale." *Kaufman,* 926 F.2d at 1141. In addition, the same inference may be made because Osteonics, Intermedics and the other accused infringers are the only suppliers of the patented product in the market. *Id.; Del Mar,* 836 F.2d at 1327. Consequently, as the Federal Circuit has explained, "when the fact situation compels the reasonableness of the inference via both courses, the inference approaches conclusiveness." *Kaufman,* 926 F.2d at 1141.

Except for the issue of the actual date of Osteonics's damages, Intermedics did not show the unreasonableness of Osteonics's lost sales or profits. Rather, on the totality of the evidence, Osteonics proved $23,421,076 in lost incremental profits.

The conclusions stated above are based on the following findings:

### A. *Panduit Factor 1.*

1. The Court finds that the patented product, as reflected in its commercial embodiment the Omniflex hip implant, and the infringing device, the APR II, are sufficiently similar to directly compete in the same market for the same customers.

2. The Court finds that demand for the Omniflex and APR II was driven by the modular distal tip or sleeve feature of the devices.

3. The Court finds overwhelming evidence of demand for the patented product in (i) the increases in sales and sales volume of the patented product during the relevant years, (ii) the comparison of demand for the Omniflex relative to its predecessor the Omnifit, and for the APR II relative to the APR I, which show demand rising for the patented product relative to the predecessors, and (iii) the industry and the defendant's documents recognizing the increased demand for the patented product.

4. The Court finds that Intermedics's contention, that the plaintiff has not shown that the APR II was selected by surgeons because of its sleeve option, is belied by the defendant's own marketing and sales strategy which emphasize selling the APR II as one unit, including the sleeve.

### B. *Panduit Factor 2.*

1. The Court finds that the accused APR II, the Howmedica Precision Osteolock Hip System, the Smith & Nephew Richards Modular Hip System and the Endotec Buechel–Pappas Femoral Stem System are the only products on the market which feature the patented product, namely a stem type porous femoral prosthesis with a metal modular distal tip or sleeve that is capable of being integrally locked on to the distal portion of the stem. All four of these products have been formally accused of infringement by Osteonics in pending law suits, and, accordingly, the Court also finds that there are no acceptable *noninfringing* substitutes for the patented device.

2. The Court finds that the defendant's contention, that there are numerous acceptable noninfringing substitutes available in the market, is contradicted by the defendant's own documents and marketing forecasts. These documents and forecasts reveal that in the relevant market—the porous, high priced state-of-the-art hip implant market,—Intermedics has identified only three primary competitors to the APR II, besides the Omniflex: the Howmedica PCA–E, the Zimmer Multilock, and the Depuy AML. However, the Court finds that these three products are not acceptable alternatives, because they do not contain a modular distal tip or sleeve as featured in the 023 patent, the Omniflex and the APR II, and thus do not contain the patent's advantages.

3. The Court finds that the evidence of 1993 preferences by the APR II surgeon customers and by interested Intermedics sales representatives that they "would have" bought the APR II in 1990, even if offered without the infringing modular distal features, is not probative on the issue of acceptable non-infringing substitutes.

4. The Court finds that there is further proof of the absence of acceptable non infringing alternatives in the evidence of Osteonics's market share.

### C. *Panduit Factor 3.*

1. The Court finds that Osteonics had the capacity to manufacture, market and sell additional Omniflex units equal to the entire volume of the APR II infringing sales.

### D. *Panduit Factor 4.*

1. The Court finds that Osteonics's lost incremental profits is in the amount of $23,421,076.

2. The Court finds that the Omniflex acetabular components should be included in the lost sales calculations because they are a functional component of the patented product, and were normally sold with the Omniflex. The Court finds that the evidence indicates of hybridization of Omniflex components is minimal, and does not

warrant excluding the acetabular components from the sales calculations.

3. The Court finds that Dr. Stewart's method of a line-by-line review of Osteonics's profit and loss statements is a more accurate measure for determining which costs are variable than Nawrocki's multi-regression analysis, because Dr. Stewart's method involves item by item review of Osteonics's books and records, and does not have a risk of nonsense correlation.

4. The Court finds that the plaintiff has failed to meet the marking requirement of section 287(a) of the patent statute, and that Osteonics's lost profit damages must be calculated beginning in May, 1990 and not January, 1990. The Court finds that the evidence does not show that a label containing the patent mark was fixed to the Omniflex package wherein one or more of the devices were contained for distribution, as the statute requires, nor was there any evidence offered at trial by the plaintiff that literature containing the patent marking was placed in the packaging of the Omniflex that was distributed to vendors and end-users. Instead, the Court finds that the evidence shows that the patent mark was put in literature describing the Omniflex, which was then freely distributed to surgeons, nurses, hospital personnel, and anyone that asked for them, separately from the Omniflex devices themselves. This type of constructive notice is insufficient under the statute.

5. The Court finds that proper notice in this case under section 287(a) for the purpose of recovering damages, was given to Intermedics by Mr. Paulson's letter of April 26, 1990, which informed Mr. Cindrich, Intermedics's president, of Intermedics's infringement of the 023 patent by selling the APR II.

## 2. Reasonable Royalty

As explained above, when actual lost profits resulting from infringement cannot be determined, the court will award damages on the basis of a reasonable royalty. *See Rite-Hite,* 56 F.3d at 1554; *Kearns,* 32 F.3d at 1549. Under the statute, a "reasonable royalty" is the floor below which a damage award may not fall. *Rite–Hite,* 56 F.3d at 1554.

In this case, there is no established royalty rate because the plaintiff has never licensed its patent. (Tr. at 385, 3447). The plaintiff contends that a reasonable royalty is 19% of Intermedics's gross sales revenue for the entire APR II—sleeve, stem and acetabular component—through March, 1993. Adding interest through July, 1993, the plaintiff calculates its reasonable royalty damages to be $8,229,226. (Plaintiff's Exh. 940A). On the other hand, the defendant contends that a reasonable royalty is 5% of Intermedics's APR II stem sales from May, 1990 until March, 1993 which only included a sleeve component as part of the sale. The defendant calculates the reasonable royalty to be approximately $518,000.

■ The Court has held that the plaintiff was able to accurately calculate its lost profits. As a result, the Court need not conduct an analysis of the 15 factors set forth in *Georgia–Pacific Corp. v. United States Plywood Corp.,* 318 F.Supp. 1116, 1120 (S.D.N.Y. 1970), *modified and aff'd,* 446 F.2d 295 (2d Cir.), *cert. denied,* 404 U.S. 870, 92 S.Ct. 105, 30 L.Ed.2d 114 (1971), to determine a reasonable royalty. The figures proffered by the parties—approximately $8.2 million by the plaintiff and $518,000 by the defendant—are well below the $23,421,076 figure calculated as actual lost incremental profits.

## 3. Prejudgment Interest

■ Prejudgment interest under section 284 of the patent statute is ordinarily awarded in order to adequately compensate the patent owner for the infringement. *General Motors Corp. v. Devex Corp.,* 461 U.S. 648, 654–55, 103 S.Ct. 2058, 2062, 76 L.Ed.2d 211 (1983). The award of interest reflects the compensation to the patentee for the money foregone due to the infringement from the time of infringement to the entry of judgment. *Id.* at 655–56, 103 S.Ct. at 2062–63.

The trial court is "afforded wide latitude in the selection of interest rates, and may award interest at or above the prime rate." *Uniroyal, Inc. v. Rudkin–Wiley Corp.,* 939 F.2d 1540, 1545 (Fed.Cir.1991) (citing cases).

Moreover, whether to award simple or compound interest is also left to the Court's discretion. *Rite–Hite,* 56 F.3d at 1555–56.

■ The plaintiff in this case calculated the prejudgment interest on a compounded basis using the prime rate. The defendant contends the 3 month Treasury–Bill Rate is more appropriate. According to the plaintiff, use of the prime rate is appropriate because that rate (i) more accurately reflects the costs of the plaintiff's borrowing during the time of infringement than the 3 month Treasury Bill rate, and (ii) compares closely with the plaintiff's rate of returns on investment. (Tr. at 522–24).

The Court agrees with the plaintiff. The 3 month Treasury Bill rate is the cost of raising funds by the Government. (Tr. at 526). Corporations are more likely to borrow at the prime rate (Tr. at 523). Thus, in the Court's view the prime rate is more reflective of Osteonics's cost of funds than the 3 month Treasury Rate. *See, e.g., Mars, Inc. v. Conlux U.S.A. Corp.,* 818 F.Supp. 707, 720–21 (D.Del) (awarding prejudgment interest based on the prime rate rather than the Treasury Bill rate, because the cost of borrowing money—and not the rate of return on investing money—provides a better measure of the harm suffered as a result of the loss of the use of money over the time of infringement), *aff'd without opinion,* 16 F.3d 421 (Fed.Cir.1993).

■ The Court also believes that the prejudgment interest awarded to Osteonics should be compounded, because the incremental profits Osteonics would have earned on the lost sales over the infringement period would have been invested in a manner resulting in yearly accrued growth. In addition, although not dispositive in and of itself of the issue of compounding interest, the Court notes that Intermedics's infringement was willful.

Dr. Stewart added $2,938,974 in prejudgment interest on the plaintiff's incremental lost profits $24,727,698, for a total of $27,666,671 in incremental lost profit plus interest for the period January 1, 1990 through July 15, 1993. (Plaintiff's Exh. 818B). However, as discussed in the previous section on lost profits, the plaintiff's damages accrued from May, 1990. Thus, the amount of prejudgment interest from January, 1990 through April, 1990 must be subtracted from the plaintiff's calculations. Dr. Stewart delineated the plaintiff's incremental lost profits plus interest on a month by month basis. (See Plaintiff's Exh. 709A at 303 and compare to Plaintiff's Exh. 818B). The amount of incremental lost profits plus interest for the four month period amounts to $1,317,687. Subtracting this amount from the originally calculated total incremental lost profit plus interest figure of $27,666,671 results in a revised total incremental lost profit plus interest of $26,348,984. This is the amount of the damage award to the plaintiff for lost profits plus interest based on the defendant infringer's sales of the APR II.

## 4. Enhancement of Damages and Attorneys' Fees

### A. *Enhancement of Damage Award*

Section 284 of the patent statute provides that damages may be enhanced up to three times the compensatory award. Such an enhancement is appropriate where "the infringer acted in wanton disregard of the patentee's patent rights, that is, where the infringement was willful." *Read Corp.,* 970 F.2d at 826; *see also Electro Medical,* 34 F.3d at 1056. However, "a finding of willful infringement does not mandate that damages be enhanced, much less mandate treble damages." *Read Corp.,* 970 F.2d at 826. Thus, the Court's finding that Intermedics's willfully infringed claims 8, 10 and 12 of the 023 patent, *see* section IV, *supra,* is a necessary but insufficient basis for enhancing the damage award in this case.

■ As explained by the Federal Circuit, the paramount determination in deciding to grant enhancement and the amount thereof is the egregiousness of the defendant's conduct based on all the facts and circumstances. The court must consider factors that render defendant's conduct more culpable, as well as factors that are mitigating or ameliorating.

*Read Corp.,* 970 F.2d at 826 (citing cases). To help the trial court in determining wheth-

er to enhance the damage award, the *Read* court listed a number of factors the court was to consider. These factors include: (1) whether the infringer deliberately copied the ideas or design of another; (2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed; (3) the infringer's behavior as a party to the litigation; (4) the defendant's size and financial condition; (5) closeness of the case; (6) the duration of the defendant's misconduct; (7) remedial action by the defendant; (8) the defendant's motivation for harm; and (9) whether defendant attempted to conceal its misconduct. *Id.* at 826–27; *see also Amsted Indus.,* 24 F.3d at 183.

Moreover, to enable appellate review, the district court "is obligated to explain the basis for the [enhanced] award, particularly where the maximum amount is imposed." *Read Corp.,* 970 F.2d at 828.

■ Based on a review of the evidence in this case, the findings and conclusions previously made and set forth in this Opinion, and the totality of the circumstances, the Court concludes that a doubling of the damage award to Osteonics is appropriate in this case. The Court's reasons for doubling the award are as follows, paralleling the factors set forth in *Read Corp.*

First, Intermedics willfully and deliberately copied the 023 patent.

Second, the defendant had actual notice of the plaintiff's patent as of January 5, 1990, prior to proceeding with the national launch of the APR II. At that time it ignored its own counsel's requests for a search of similar technology, and did not seek competent legal advice from counsel until after it was notified of its infringement by Mr. Paulson on April 26, 1990.

These two reasons strongly support enhancing the damage award by the maximum amount, as they are indicative of, in the Court's view, egregious conduct and bad faith on the part of Intermedics by proceeding with the infringement despite being aware of patent related problems. In addition, the Court notes that the defendant continues to infringe on the 023 patent by selling the APR II, and has not taken any remedial action to stop the infringement pending the litigation.

However, the Court also notes that other factors militate against enhancement of the damages. These include Intermedics's behavior during the course of this litigation. Except for one instance during the trial, where sanctions were imposed on the defendant for failing to concede the admissibility of its own document admitting to the flexibility of the APR II (Tr. at 279–80), the Court finds the defendant and its counsel were highly professional, and contributed to the efficient and relatively speedy disposition of the matters at issue. Moreover, the defendant did not attempt in any way to conceal its misconduct. In addition, the Court finds that the defendant's motivation to infringe was not pernicious, but was due to competitive reasons, namely the commercial failure of the APR I and Intermedics's need to recapture its market share in the hip implant industry. Finally, although the Court believes that this case is not a close one, it nevertheless is of the opinion that it neither is a clear cut case and that most of the defenses raised by the defendant had some apparent merit.

Accordingly, the Court finds that the defendant's conduct was egregious, and entailed sufficient culpability to warrant doubling of the damage award. Thus the $26,-348,984 damage award to Osteonics is enhanced to double that amount, namely the sum of $52,697,968.

B. *Attorneys' Fees*

■ Section 285 of the Patent Statute authorizes the Court "in exceptional cases" to award "reasonable attorney fees" to the prevailing party. Whether a case is "exceptional" is a determination of fact, and the awarding of attorneys' fees in such cases is left to the court's discretion. 35 U.S.C. § 285 (1988). *Molins,* 48 F.3d at 1186; *Amsted Indus.,* 24 F.3d at 184. An express finding of willful infringement is a sufficient basis for classifying a case as exceptional. *Id.* (citing *Modine Mfg. Co. v. Allen Group Inc.,* 917 F.2d 538, 543 (Fed.Cir.1990)).

■ For the reasons stated above in discussing enhancement of the damage award, the Court finds that Osteonics's met its burden of proving by clear and convincing evidence that this case is exceptional. *BIC Leisure,* 1 F.3d at 1222. Intermedics's deliberate copying of the patent and its failure to obtain a competent opinion of counsel at the time it first had knowledge of the 023 patent—despite the admonitions of its managerial personnel—are a clear, sufficient basis to grant Osteonics an award of attorneys' fees.

Accordingly, the Court will grant Osteonics's request for reasonable attorneys' fees under 35 U.S.C. § 285.

### 5. *Injunctive Relief*

The Court has determined that the 023 patent is valid and enforceable, and that it was infringed. By the provisions of 35 U.S.C. § 283, the plaintiff is entitled to a permanent injunction against defendant's future manufacture, use, or sale of the infringer APR II and APR II–T products. *Polaroid Corp. v. Eastman Kodak Co.,* 789 F.2d 1556, 1557 (Fed.Cir.), *cert. denied,* 479 U.S. 850, 107 S.Ct. 178, 93 L.Ed.2d 114 (1986).

### VI. CONCLUSION

In conclusion, the Court finds that the plaintiff has met its burden and proved that claims 8, 10 and 12 of the 023 patent were literally and willfully infringed by the defendants Intermedics and Marli. In addition, the Court finds that the reverse doctrine of equivalents is inapplicable here, because the APR II does not function in a substantially different way from the 023 patent. The Court further finds that the 023 patent is valid and enforceable.

The plaintiff has proven its lost profits, and accordingly is entitled to lost incremental profits for the period May 1, 1990 to March 31, 1993 in the sum of $23,421,076, together with prejudgment interest at the prime rate for the period May 1, 1990 until July 15, 1993 in the sum of $2,927,908, for a total damage award of $26,348,984. Moreover, the plaintiff Osteonics is entitled to an enhancement of its damage award by doubling the amount of the award, resulting in total damages of $52,697,968. Finally, Osteonics is entitled to an award of reasonable attorney's fees, and permanent injunctive relief against further infringement.

The plaintiff Osteonics is directed to submit a proposed judgment and affidavits related to its request for reasonable attorney's fees and injunctive relief within fifteen days from the date of this opinion, and the defendant Intermedics shall submit any objections to the proposed judgment, the injunctive relief and/or Osteonics's request for attorney's fees within twenty days after receipt of Osteonics submissions. The plaintiff's request for attorney's fees, injunctive relief and its proposed judgment are set down for oral argument before the Court on Friday, September 2, 1995 at 9:30 a.m.

**SO ORDERED.**

APPENDIX A

**U.S. Patent** Dec. 19, 1989 **4,888,023**

FIG. 1

FIG. 2

FIG. 3

FIG. 4

FIG. 5

## APPENDIX B

# Omniflex Embodiment of the '023 Patent

Stem-Type Femoral Prosthesis

Proximal End of Femur

Proximal End of Stem

Affixation Surface

Femur

Distal End of Stem

Femur

APPENDIX C

Stem-Type
Femoral
Prosthesis

Proximal End
of Femur

Proximal
End of Stem

Affixation
Surface

Femur

Distal End
of Stem

Femur